08/07/2017 8:26 PM   □ 22

1021 104

# APPLICATION FOR CORRECTION OF MILITARY RECORD
## UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552
(Please read instructions on reverse side BEFORE completing this application.)

OMB No. 0704-0003

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services Directorate, Information Management Division, 1155 Defense Pentagon, Washington, DC 20301-1155 (0704-0003). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

### PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**ROUTINE USE(S):** None.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

**1. APPLICANT DATA** (The person whose record you are requesting to be corrected.)

| a. BRANCH OF SERVICE (X one) | ARMY | X NAVY | AIR FORCE | MARINE CORPS | COAST GUARD |
|---|---|---|---|---|---|

| b. NAME (Print - Last, First, Middle Initial) | c. PRESENT OR LAST PAY GRADE | d. SERVICE NUMBER (If applicable) | e. SSN |
|---|---|---|---|
| Bergstrom, Edward W. | | 81765 | |

| 2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES (Active Duty, Reserve, National Guard, Retired, Discharged, Deceased) | 3. TYPE OF DISCHARGE (If by court-martial, state the type of court.) | 4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY (YYYYMMDD) |
|---|---|---|
| Deceased | Honorable | 19650705 |

**5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED:** (Entry required)

Award Navy Cross decoration per P15 Serial 0266 dated 19 July 1942. Amend award narrative to include Deck Log and War Diaries showing LT Bergstrom attacked a Japanese sub hunting the USS U.S. Grant on 17 June 1942, saving the ship, men, & cargo.

**6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS:** (Entry required)

Navy Cross rec. letter was not submitted to the awards branch correctly in 1942. By error, he was rec. for the DFX but received AM, later wrongly upgraded to the DFX based on errors. The correct original Navy Cross should be awarded as rec. in '42. Further, new evidence shows he saved the USS U.S. Grant and passengers from a Japanese sub attack, and that should be referenced.

**7. ORGANIZATION AND APPROXIMATE DATE (YYYYMMDD) AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED** (Entry required)  Many confusing errors and unjust decisions in 1942 x2, 1943, 1946, 2003, 2010 x2, and 2015.

**8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE**

| a. DATE OF DISCOVERY (YYYYMMDD) | b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION. |
|---|---|
| 20011201 | Based on past Boards not conducting correct/fair reviews and based on fact and law 10 USC 1130(c) and 10 USC 1552 and new legal/fact analysis, & evidence including saving USS U.S. Grant from sub. |

**9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS:** (If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)

Please see attached cover letter and supporting documentation, including thorough new legal/fact analysis and evidence previously not submitted or understood or reviewed by the Boards. All prior decisions demonstrate total lack of understanding of key facts.

| 10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. (At no expense to the Government) (X one) | YES. THE BOARD WILL DETERMINE IF WARRANTED. | X NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE. |
|---|---|---|

| 11.a. COUNSEL (If any) NAME (Last, First, Middle Initial) and ADDRESS (Include ZIP Code) | b. TELEPHONE (Include Area Code) 253-642-7447 |
|---|---|
| Law Firm of Ryan Sweet, PLLC | c. E-MAIL ADDRESS  rsweetlaw@gmail.com |
| PO Box 4784 | |
| Spanaway, WA 98387 | d. FAX NUMBER (Include Area Code) XXX |

**12. APPLICANT MUST SIGN IN ITEM 15 BELOW. If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name** (print) Robert W. Bergstrom **and relationship by marking one box below.** son

| SPOUSE | WIDOW | WIDOWER | NEXT OF KIN | LEGAL REPRESENTATIVE | X OTHER (Specify) |
|---|---|---|---|---|---|

| 13.a. COMPLETE CURRENT ADDRESS (Include ZIP Code) OF APPLICANT OR PERSON IN ITEM 12 ABOVE (Forward notification of all changes of address.) | b. TELEPHONE (Include Area Code) |
|---|---|
| Vancouver, WA 98685 | c. E-MAIL ADDRESS  @comcast.net |
| | d. FAX NUMBER (Include Area Code) |

**14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM.** (U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)

CASE NUMBER (Do not write in this space.)  AUG 0 8 2017  BY:

| 15. SIGNATURE (Applicant must sign here) | 16. DATE SIGNED (YYYYMMDD)  20170509 |
|---|---|

**DD FORM 149, JUN 2010**     PREVIOUS EDITION IS OBSOLETE.     Adobe Designer 8.0



# Law Firm of Ryan Sweet, PLLC

LAW FIRM OF RYAN SWEET, PLLC
253-642-7447
www.rsweetlaw.com

10 May 2017

Department of the Navy
Secretary of the Navy and Navy Council of Review Boards
Navy Department Board of Decorations and Medals
720 Kennon Street, SE Suite 309
Washington DC, 20374-5023

FOR THE Secretary of the Navy and President and Members of the Awards Review Boards

Subject: Posthumous ORIGINAL Navy Cross Recognition for Navy Captain Edward W.
Bergstrom, xxx-xx- █████

Dear Sir or Ma'am

    I'm an attorney, former U.S. Army Judge Advocate, and now counsel representing the
Bergstrom family in their pursuit to get correct and equitable original (posthumous) recognition
for Navy Captain Edward W. Bergstrom, who was a World War II Patrol Plane Commander
(PPC) with VP-42 (PBY flying boat squadron) in the Aleutians (and other campaigns). New
analysis and new video evidence is provided herein. This is not a request for an upgrade, but
instead to correct an error for a substitute correct award in lieu of the incorrect submission,
award, and injustice, pursuant to 10 USC §1130(c) and 10 USC §1552. In 1942 and thereafter,
several material errors were made (and compounded) in his combat award submission and
review, and we respectfully request a fresh look at this case to correct the errors, with the goal of
posthumously securing Captain Bergstrom the appropriate and equitable award. The starting
point of the analysis is that in 1942 LT Bergstrom earned the Navy Cross, was recommended for
the Navy Cross and, absent the errors, should have received the Navy Cross. Instead, repeated
errors have prevented this. This has been incorrectly reviewed previously by the NDRB,
NDBDM, and BCNR, and to our disappointment in each instance these Boards failed to
understand what happened, provided demonstrably incorrect analysis, and the wrong conclusions
have been reached because of the lack of understanding of the errors. Enclosed is a detailed
explanation of those errors which should correct the long-term mistakes leading to an injustice.
These are mistakes that must be corrected. We ask that all those concerned start from the
beginning and process the award as intended and recommended – the Navy Cross. As new
evidence and argument we present many issues, including the Deck Logs and War Diary entries
demonstrate that Lieutenant Bergstrom clearly attacked and deterred a Japanese submarine
hunting the *USS U.S. Grant* on 17 June 1942, preventing its attack and saving up to 1,200
Americans and a valuable ship. The original 1942 Navy Cross recommendation which has never
been correctly filed and clearly never correctly referenced or understood at any time nor given
appropriate review and weight. The original Navy Cross narrative should be amended to include
this heroic act on 17 June '42. Our request is not an "upgrade" but instead a request for a
correction of the original record by correctly filing and awarding the earned Navy Cross. Please
also see video documentary evidence of the relevant PBY combat on Kiska. (Enc 1)

CAR000002

Subject: Posthumous ORIGINAL Navy Cross Recognition for Navy Captain Edward W. Bergstrom, xxx-xx-2558

In July 2003 (and 2004), in an incorrect factually and legally wrong decision, the Navy denied an "*upgrade*" award, stating in a letter, "*After carefully considering the request... no upgrade to the previously approved Distinguished Flying Cross is approved.... This case has been reviewed on several occasions.... Distinguished Flying Cross was determined to be the appropriate award for his actions when compared to similar actions.*" This was incorrect in the many ways, explained herein in detail never before reviewed or understood. It's overwhelmingly clear that this case was not carefully considered, and all reviews were based on incorrect understandings and assumptions. The Distinguished Flying Cross was not the appropriate award and only an upgrade from a wrongly awarded Air Medal which itself was based on error, and his peers universally originally received the Navy Cross. It's clear that key facts were not understood in 1942, 1943, 1946, and again in 2003. Finally, we are not requesting an upgrade but instead the original recommendation for the Navy Cross be honored. (Enc 1-4)

In February 2010 the Navy Department Board of Decorations and Medals (NDBDM) wrongly denied appropriate relief to "*upgrade*" to a Navy Cross, stating it "*gave the case fresh review*" and that "*no material error or injustice was done...*". These statements are again incorrect and entirely unsupported by its analysis and conclusion, and demonstrate a complete lack of understanding of the issue. The NDBDM stated that, "*It is apparent from our review that a fully functioning awards system was in place... some pilots received the Navy Cross while others received lower awards... in the absence of such records, we must presume regularity.*" This analysis alone demonstrates the NDBDM failed to understand that in spite of a fully functioning system, there was human error that caused the incorrect award submission, perpetuating this chain of errors, which began in 1942. Next the NDBDM fixated on the language in the narration which has little bearing on the criteria for the award (that language of "hits" was vague at the time given the fog cover and inability to determine "hits" with precision, and historical records show that none of those PBY pilots made "hits" so claims of hits is error).

Finally, the NDBDM correctly stated that, "*Commanders at the time were charged by the Secretary of Navy with determining what level of award was appropriate to recognize deserving sailors and officers. It is not the place of the NDBDM to substitute current judgment for the Commanders at the time.*" We agree and appreciate it is not the place of the NDBDM to substitute current judgment for the Commanders at the time. **This is precisely why Captain Bergstrom should be awarded the Navy Cross – the original recommendation of his Wing Commander Captain Gehres on 19 July 1942 was for the Navy Cross and absent the errors it certainly would have been awarded.** His Wing Commander was the best suited individual to make that recommendation, as LT Bergstrom's actions then were as-or-more heroic than every other Navy Cross recipient in that action. No other individuals (then or now) are better equipped to judge his heroic conduct than his Wing Commander Captain Gehres in July 1942. This Board should honor the original recommendation, and not the opinions of strangers reading reports months, years, or decades later. It is squarely in the interest of justice, consistency, and fairness that the original recommended award be issued. The NDBDM was correct in assessing that current views should not substitute views at the time, and the award should have been made on the merits, in 1942. It's overwhelmingly clear that sole reason it wasn't awarded was due to repeated Navy personnel errors. (Enc 1-3, 5)

In June 2010, the Board of Correction of Navy Records also denied appropriate relief, citing "*You are entitled to have the Board reconsider its decision upon submission of new and*

2 | P a g e

CAR000003

Subject: Posthumous ORIGINAL Navy Cross Recognition for Navy Captain Edward W. Bergstrom, xxx-xx-2558

*material evidence or other matter not previously considered by the Board. It is important to keep in mind that a presumption of regularity attaches to all official records… the burden is on the applicant to demonstrate the existence of probable material error or injustice.*" In doing so, the BCNR obviously communicated with the NDBDM to come to the same mistaken conclusions based on a faulty understanding and lack of awareness of the issues and mistakes. It's overwhelmingly clear that the original recommendation from 1942 was never reviewed and/or never considered by any review Board, so it meets any criteria required. We do request the BDNR, and all other concerned Boards, take a serious examination of the error in 1942 and thereafter, and correct the error and injustice. (Enc 1-3, 6)

It is impossible or unreasonable to review the record and come to the analysis and overall conclusions cited by the various Boards. Of course there were repeated detrimental material errors if the original award recommendation was never submitted. And of course this all resulted in a significant injustice. The request is not an "upgrade" request, an ongoing confusion which warrants clarification; it is a request to correct the errors and award the original award recommended. There can be no '*presumption of regularity*' when there was clear and convincing material error in 1942 (submission of incorrect lower award), 1942 (arbitrary downgrading of the incorrectly submitted incorrect lower award), and again in 1946 (failure to identify the incorrectly submitted or downgraded award, resulting in no relief based upon faulty information). It's impossible to say these errors were not made, not material, not detrimental, and not an injustice. Herein the Board will see the new information and analysis and have the opportunity to do the right thing and correct this error and injustice.

Again in 2015, these demonstrable fundamental errors plaguing this request were on display in the Navy response to Washington Senator Patty Murray. Key phrases such as, *"Once an award recommendation has been reviewed and an award issued by a competent awarding authority, it can only be reconsidered upon submission of new, relevant material or evidence of an injustice in the decision process…. thoroughly reviewed, it has been determined that the documentation submitted does not substantiate that an error or injustice occurred…"* Clearly, once again, as of 2015, the Navy does not understand the issue that the original recommendation from 1942 was never reviewed and/or never considered by any review Board, so it meets any criteria required for a review. A clear, demonstrable error and injustice occurred in 1942 when the wrong award recommendation was submitted and a far lower award authorized. This error was then perpetuated many times over the next 7 decades, including the 2015 "review." We submit that since the Navy has never understood the issue nor apparently reviewed the original recommendation, that this is new evidence, not considered, and new argument for the Navy to consider and correct. (Enc 1-3, 7)

Summary of issues and reasons why the Navy should do right, correct the errors and record, and award the Navy Cross: The Navy made errors in 1942 (twice), 1943, 1946, 2003, 2010 (twice), and 2015. It is incumbent on the Navy to correct its errors and 75-year injustice.
- o  This request is not for an "upgrade." The Air Medal and subsequent Distinguished Flying Cross were awarded in error. This request is to correct the error and award the correct Navy Cross based upon the original P15 Serial 0266 Navy Cross recommendation, based on the observations of his Wing Commander in 1942 and his conduct which was consistent with his peers who were awarded the Navy Cross.
- o  Was there procedural regularity? No. Mistakes were plainly and repeatedly made.
- o  Were there errors made? Yes – in 1942, 1943, 1946, 2003, 2010 and 2015. (Enc 1-8)

CAR000004



**DEPARTMENT OF THE NAVY**
SECRETARY OF THE NAVY COUNCIL OF REVIEW BOARDS
720 KENNON STREET SE STE 309
WASHINGTON NAVY YARD DC 20374-5023

IN REPLY REFER TO
1650
NDBDM/025-18
2 Feb 2018

From: President, Navy Department Board of Decorations and Medals
To:   Chairman, Board for Correction of Naval Records

Subj: ADVISORY OPINION ICO THE LATE CAPT. EDWARD W. BERGSTROM USN (RET.)

Ref: (a) Your ltr MTN Docket No: 6782-17 of 30 Aug 2017
     (b) NDBDM advisory opinion dtd 22 Feb 2010
     (c) DODI 1348.33
     (d) SECNAVINST 1650.1H

1.  Reference (a) requested comments and recommendations regarding
whether documents provided to BCNR by Mr. Ryan Sweet in May 2017 justify
reconsideration of this case under existing statutes and regulations. All
recently submitted materials were thoroughly reviewed by an aviation
qualified officer with no prior knowledge of this specific case.  The
officer then reviewed all information that informed reference (b).  The
conclusion of this new review is that **no new and relevant material
evidence has been submitted**, and there is **no basis for reconsideration**.

2.  Reference (b) remains valid. The case has been reviewed several
times and it was decided at the highest levels of the Department that the
Distinguished Flying Cross (DFC) was appropriate recognition. Pursuant to
references (c) and (d), no further reconsideration of this matter is
possible within the administrative awards process, including submission
under provisions of 10 U.S.C. §1130.

3.  It was noted in reference (b) this case was reviewed in 1946 by the
post WW II Board of Review for Decorations and Medals, sometimes called
the Horne Board, after its senior member, Admiral F. J. Horne.  That
review determined the DFC was appropriate and no change should be made.
The charter of the Horne Board was to review cases in which award
nominations had either been disapproved, or the award presented was lower
than had been nominated. The intent was to improve equity across the
Navy, since so many awards had been made by commanders with delegated
authority. Spanning 15 months, the review included 30,000 cases, and more
than five thousand awards were upgraded or newly approved. The board
decided that in no case would they revoke an already approved award, even
when they felt it had been inappropriate for the actions and
circumstances. Apparently they saw many cases of that type.  In Admiral
Horne's final report to SECNAV, he said many awards of the Navy Cross had
been inappropriate.  Citing two egregious examples, he then summarized
*"the greatest number of abuses in award of the Navy Cross was in awards
made to aviation personnel.  Here again, the Distinguished Flying Cross
or Air Medal were in many cases the appropriate awards."*

4.  The point of the foregoing is that this case was previously
considered by a Secretarial level review board whose express purpose was

Subj:  ADVISORY OPINION ICO THE LATE CAPT EDWARD W. BERGSTROM USN (RET.)

to determine whether the award had been appropriate and equitable.  That board of senior officers certainly possessed more familiarity than could anyone alive today with the award standards and practices in effect during WW II, and with the great many actions for which Service members had been nominated for and approved.  The official record indicates that Captain Bergstrom's case got a valid review in 1946, and that his case was decided according to the same standards applied to all other cases.

5.  There is one important administrative point to clarify.  The Navy Cross (NX) is not the next higher decoration above the DFC.  The Act of August 7, 1942 restricted the Navy Cross (NX) to extraordinary heroism in action not rising to the Medal of Honor (MOH).  Prior to the Act, the NX was also awarded for distinction in the line of one's profession – in effect a junior medal to the Distinguished Service Medal(DSM).  This led the Navy to elevate the NX above the DSM in precedence.  The same Act also authorized the Silver Star Medal (SS) to be awarded by the Navy and Marine Corps for acts after 6 Dec 1941.  The SS ranks above the DFC in precedence, and may be awarded for gallantry in action not meriting the NX or MOH.  Further, another medal ranking ahead of the DFC in precedence was also introduced during 1942: the Legion of Merit (LOM).  The LOM has evolved into an award for sustained outstanding performance, but was originally intended for, and was awarded for, either sustained meritorious service or outstanding specific achievement, whether in combat or not.  The point clarified is that the NX would be a two-level upgrade of the DFC.  Even if new evidence were to be presented in the future that might justify reconsideration of the previous decisions regarding Capt. Bergstrom, such reconsideration would have to include not only the NX, but also the SS or LOM with Combat "V" device.

6.  We found no indication of material error or injustice in the awarding Capt. Bergstrom the DFC, one of the Nation's oldest and most prestigious decorations.  The Petitioner has failed to present evidence to overcome the presumption of regularity attaching to the earlier reviews of this case.  The Petitioner has also failed to present and new, substantive, and relevant material evidence that wasn't available at the time of the most recent Departmental decision on this matter, namely BCNR's denial of the petition.  Therefore, it is recommended the request for further reconsideration be denied.

J. E. NIERLE

Copy to:
DNS-35
PERS-312

2

CAR000006



**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
701 S. COURTHOUSE ROAD, SUITE 1001
ARLINGTON, VA 22204-2490

MTN
Docket No: 6782-17
30 Aug 17

From: Chairman, Board for Correction of Naval Records
To:    Secretary of the Navy Council of Review Boards (NDBDM)

Subj: REQUEST FOR ADVISORY OPINION ICO CAPTAIN EDWARD W. BERGSTROM, USN

Ref: (a) 10 U.S.C. 1552

Encl: (1) BCNR File with service records. plus 1-BOX of documents w/CD provided by lawyer
(RYAN SWEET, PLLC)

1. Petitioner requests consideration for awarding of the Navy Cross to the late CAPT Edward W. Bergstrom. NDBDM previously provided an unfavorable advisory opinion on 22 February 2010.

2. In order to assist the Board in arriving at a fair and equitable decision in this case, it is requested that your comments and recommendation in the premises be furnished. Your advice would be especially helpful concerning the following issue:

   a. Does the Petitioner present new and relevant information to be considered under 10 U.S.C. 1130?

   b. If new and relevant information is found to be included in this petition, should the previous denial of the Navy Cross be reconsidered?

3. Regulations approved by the Secretary of the Navy state that your comments and recommendation should be submitted within 60 days after receiving this request. It is further requested that the enclosure be returned with your reply. Your cooperation and assistance are appreciated.

M. NEWMAN
By direction

RECEIVED
SEP 0   2017
BY:

NR6782-17

# Law Firm of Ryan Sweet, PLLC

LAW FIRM OF RYAN SWEET, PLLC
253-642-7447
PO Box 4784 Spanaway WA 98387
www.rsweetlaw.com
Fax: 253-617-4032

1 March 2018

Department of the Navy
Board of Corrections of Naval Records
701 S. Courthouse Rd.  Suite 1001
Arlington VA 22204-2490

Secretary of the Navy Council of Review Boards
720 Kennon St. SE. Suite 309
Washington Navy Yard DC 20374-5023

1650
NDBDM/025-18
Docket: 6782-17

SUBJECT: Response and supplemental evidence regarding advisory opinion on award of Navy Cross to late Captain Edward W. Bergstrom, USN

Sir/Ma'am,

On 15 February 2018 we were provided an advisory opinion (and given a 30-day response window) denying the requested relief of an earned and recommended Navy Cross for Captain Edward Bergstrom's heroic aerial actions defending American soil, saving American lives, and aiding to repel the Japanese in World War II.  This unjust error is being perpetuated by faulty reliance on clear and unmistakable errors that occurred in 1942 and continue in spite of overwhelming evidence that the Navy Cross is the correct award.  **Captain Bergstrom was among the most heroic of his peers, yet received a lesser award for the same exact actions. That is not a fair or consistent award system and serves to undermine any appearance of a system with award integrity if the Navy cannot admit to material mistakes and award the appropriate award originally recommended by his Commander and also awarded to his peers.  It's that simple.**

1.     The 2 February 2018 advisory opinion is fatally flawed due to factual errors in several key areas, raising issues that are easily disproven or false, showing a complete lack of understanding of the clear issues, and therefore warrants being disregarded.  This advisory opinion is another example of a poor grasp of the facts and continuation of the injustice which denies the correct award to my client's deceased war hero father, World War II Navy Pilot Captain Bergstrom.

      A.     The conclusion, "We found no indication of material error or injustice in the awarding Capt. Bergstrom the DFC…" is **<u>literally impossible</u> when viewed in fact that the wrong award was submitted by clerical error, leading to a host of other mistakes which ultimate caused an "upgrade" to the DFC.**  The entire case history is filled with

SUBJECT: Response and supplemental evidence regarding advisory opinion on award of Navy Cross to late Captain Edward W. Bergstrom, USN

material errors resulting in injustice. **It was wrongly submitted due to clerical error (material injustice), and then "downgraded "with no explanation (a material injustice), only to be "upgraded" to a lesser award than he was initially meant to receive with his peers. These awards are also materially different. How can someone review this case history and find "no material error?" It's impossible.** There are several material injustices in that brief explanation, which was compounded over seven decades of faulty logic or understanding. Keep in mind that his peers who did the same or lesser acts on the same combat missions did receive the Navy Cross.

B.      **It ignores or fails to address the material errors made in prior reviews based on a complete lack of understanding.** Prior reviews have not had material information, and therefore have come to incorrect conclusions. We ask that these critical errors be expressly addressed, as outlined in 10 May 2017. Otherwise, **this canned response that it was looked at before and decided is fatally flawed. It was not correctly reviewed, nor has it ever been correctly reviewed with the correct information.**

C.      **New and material information was submitted in May 2017.** This includes the material information of the 17 June 1942 defense of the *USS U.S. Grant* from a Japanese sub attack, by bombing the threatening submarine and thwarting an attack. More new information is enclosed on that point and other points. Further open source research suggests this was possibly the I-9 Japanese submarine, which was stalking and attacking ships between Hawaii and the Aleutian Islands and off the United States Pacific coast. The I-9 is recorded to have sunk the *SS Lahaina* 700-800 miles Northeast of Hawaii in December 1941, and successfully attacked and damaged the *USS General W. C. Gorgas* (operating as a troop transport between Seattle and Alaska) in June 1942. The I-9 likely met its fate when sunk off Kiska a year later in June 1943 by the *USS Frazier.*

Several pages of the submission discuss the new and material information and analysis. **Our submission includes a clear, concise, and thorough explanation for the first time that the Horne Board failed to have a clear picture or understanding of the case history. This is new and material information which the opinion simply fails to acknowledge. The correct answer cannot be reached if material data was not supplied to the Board. And if the Board strives for consistency, his award should have been a Navy Cross like his peers and like he was intended to receive.**

D.      It is abundantly clear that **Captain Bergstrom's actions predated the 7 August 1942 changes to the Navy Cross award** (his Navy Cross recommendation was dated 19 July 1942). His award must be considered in light of the appropriate award prior to the change. The opinion spends much time clouding the issue with other awards and precedents but the correct award, the Navy Cross, and the incorrect award precedents are established in the record. This is all clearly explained in the May 2017 submission.

E.      It is strongly implied there was a presumption of "procedural regularity." This is patently false. **We have proven, without any doubt, that for seven decades material errors were committed and perpetuated.** One cannot ignore these facts, or claim with any credibility, that a wrongly submitted award is "procedural regularity." Likewise,

0009
CAR000009

SUBJECT: Response and supplemental evidence regarding advisory opinion on award of Navy Cross to late Captain Edward W. Bergstrom, USN

when a reviewing Board fails to have material information and (incorrectly) concludes based on not having said material information, it is intellectually impossible for there to be "procedural regularity." Stated otherwise, in a criminal trial if critical DNA evidence were withheld and it resulted in the wrong conclusion, there would be a total mistrial. That is exactly what happened in Captain Bergstrom's case. Material information was not before the "Horne Board." This led to the wrong conclusion, which has been perpetuated in reliance on the same incomplete information.

2.      The baseline is that the correct award is the Navy Cross. **The correct answer is to honor his Commander's intent in July 1942, which was a Navy Cross award. Wing Commander Captain Gehres, on 19 July 1942, fresh off of combat actions, recommended the Navy Cross and absent the clerical submission errors it certainly would have been awarded.** Captain Bergstrom's peers received the Navy Cross for the same and even lesser action. We have unequivocally proven that the Wing Commander intended that he receive the Navy Cross. But for a clerical error in failing to submit the Navy Cross Recommendation Letter in 1942, the Navy Cross would have presumably been awarded. In continuing to refuse to award the Navy Cross, the Navy violates its own principles of ignoring the Commander's intent at the time. This advisory opinion materially departs from the recent 2010 Navy response that, "…. *Commanders at the time were charged by the Secretary of Navy with determining what level of award was appropriate to recognize deserving sailors and officers. It is not the place of the NDBDM to substitute current judgment for the Commanders at the time.*" Most, but not all, of Captain Bergstrom's peers were recommended for and received the Navy Cross. Some were recommended for lesser awards. To our best understanding, Captain Bergstrom is the only pilot recommended for a Navy Cross who performed the same actions as those who were awarded this decoration, but due to a clerical error received a far lesser award.

3.      The conclusion that "no new material evidence" was submitted is factually incorrect. Our best understanding and review of the facts shows that at no time until now has the evidence of Captain Bergstrom's defense of the *USS U.S. Grant* and attack on a Japanese submarine hunting the American vessel (17 June 1942) been supplied or considered. It is probable and more likely than not, based on deck log submission and war journal entries, that Captain Bergstrom saved the *USS U.S. Grant* and her crew and passengers and cargo from being sunk and meeting the fate of hundreds of vessels in World War II, being torpedoed and ending up at the bottom of the ocean (many transports were sunk in the Aleutians). We supplied that evidence, and enclosed supply more. We request written acknowledgement that this heroic act has been received, reviewed, acknowledged in determining the appropriate award. It should be clear, of course, that saving a ship and her crew, passengers, and cargo from a Japanese submarine attack, in addition to the other actions he performed during this campaign merits the Navy Cross.

4.      Reliance on the "Horne Board" in this case faulty. We acknowledge the Horne Board was diligent in reviewing thousands of war-time awards for uniformity. No doubt they tried to achieve fairness. We cannot speak to any other case, but in Captain Bergstrom's case, the Horne Board (unintentionally) failed. We have thoroughly detailed the reasons why. The Horne Board did not have critical information (e.g. the wrong 1942 award submission was made due to clerical error, compounded by later "upgrade" errors) and therefore did not understand or realize

CAR000010

SUBJECT: Response and supplemental evidence regarding advisory opinion on award of Navy Cross to late Captain
Edward W. Bergstrom, USN

the numerous errors. If it had, it is clear the Navy Cross would have been awarded consistent
with the Commander's intent and Captain Bergstrom's actions. In other words, incomplete
information input led to the wrong conclusion output. Material information was not known or
understood by the Board. The Horne Board also did not consider the defense of the *USS U.S.
Grant* and attack on the Japanese sub, and the gravity of that heroic action that almost certainly
saved the ship, many lives, and cargo. This is new information to consider. For these reasons, a
reliance on the Horne Board, which failed to take into account material facts, is flawed logic.
While well-meaning, the Horne Board reached a flawed conclusion and repeated the same error
from 1942. Please review our May 2017 submission for a thorough explanation. In addition, all
Navy Cross's awarded during the Aleutian Islands Campaign were *not overturned or
downgraded* by the Horne Board review after the war.

5.      This is so simple that it is tragic for Captain Bergstrom and the Navy that Navy
representatives cannot reach the correct and simple overwhelming conclusion. Succinctly:

- **During June/July 1942, the requirements for a Navy Cross were, "extraordinary
  heroism or distinguished service in the line of his profession." Captain Bergstrom's
  heroic action as a PBY pilot (a plane not designed for aerial combat or agile
  maneuvers) doing combat sorties in the Aleutian Islands Campaign more than
  demonstrate satisfaction of this criteria, and his peers were in fact awarded the
  Navy Cross for similar or lesser conduct. In this case, his actions warranted the
  June/July 1942 criteria for a Navy Cross.**
- **The Navy has stated that it strives to honor and not disturb original Commander's
  intent. We agree. His Commander's intent was to submit him for a Navy Cross
  award, along with his peers, who did receive the Navy Cross for the same combat
  flights and actions, and even lesser actions, and also based on non-award criteria
  such as unconfirmed "hits" which is not criteria of the award (and not achieved).**
- **The Navy states that there needs to be award consistency. We agree. His peers who
  were submitted for the Navy Cross received the Navy Cross.**
- **The Navy relies on procedural regularity. We agree. Due entirely to a clerical
  error, the intended and earned Navy Cross award was not submitted correctly. By
  definition, that is a procedural irregularity! The errors were repeated for decades
  thereafter.**

        Continuing to deny Captain Bergstrom the award his Commander intended for heroic
actions in the Aleutian Islands Campaign, aerial defense of American soil and service members
in 1942, in extreme conditions flying a plane ill-suited for combat, when his peers received the
Navy Cross, does the opposite of what the Navy apparently intends – award consistency, award
appropriateness, honoring Commander intent, and procedural regularity.  This case represents a
total failure in the Navy's goal to achieve these ideals. This was an error and in seven decades
no rational explanation of the repeated denials has been offered – a mere reliance on a flawed
Horne Board that did not have the material information so came to the wrong finding. This does
a disservice to the late Captain Bergstrom and the Navy by perpetuating clear and material
errors, perpetuating an injustice, and undermining the Naval award system. Replace Captain
Bergstrom's name with your own and see if you conclude no material error(s) were made, and I
suspect that no intellectually honest person can look at this case history and conclude that if
his/her award history was involved that there wasn't a series of material errors and injustice.

CAR000011

SUBJECT: Response and supplemental evidence regarding advisory opinion on award of Navy Cross to late Captain Edward W. Bergstrom, USN

In 1943, Alonzo Swann was merely promised a Navy Cross and due to clerical errors did not receive it for several decades. **In Captain Bergstrom's case, his Commander actually intended in writing for him to receive the Navy Cross, for earned heroism, for which his peers also received the Navy Cross award. Clearly, just like Alonzo Swann had his WWII Bronze Star upgraded to a Navy Cross when clerical errors were responsible for the incorrect award, we respectfully request the same result here. It should not require a lawsuit (which will waste tax payer money defending, and waste my client's time and money pursuing) to get the award he was originally expressly intended to receive along with his peers for the same heroic combat actions. There is NO satisfactory or intellectually honest explanation other than the 1942 clerical error to justify why this Navy Cross has been repeatedly denied him for seven decades.**

The Navy's goals are for award appropriateness, consistency, fairness, justice, and honoring an original Commander's intent. To that end, the Navy Cross is the correct, appropriate, consistent, and intended award from June/July 1942 and should be retroactively awarded. If necessary, we request at least a conference call to sort this ongoing mess out. This is straight forward and simple, and we are puzzled why the Navy is entrenched in denying what his heroic actions warranted, that which was intended by his Commander, what his peers received, and what has been denied only due to clear and unmistakable repeated errors.

Respectfully,

///Original signed, *Ryan Sweet*, 1 March 2018///

Ryan Sweet, Esq.
Civilian Counsel
US Army OIF veteran

Enclosures and new evidence
1. Submarine actions of relevance
2. Historical submarine evidence
3. Notice and advisory opinion

# Comparison of Japanese Submarine

| Wednesday, June 10, 1942 | Thursday, June 11, 1942 | Friday, June 12, 1942 |
|---|---|---|
| | Japanese submarine I-17, heading towards Unimak Island on the surface, is spotted by a PBY-5 "Catalina" from VP-43, piloted by Pilot Machinist Leland L. Davis. Davis commences a bombing run just when the submarine is diving and drops two depth charges immediately ahead of the wake left by I-17. He observes a large oil slick spreading from each side of the submarine's hull and claims it as sunk. (51-00N, 177-10W). In reality, I-17 is buffeted by explosions, but the damage is minor. The oil leak is repaired by the following morning. http://www.combinedfleet.com/I-17.htm | |

CAR000013

# Actions for Aleutian Island Campaign June 10 - June 20, 1942

| Saturday, June 13, 1942 | Sunday, June 14, 1942 | Monday, June 15, 1942 | Tuesday, June 16, 1942 |
|---|---|---|---|
| | | Japanese submarine I-9's floatplane reconnoiters Kodiak Naval Air Station. On that same day, I-9 attacks two merchants in the same area, but misses both times. | |
| | | http://www.combinedfle et.com/I-9.htm | |

| Wednesday, June 17, 1942 | Thursday, June 18, 1942 | Friday, June 19, 1942 |
|---|---|---|
| VP-42 -LT Edward Bergstrom depth bombed submarine which was hunting troopship USS US Grant (about 10 miles from ship at 54-32N, 162-30W).  Prevented attack on this troopship.* | | Japanese submarine I-9 shells and damages the 4,636-ton American troop transport GENERAL W. C. GORGAS (former Hamburg-America Lines PRINZ SIGISMUND) at 56-17N, 146-46W. |

USS US Grant Deck Log

VP-42 War Diary June 17, 1942
http://www.combinedfleet.com/I-9.htm
*May have been I-9, I-17 or I-19. These three were active in this area.

http://www.combined fleet.com/I-9.htm

# SENSUIKAN!



(Type A1 Submarine)

## IJN Submarine I-9:
## Tabular Record of Movement

© 2001-2016 Bob Hackett & Sander Kingsepp
Revision 5

---

**25 January 1938:**
Laid down at Kure Navy Yard.

**20 May 1939:**
Launched.

**26 July 1940:**
Cdr (later Captain) Nanri Katsuji (49)(former CO of I-59) is appointed Chief Equipping Officer (CEO).

**25 November 1940:**
Cdr (Rear Admiral, posthumously) Kato Ryonosuke (48) (former CO of I-1) is appointed Chief Equipping Officer of I-9 "on paper".

**20 December 1940:**
Cdr (later Captain) Oyama Toyojiro (49)(former CO of I-15) is appointed Chief Equipping Officer.

**13 February 1941:**
Completed and attached to Yokosuka Naval District. Cdr Oyama Toyojiro is the CO.

**28 February-3 March 1941:**
In Cdr Oyama's absence, LtCdr (Cdr, posthumously) Ueno Toshitake (56)(current torpedo officer of I-9) is appointed the CO of I-9 "on paper".

**31 July 1941:**
Cdr (promoted Captain 1 May 1943; Rear Admiral, posthumously) Fujii Akiyoshi (49)(former CO of I-2) is appointed CO.

**November 1941:**
I-9 is assigned to Vice Admiral Shimizu Mitsumi's Advance Expeditionary Force (Sixth Fleet) as flagship of Rear Admiral Sato Tsutomu's SubRon 1's I-15 through I-26.

**21 November 1941:**
Departs Yokosuka with ComSubRon 1 RAdm Sato Tsutomu aboard in company of I-15, I-17 and I-25, carrying a Watanabe E9W1 "Slim" floatplane.

**2 December 1941:**
The coded signal "Niitakayama nobore (Climb Mt. Niitaka) 1208" is received from the Combined Fleet. It signifies that hostilities will commence on 8 December (Japan time). Mt. Niitaka, located in Formosa (now Taiwan), is then the highest point in the Japanese Empire.

**7 December 1941: Operation "Z" - The Attack on Pearl Harbor:**
Off Hawaii. I-9, with Rear Admiral Sato embarked, patrols north of Oahu during the attack on Pearl Harbor. Its mission is to reconnoiter and attack any ships that try to sortie from Pearl Harbor.

**9 December 1941:**
I-6 reports sighting a LEXINGTON-class aircraft carrier and two cruisers off Oahu heading ENE. Vice Admiral Shimizu in KATORI at Kwajalein orders all of SubRon 1's boats, except the Special Attack Force, to pursue and sink the carrier. I-9 surfaces and sets off at flank speed after the carrier.

**11 December 1941:**
700 miles NE of Oahu. At 1340, I-9 battle-surfaces on the unarmed Matson Lines' steamer LAHAINA (ex-WEST CARMONA, ex-GOLDEN STATE) returning to Hawaii after the outbreak of war with 745 tons of molasses and 300 tons of scrap iron. After surfacing off LAHAINA's starboard quarter, the submarine first fires a warning shot. The crew abandons ship after transmitting an S.O.S. signal. Cdr Fujii fires no less than 25 shells for 12 hits (8 starboard, 4 port), setting the superstructure afire.

**12 December 1941:**
In the following morning, the crew attempts to reboard the ship, but the fires and flooding are out of control. LAHAINA explodes, capsizes to port and sinks around 1230 at 27-42N, 147-38W. Two LAHAINA sailors die of exposure, two commit suicide. Thirty survivors reach Kahului, Maui, on 21 December. [1]

**13 December 1941:**
The Imperial General Headquarters orders the IJN submarines to shell the US West Coast. VAdm Shimizu issues a detailed order on the targets. I-15, I-9, I-10, I-17, I-19, I-21, I-23, I-25 and I-26 are each to fire 30 shells on the night of 25 December. Rear Admiral Sato, aboard I-9, is charged to execute the order.

**19 December 1941:**
Arrives off Cape Blanco, Oregon.

**22 December 1941:**
Departs her patrol sector for Guadalupe Island area.

**27 December 1941:**
Most of the I-boats off the coast have depleted their fuel reserves. Vice Admiral Shimizu cancels the shelling.

**1 January 1942:**
Arrives at Kwajalein.

**January 1942: Operation "K-1" - Flying Boat Attack on Pearl Harbor:**
The Naval General Staff develops a plan to raid Pearl Harbor using two large Type 2 four-engined Kawanishi H8K1 Emily flying boat bombers. The objective of the attack is to disrupt ship repair activities. The plan calls for the planes to depart Wotje in the Marshalls and fly to French Frigate Shoals in the Hawaiian Islands (500 miles WNW of Pearl Harbor) where they are to be refueled by I-class submarines.

**1 February 1942:**
Kwajalein is attacked by planes from USS ENTERPRISE (CV-6). Two hours later, Headquarters Sixth Fleet orders I-9 and the other boats of SubRon 1 to put to sea and intercept the enemy carriers. After their return, I-9 departs that same day, carrying a E9W1 floatplane on her second war patrol.

**5 February 1942:**
At Kwajalein. Five submarines are selected to participate in Operation K-1. I-9 is assigned to take up station midway between Wotje and the Shoals and act as a radio beacon for the two H8K1 Emily flying boats. I-19, I-15 and I-26 are to refuel the flying boats at the Shoals. I-23 is to standby south of Hawaii, provide weather reports and act in an air-sea rescue capacity. The submarines depart for their stations.

**7 February 1942:**
Arrives to the area 200 miles S of Hawaii.

**23 February 1942:**
The E9W1 floatplane from I-9 conducts a nightly recce flight over Pearl Harbor. Due to limited visibility the pilot and observer cannot identify any ships in the harbor. During recovery after return, both wings of the plane are damaged.

**28 February 1942:**
Departs her patrol sector to participate in Operation K-1.

CAR000017

**1 March 1942: The Second Air Attack on Pearl Harbor:**
I-9 is on station and participates in Operation K-1.

**4 March 1942:**
After dark, the Emilys arrive at French Frigate Shoals, refuel and take off again for Pearl Harbor.

**5 March 1942:**
Seven hours after departing French Frigate Shoals, the flying boats drop eight 550-lb. bombs on Honolulu through an overcast. They achieve no significant results and return to the Marshall Islands.

**13 March 1942:**
I-9 acts as radio-beacon-cum-communications relay platform at Point M (19-00N, 174-20W).

**16 March 1942:**
Vice Admiral, the Marquis, Komatsu Teruhisa (former CO of CA NACHI) assumes command of the Sixth Fleet (Submarines).

**21 March 1942:**
Returns to Yokosuka.

**15 May 1942:**
Departs Yokosuka for Aleutians on her third war patrol, carrying an E14Y1 Type 0 Glen floatplane.

**17 May 1942:**
Arrrives at Ominato.

**19 May 1942:**
Departs Ominato to support the invasion of the Western Aleutians.

**20 May 1942:**
Reassigned to Northern District Force.

**21 May 1942:**
Rear Admiral (later Vice Admiral) Yamazaki Shigeaki's (former CO of old CA YAKUMO) SubRon 1's I-19, I-9, I-15, I-17, I-25 and I-26 is tasked to carry out preliminary invasion reconnaissance of the Aleutian Islands. I-9 departs Yokosuka for Kiska.

**24 May 1942:**
At dawn, I-9's E14Y1 floatplane reconnoiters Kiska and Amchitka, Aleutians. The pilot reports that Reynard Cove on Kiska is best suited for a future landing. No troops or barracks are sighted ashore. He also reports that contrary to the earlier reports there is no airfield on Amchitka.

**26 May 1942:**
Around 0500 (local), I-9's floatplane reconnoiters Adak and Kanaga. The pilot counts eight bivouacs and other similar buildings on Adak.

**29 May 1942:**
Provides distant cover for Rear Admiral Kakuta Kakuji's CarDiv 4.

**5 June 1942: Operation "AL"- The Invasion of the Western Aleutians:**
Twenty ships of the Vice Admiral Hosogaya Boshiro's (former CO of MUTSU) Fifth Fleet, including light cruisers KISO and TAMA, three destroyers, three corvettes, three minesweepers and four transports land Rear Admiral (later Vice Admiral) Omori Sentaro's (former CO of ISE) Occupation Force on Attu, Aleutians without opposition.

**6 June 1942:**
Joins a patrol line off Aleutians.

**7 June 1942:**
Captain (later Rear Admiral) Ono Takeji's Occupation Force occupies Kiska, also without opposition.

**8 June 1942:**
The patrol line is shifted to Kodiak area.

**15 June 1942:**
I-9's floatplane reconnoiters Kodiak Naval Air Station. On that same day, I-9 attacks two merchants in the same area, but misses both times.

**19 June 1942:**
I-9 shells and damages the 4,636-ton American troop transport GENERAL W. C. GORGAS (former Hamburg-America Lines PRINZ SIGISMUND) at 56-17N, 146-46W.

**30 June 1942:**
Reassigned to Advance Force. Departs her patrol sector for Yokosuka.

CAR000018

**7 July 1942:**
I-9 arrives at Yokosuka.

**7 August 1942: American Operation "Watchtower" - The Invasion of Guadalcanal, British Solomon Islands:**
Rear Admiral (later Admiral) Richmond K. Turner's Amphibious Task Force 62, covered by Vice Admiral (later Admiral) Frank J. Fletcher's Task Force 61 and Rear Admiral (later Admiral) John S. McCain's Task Force 63's land-based aircraft, lands Maj Gen (later Gen/Commandant) Alexander A. Vandegrift's 1st Marine Division on Guadalcanal, opening a seven-month campaign to take the island.

**15 August 1942:**
Departs Yokosuka in company of I-15, I-17, I-19 and I-26 with ComSubRon 1 Rear Admiral Yamazaki Shigeaki aboard on her fourth war patrol.

**23 August 1942:**
I-9 joins the patrol line A off San Cristobal..

**24 August 1942: The Battle of the Eastern Solomons:**
Vice Admiral (later Admiral) Frank J. Fletcher's Task Force 61's USS SARATOGA (CV-3) and ENTERPRISE (CV-6) launches aircraft that find and sink the light carrier RYUJO. In turn, CarDiv 1's SHOKAKU and ZUIKAKU launch aircraft that find and damage ENTERPRISE. That evening, aircraft from SARATOGA damage seaplane carrier CHITOSE.

**25 August 1942:**
At 1143, LtCdr Frederick Bell's USS GRAYSON (DD-435), temporarily screening Fletcher's TF 11, spots a "carrier's superstructure" 12 miles WSW. The destroyer is detached to investigate the contact, two minutes later identified as a diving submarine.

At 1223, GRAYSON commences a depth-charge attack, but I-9 foils her approach, turning inside the destroyer's turning circle. After the contact is reestablished, GRAYSON makes another attack, but again I-9 escapes with a hard turn at full speed at the depth of 200 feet.

LtCdr Bell, joined by a Douglas SBD "Dauntless" dive-bomber from USS WASP, conducts a dummy attack to wear the submarine down. After 1329, GRAYSON drops the third pattern of depth charges. I-9 heads due west at 4 knots and the contact is lost until 1347. Meanwhile PATTERSON (DD-392) joins the hunt.

At 1351, GRAYSON commences the fourth attack, but I-9 turns to WSW, making 7 knots. With the fifth attack the destroyer expends her entire supply of depth charges, slowing the submarine down to 4 knots. Buffeted by close explosions, I-9 drops to 440 feet; all lights go out and a small leak appears in one of the forward fuel tanks. Aft bilge pump is disabled.

At 1418, PATTERSON commences her first run, but fails to detect the target in the turbulence created by GRAYSON's depth charges. 1438, USS MONSSEN (DD-436) joins the hunt.

At 1440, PATTERSON establishes sonar contact with the submarine; a few minutes later her lookouts report the submarine is surfacing. The "Dauntless" marks its location with a smoke float. PATTERSON and MONSSEN make one attack each. After a huge air bubble and oil slick appear, the destroyers depart the area, claiming their target as sunk.

I-9 surfaces two hours after the last attack. An inspection reveals some additional damage: two periscopes are rendered inoperable and one radio transmitter temporarily knocked out. Rear Admiral Yamazaki reports the damage to Truk and is ordered to return to base.

**30 August 1942:**
Arrives at Truk. Undergoes repairs by URAKAMI MARU.

**8 September 1942:**
Departs Truk for an area SE of Guadalcanal on her fifth war patrol with ComSubRon 1 embarked.

**15 September 1942:**
Cdr Fujii sights several transports. On that same day, I-9 is reassigned to 2nd Patrol Unit.

**23 September 1942:**
200 miles SE of Guadalcanal. I-9 briefly chases a transport escorted by one destroyer.

**1 October 1942:**
Departs her patrol sector for Truk.

**6 October 1942:**
Arrives at Truk.

**13 October 1942:**
The staff of ComSubRon 1 is transferred ashore.

**16 October 1942:**
Departs Truk on her sixth war patrol SE of the Solomons, carrying an E14Y1 floatplane. Reassigned to the "B" Patrol Unit.

**31 October 1942:**
Reassigned to B Patrol Unit. Ordered to reconnoiter Nouméa, New Caledonia.

CAR000019

2/1/2018                                                   Imperial Submarines

**4 November 1942:**
I-9's floatplane reconnoiters Nouméa airfield and harbor, sighting one aircraft carrier, three cruisers and several smaller vessels.

**7 November 1942:**
I-9 is detached from B Patrol Unit to conduct aerial reconnaissance of Espiritu Santo instead of I-7.

**11 November 1942:**
I-9 is ordered to proceed to Shortland.

**12 November 1942:**
I-9's floatplane reconnoiters Espiritu Santo, but as a result of dense cloud cover no ships can be observed.

**16 November 1942:**
Truk. Vice Admiral Komatsu convenes a meeting of his submarine captains. He announces that the Sixth Fleet has been ordered by Admiral Yamamoto, CINC, Combined Fleet to organize a supply system for the IJA's 17th Army garrison on Guadalcanal.

**19 November 1942:**
Arrives at Shortland, embarks cargo.

**24 November 1942:**
Departs Shortland on her first supply run to Kamimbo Bay, NW Guadalcanal, carrying 32 tons of food and ammunition.

**26 November 1942:**
Arrives at Kamimbo, unloads her cargo, then departs for Truk.

**1 December 1942:**
Arrives at Truk.

**Late December 1942:**
Departs Truk for Shortland.

**2 January 1943:**
Arrives at Shortland.

**4 January 1943:**
Departs Shortland on her second supply run to Guadalcanal, carrying 21 tons of food in rubber containers.

**6 January 1943:**
Arrives at Kamimbo, unloads her cargo, then departs for Shortland.

**8 January 1943:**
Returns to Shortland.

**10 January 1943:**
Departs Shortland on her third supply run to Guadalcanal.

**12 January 1943:**
Arrives off Kamimbo, but fails to deliver her cargo, since the anchorage is patrolled by torpedo boats.

**14 January 1943:**
Returns to Shortland.

**16 January 1943:**
Departs Shortland on her fourth supply run to Guadalcanal.

**18 January 1943:**
Arrives off Kamimbo, but cannot release her supply drums underwater.

**20 January 1943:**
Returns to Shortland.

**22 January 1943:**
Departs Shortland on her fifth supply run to Guadalcanal, carrying 18 tons of cargo in 120 supply drums.

**25 January 1943:**
Arrives off Kamimbo, releases 80 supply drums with 12 tons of cargo, but is then driven away by torpedo boats.

**27 January 1943:**
Returns to Shortland.

**28 January 1943:**
Departs Shortland on her sixth supply run to Guadalcanal.

CAR000020



**30 January 1943:**
Arrives off Kamimbo, releases all supply drums, but all are detected and destroyed by arriving torpedo boats.

**31 January 1943: Operation "KE" - The Evacuation of Guadalcanal:**
A task force of units of the Second and Third Fleets from Truk including carriers ZUIKAKU, ZUIHO and JUNYO, Bat Div 3's KONGO and HARUNA, CruDiv 4's ATAGO and TAKAO, CruDiv 5's HAGURO and MYOKO, DesRon 4's light cruiser NAGARA, DesRon 10's light cruiser AGANO and destroyers, steams north of the Solomons as a feint to cover Rear Admiral (later Vice Admiral) Hashimoto Shintaro's (former CO of HYUGA) destroyer force from Rabaul.

**1 February 1943:**
Returns to Shortland, departs for Truk on that same day.

**4 February 1943:**
Arrives at Truk.

**5 February 1943:**
Departs Truk for Yokosuka.

**9 February 1943:**
The Japanese successfully complete the evacuation of 11,700 troops from Guadalcanal.

**12 February 1943:**
Arrives at Yokosuka.

**20 February 1943:**
Transferred from Yokosuka to Kawasaki's Kobe Yard for repairs. [2]

**1 May 1943:**
Cdr Fujii is promoted Captain.

**11 May 1943: American Operation "Landcrab"- The Invasion of Attu, Aleutians:**
Rear Admiral (later Admiral) Thomas C. Kinkaid's Task Force 16, covered by Rear Admiral Francis W. Rockwell's Task Force 51, lands the Army's 7 th Division that captures Attu.

**12 May 1943:**
Reassigned to Northern District Force.

**13 May 1943:**
Returns to Kure.

**14 May 1943:**
Departs Kure for Yokosuka, arriving on 16th.

**21 May 1943: Operation "KE-Go" - The Evacuation of Kiska:**
The Imperial General Headquarters decides to evacuate the garrison at Kiska Island, Aleutians.

**23 May 1943:**
Departs Yokosuka for Paramushiro Island in the Kuriles.

**27 May 1943:**
Arrives at Paramushiro.

**29 May 1943:**
Departs Paramushiro on her first supply run to Kiska, carrying 17 tons of ammunition and 2 tons of food.

**1 June 1943:**
Bering Sea, off Agattu. I-9 is chased by an unidentified destroyer for three hours.

**2 June 1943:**
Arrives at Kiska, unloads her cargo and departs on that same day, carrying 79 passengers (55 sailors, 10 soldiers and 10 gunzoku construction workers).

**8 June 1943:**
Returns to Paramushiro.

**10 June 1943:**
Departs Paramushiro for Kiska on her second supply run to that location to evacuate the personnel of the local midget base. No messages are received from I-9 thereafter.

**13 June 1943:**
Kiska, 15 miles E of Sirius Point. At 1758 LtCdr (later RAdm) Elliot M. Brown's USS FRAZIER (DD-607) detects a target with her radar

CAR000021

Case 2:21-cv-00055-MJP   Document 39-1   Filed 01/18/22   Page 22 of 128

6,900 yards away. FRAZIER closes the range in dense fog at 20 knots and soon establishes sonar contact with a submarine. At 2009 a lookout sights two periscopes at 100 yds.

FRAZIER opens fire on the submarine, scoring a hit on one periscope. The destroyer attacks I-9 with depth charges. Air bubbles, oil and debris rise to the surface, but FRAZIER makes two more attacks to ensure that the submarine is sunk. I-9 is lost with all hands at 52-08N, 177-38E. [3]

**15 June 1943:**
Presumed lost lost with all 101 hands off Kiska.

**1 August 1943:**
Removed from the Navy List.

---

**Authors' Note:**
[1] One source claims that on 9 December LAHAINA had been detected by a floatplane, probably an E14Y1 Type 0 launched from I-9. This is incorrect: no aircraft were launched from submarines on that day, nor were any E14Y1s embarked by that time.

[2] On 11 April 1943, USS TUNNY (SS-282) attacked a Japanese submarine it identified as I-9 off Truk. Since I-9 was nowhere near Truk at that time, this could only have been a mistake. In all likelihood, TUNNY 's adversary was I-16.

[3] USS FRAZIER's victim was first identified as I-31 in Morison's "History of United States Naval Operations in World War II," but this is incorrect: I-31 had already been lost a month before off Attu.

Thanks go to Dr. Higuchi Tatsuhiro of Japan.

– Bob Hackett & Sander Kingsepp

**Back to Submarine Page**

WIKIPEDIA

# Japanese submarine *I-9*

The **Japanese submarine *I-9*** was a Type A1 submarine built for the Imperial Japanese Navy (IJN) during the 1930s.

## Contents

Design and description
Construction and career
Notes
References

## Design and description

The submarines of the A1 type were versions of the preceding J3 class with superior range, improved aircraft installation, and were fitted as squadron flagships.[1] They displaced 2,966 tonnes (2,919 long tons) surfaced and 4,195 tonnes (4,129 long tons) submerged. The submarines were 113.7 meters (373 ft 0 in) long, had a beam of 9.5 meters (31 ft 2 in) and a draft of 5.3 meters (17 ft 5 in). They had a diving depth of 100 meters (330 ft).[1]

For surface running, the boats were powered by two 6,200-brake-horsepower (4,623 kW) diesel engines, each driving one propeller shaft. When submerged each propeller was driven by a 1,200-horsepower (895 kW) electric motor. They could reach 19 knots (35 km/h; 22 mph) on the surface[2] and 8.25 knots (15.28 km/h; 9.49 mph) underwater. On the surface, the A1s had a range of 16,000 nautical miles (30,000 km; 18,000 mi) at 16 knots (30 km/h; 18 mph); submerged, they had a range of 90 nmi (170 km; 100 mi) at 3 knots (5.6 km/h; 3.5 mph).[3]

The boats were armed with four internal bow 53.3 cm (21.0 in) torpedo tubes and carried a total of 18 torpedoes. They were also armed with a single 140 mm (5.5 in)/40 deck gun and two twin 25 mm (1 in) Type 96 anti-aircraft guns.[3]

Unlike the J3 class, the aircraft hangar is integrated into the conning tower and faces forward; the positions of the deck gun and the catapult were exchanged so the aircraft can use the forward motion of the ship to supplement the speed imparted by the catapult.[3]

## Construction and career

| History | |
|---|---|
| **Empire of Japan** | |
| Name: | *I-9* |
| Builder: | Kure Naval Arsenal |
| Laid down: | 25 January 1938 |
| Launched: | 20 May 1939 |
| Commissioned: | 13 February 1941 |
| Struck: | 1 August 1943 |
| Fate: | Sunk, 13 June 1943 |

| General characteristics | |
|---|---|
| Class and type: | Type A1 submarine |
| Displacement: | 2,966 tonnes (2,919 long tons) surfaced |
| | 4,195 tonnes (4,129 long tons) submerged |
| Length: | 113.7 m (373 ft 0 in) overall |
| Beam: | 9.5 m (31 ft 2 in) |
| Draft: | 5.3 m (17 ft 5 in) |
| Installed power: | 12,400 bhp (9,200 kW) (diesel) |
| | 2,400 hp (1,800 kW) (electric motor) |
| Propulsion: | Diesel-electric |
| | 1 × diesel engine |
| | 1 × electric motor |
| Speed: | 23.5 knots |

CAR000023

On 11 December 1941, *I-9* sank SS *Lahaina* 700 miles northeast of Oahu. On 19 June 1942, the boat damaged US Army Transport *General W. C. Gorgas* with gunfire. On 25 August, she was depth charged and damaged by the destroyers USS *Grayson* (DD-435), USS *Monssen* (DD-436), and USS *Patterson* (DD-392). She made supply runs to Guadalcanal from November 1942 to January, 1943. She was sunk off Kiska(58°08′N 177°38′E) on 13 June 1943 by the destroyer USS *Frazier* (DD-607).[4][5][6]

# Notes

1. Bagnasco, p. 188
2. Chesneau, p. 200
3. Carpenter & Dorr, p. 101
4. Boyd & Yoshida, p. 211
5. Stille, p. 19. There is some confusion over the date, however; *DANFS* lists it only a possible, and on 11 June. Japanese records were so chaotic, JANAC could not be certain.
6. Hackett & Kingsepp

# References

- Bagnasco, Erminio (1977). *Submarines of World War Two*. Annapolis, Maryland: Naval Institute Press. ISBN 0-87021-962-6.
- Boyd, Carl & Yoshida, Akikiko (2002). *The Japanese Submarine Force and World War II*. Annapolis, Maryland: Naval Institute Press. ISBN 1-55750-015-0.
- Carpenter, Dorr B. & Polmar, Norman (1986). *Submarines of the Imperial Japanese Navy 1904–1945*. London: Conway Maritime Press. ISBN 0-85177-396-6.
- Chesneau, Roger, ed. (1980). *Conway's All the World's Fighting Ships 1922–1946*. Greenwich, UK: Conway Maritime Press. ISBN 0-85177-146-7.
- Hackett, Bob; Kingsepp, Sander (2012). "IJN Submarine I-9: Tabular Record of Movement" (http://www.combinedfleet.com/I-9.htm). *SENSUIKAN! Stories and Battle Histories of the IJN's Submarines*. Combinedfleet.com. Retrieved 18 August 2015.
- Hashimoto, Mochitsura (1954). *Sunk: The Story of the Japanese Submarine Fleet 1942 – 1945*. Colegrave, E.H.M. (translator). London: Cassell and Company. ASIN B000QSM3L0.
- Stille, Mark (2007). *Imperial Japanese Navy Submarines 1941-45*. New Vanguard. **135**. Botley, Oxford, UK: Osprey Publishing. ISBN 978-1-84603-090-1.

| | |
|---|---|
| | (43.5 km/h; 27.0 mph) surfaced |
| | 8 knots (15 km/h; 9.2 mph) submerged |
| Range: | 16,000 nmi (30,000 km; 18,000 mi) at 16 knots (30 km/h; 18 mph) surfaced |
| | 60 nmi (110 km; 69 mi) at 3 knots (5.6 km/h; 3.5 mph) submerged |
| Test depth: | 100 m (330 ft) |
| Crew: | 100 |
| Armament: | 6 × bow 533 mm (21 in) torpedo tubes |
| | 1 × 14 cm (5.5 in) deck gun |
| | 2 × twin 25 mm (1 in) Type 96 anti-aircraft guns |
| Aircraft carried: | 1 × Yokosuka E14Y seaplane |
| Aviation facilities: | 1 × catapult |

Retrieved from "https://en.wikipedia.org/w/index.php?title=Japanese_submarine_I-9&oldid=786521508"

**This page was last edited on 20 June 2017, at 00:15.**

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

## CHAPTER III

### Submarine Operations in the North Pacific Area
### (April – August 1942)

The objective of the Aleutian Operations was the invasion of Attu and Kiska Islands and the destruction of military facilities on Adak Island. The Northern Force, under the commander of the 5th Fleet, was assigned to carry out the mission. Because the Aleutian Operations were closely connected with the Midway Operations, the Commander in Chief of the Combined Fleet was to exercise overall command of both operations.

The plan for the Aleutian Operations as outlined by the Commander in Chief of the Combined Fleet was as follows:

"Destroy the military strength stationed on the islands as well as the defense facilities. Dutch Harbor is to be attacked by the Carrier Force prior to the landing of the Invasion Force on Kiska Island. Also prior to the invasion, the enemy on Kiska and Adak will be destroyed from the air.

"The Invasion Force will invade Kiska Island simultaneously with the assault on Adak Island by a small element of the Invasion Force to prevent the enemy from using the military facilities there. The landing force for Adak will then invade Attu Island. In the event of counterattacks by powerful enemy forces, they will be destroyed by the Carrier Task Force, the Submarine Group and other supporting units."

29

The attack on Dutch Harbor by the Carrier Task Force was to be launched on 4 June and the landing on Kiska Island was scheduled for 7 June.

The Northern Force was divided into the Main Force, the 2d Carrier Task Force, the Attu and Kiska Invasion Forces and the Submarine Group.  On 10 May, the 1st Submarine Squadron (I-9, I-15, I-17, I-19, I-25, I-26 and Heian Maru) was placed under the command of the 5th Fleet and designated the Submarine Group of the Northern Force.

The mission of the Submarine Group in the Aleutian Operation, as outlined in the General Order of the Combined Fleet, was generally as follows:

a.  Prior to the end of May the Submarine Force was to conduct reconnaissance of strategic areas in the Aleutians, while elements of the Group were to guard the entrance to the port of Seattle during the period of the invasion.

b.  After performing the reconnaissance, the majority of the Group was to protect the advance of the Carrier Force and support the attack on Dutch Harbor.

c.  In the event the Combined Fleet wages a decisive battle in the Midway area, the Groups shall return to the immediate control of the 6th Fleet.

d.  The operational boundary between the submarines participating in the Aleutian Operations and the submarines participating in the Midway Operations was set as $40^{\circ}$ N.

30

0026
CAR000026

## Submarine Operations in the Aleutians

As soon as the 1st Submarine Squadron became a part of the
Northern Force on 10 May 1942, the commander of the 1st Submarine
Squadron ordered the I-25 and I-26 to advance immediately to the
eastern part of the Aleutian Islands and scout the area around
Kodiak Island. The two submarines sailed directly to the eastern
part of the Aleutians and carried out reconnaissance over Chirikof,
Sitkinak and Kodiak Islands.

Around the end of May, they left the Kodiak area and patrolled
the waters off the coast of Seattle. During this period the plane
from the I-25 spotted a cruiser and two destroyers in the vicinity
of Kodiak. While moving from Kodiak to Seattle, the I-26 spotted
two vessels which looked like large cruisers.

Meanwhile, the remainder of the submarines of the 1st Subma-
rine Squadron left Japan around the middle of May; the I-19 for
Dutch Harbor; the I-15 for Adak Island; the I-17 for Attu Island;
and the I-9 for Kiska Island. After completing reconnaissance of
these areas, the I-15, I-17 and I-9 cruised east along the southern
side of the archipelago from a point about 300 nautical miles south
of Kiska, and by 4 June, reached a point about 200 nautical miles
south of Dutch Harbor. The I-19 took up a position south of Unimac
Pass near Dutch Harbor. During the cruise, no enemy vessels were
sighted in the area of Kiska, Attu or Adak, however, a few patrol
ships were found moored in the Dutch Harbor area. Based on this

31

information, the commander of the Northern Force, at the start of the invasion operations, estimated the enemy surface strength in the Aleutian Area to be a small force including one or two cruisers.

The first air raid on Dutch Harbor was carried out by the 2d Carrier Task Force at 2400 hours on 3 June, and the second attack was carried out from 0800 to 1200 on 5th June. The invasion Force for Kiska Island succeeded in landing on the island at 2130 on 7 June. The Invasion Force for Attu was ordered to abandon its plan to first land on Adak and was instructed to land on Attu directly. At 0010 hours on the 8th of June the landing was effected.

Meanwhile, the 1st Submarine Squadron (less the I-25 and I-26) started on a sweep west from a point about 200 nautical miles south of Dutch Harbor. The I-15 and I-19 passed through Amukta Pass and moved down the northern side of the archipelago to a point north of Adak. The I-9 and I-17 swept south of the archipelago to the waters south of Adak. Although all of these submarines were prepared to engage enemy fleet units, none were sighted.

On the 10th of June 1942, the 2d Submarine Squadron was assigned to the Northern Force by order of the Combined Fleet, therefore, the Force commander ordered the 1st Submarine Squadron to patrol the eastern Aleutians while the 2d Submarine Squadron, upon arrival, would patrol the western Aleutians. Upon receipt of these orders the I-15, I-17, I-19 and the I-9 returned east to patrol the areas in the vicinity of Umnak Island, Unalaska Island, Akutan Island and Kodiak Island. The submarines reached their respective areas around

32

0028
CAR000028

the middle of the month and patrolled their areas until the end of the month.  The I-25 and I-26 had continued their patrol off the coast of Seattle, and around the end of June they were ordered to shift their patrol to the area south of Unimac Pass.  On 8 June, the I-25 and I-26 sank a supply ship and during their patrol from 10 June, they sank one more cargo vessel and shelled the radio compass station at Estevan Point on Vancouver Island and Astoria Airfield.

## Operations of the 2d Submarine Squadron

After completing its operations in the Indian Ocean, the 2d Submarine Squadron (I-1, I-2, I-3, I-4, I-5, I-6, I-7) had returned to its home base and did not take part in operations from May to the early part of June 1942.  On the 10th of June, the 2d Submarine Squadron was assigned to the Northern Force and ordered to proceed to the Aleutian waters.  Upon receipt of these orders, the flagship of the squadron, the I-7, accompanied by the I-1, I-2, I-3 and I-4 left the Homeland for duty in the Aleutians.  These submarines arrived in the area south of Adak around 20 June and from then until the early part of July patrolled the waters between Adak and Amchitka although it was difficult to perform a satisfactory patrol due to the fog and bad weather.  The remainder of the squadron, the I-5 and I-6, which had been left in the Homeland to complete repairs, were to proceed to the Aleutians upon completion of repairs and the submarine tender Santos Maru was ordered to stand by at its base in

33

0029
CAR000029

the Homeland.

In late June, Imperial General Headquarters revised its original plan and decided to hold the bases in the Aleutians at least through the winter. The fortifications for the defense of Kiska was to be strengthened and the Northern Force was to defend the area against enemy counter invasion. The 1st Submarine Squadron, however, had reached the limit of its operations; therefore, the squadron was ordered to return to the Homeland for repairs and was subsequently to join the Submarine Force of the Combined Fleet. With the return of the 1st Submarine Squadron to Japan around the end June, the 2d Submarine Squadron was the only submarine force remaining under the command of the Northern Force, therefore, its area of operations was extended to include the entire Aleutian waters. The I-7, I-1, I-2 and I-3 were to patrol the waters south of Unimac Pass to cut off the route between Dutch Harbor and Seattle. The I-4 and I-5 was to patrol and reconnoiter Dutch Harbor from a position north of Unimac Pass, while the I-6 was to remain in the area south of Kiska in defense of the island. The submarines proceeded to their respective patrol areas and in the middle of July, the I-7 sank an enemy transport in the waters southwest of Unimac Pass.

On 20 July, the 2d Submarine Squadron less the I-6 was ordered to return to Japan by early August for transfer to the Submarine Force of the Combined Fleet. The I-6 was ordered to remain in the Aleutian area as the base submarine of the Northern Force for patrol

34

0030
CAR000030

of the waters around Kiska Island.  In the latter part of July,
one of our flying boats stationed on Kiska discovered the presence
of a flying boat tender in Nazan Bay (Atka Island).  The I-6 immedi-
ately proceeded to Nazan Bay but upon arrival there found no trace
of the tender, therefore it returned to Kiska.  In mid-August, the
I-6 was ordered to rejoin its squadron and returned to Japan in the
latter part of the month.

### Organization of the Northern Force Base Submarine Group

On 14 July 1942, the reorganization of the fleet was carried
out and, as a result, the 26th Submarine Division (RO-61, RO-62,
RO-65, RO-67) and the 33d Submarine Division (RO-63, RO-64, RO-68),
which had been operating in the South Seas area as a part of the
7th Submarine Squadron, were released from the 7th Submarine
Squadron and assigned to the 5th Fleet as an attached submarine
group.  With the 26th and 33d Submarine Divisions being placed
under his command on 14 July, the Commander in Chief of the 5th
Fleet placed the submarine divisions under the command of the
Kiska Defense Unit commander.  They were called the Base Submarine
Group and primarily engaged in the defense of Kiska.  The 26th and
33d Submarine Divisions were to operate in Aleutian waters using
Kiska as a base, and, with the exception of the RO-65 and RO-67
which had not completed repairs, the two divisions left Japan in
the latter part of July and arrived in Kiska in early August.

35

0031
CAR000031

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No: 6782-17**
            **8417-09**

**Military Status: Discharged**                    RECONSIDERATION

**Issue Category: 1021**                    ~~Personal Appearance Approved:   Yes/No~~
**Personal Appearance Requested:** No          ~~(Please circle one & initial)~~

**Claims of Error/Injustice: Injustice**

**SPECIFIC ISSUES:**

**RECORD CHANGE REQUESTED:  Request for the Navy Cross**

**PETITIONER CONTENTION(S):   Petitioner contends in his request that, though his father was awarded a Distinguished Flying Cross (DFC) from a different recommendation, his father's Navy Cross recommendation was never reviewed and request the Navy review it now.**

*Complete Information as needed:*

| Service Branch | Rate/Rank | Dates of Service | Characterization of Service | Separation Reason(s) | Reentry Code |
|---|---|---|---|---|---|
| USN | Captain | 27 Jul 38 to 1 Jul 65 | HON | Retired from active duty | N/A |

| Date | CHRONOLOGY OF RELEVANT EVENTS |
|---|---|
|  | Petitioner's father was recommended for the DFC, it was originally approved by SECNAV on 5 Nov 1942 as an Air Medal and then ungraded to the DFC on 25 Mar 1943.  The DFC was reviewed again and it was determined that no change would be made.  The NDBDM award card, the citation reads almost identical to the proposed citation for the Navy Cross. |
| 1 Feb 03 | Petitioner, son of servicemember, submitted request to upgraded DFC to Navy Cross |
| 16 Jul 03 | SECNAV to CNO ltr states no upgrade to the previous approved DFC is approved. |
|  |  |
| 22 Feb 10 | Advisory Opinion (AO) from Navy Board of Decorations and Medals (NDBDM), from there review a fully functioning awards system was in place in the servicemember chain of command.  Some pilots did receive the Navy Cross, while others received the lower awards.  It was impossible for them the know how those decisions were made.  In the absence of such records, the NDBDM presume regularity. |
| 16 Jun 10 | BCNR denied request to upgrade award, concurred with |
|  |  |
| 8 Aug 17 | BCNR in receipt of Petitioner's, son of servicemember, reconsideration request dtd 9 May 2017 |
| 30 Aug 17 | BCNR requested an AO from NDBDM |
| 2 Feb 18 | NDBDM / previous AO dtd 22 Feb 10 remains valid.  Case has been reviewed several times and it was decided at the highest levels of the Department that he DFC was appropriate recognition.  No further reconsideration of this matter is possible within the administrative awards process. |
| 1 Mar 18 | Response to AO from Petitioner via Law Firm.  State that CAPT B. was among the most heroic of his peers, yet received a lesser award for the same exact actions.  The is not fair or consistent award system and serves to undermine any appearance of a system with award integrity if the Navy cannot admit to material mistakes and award the appropriate award originally recommended by his Commander and also awarded to his peers.

➢ Believed the wrong award was submitted by clerical error, leading to a host of other mistakes which ultimate cause an "upgrade" to the DFC.

➢ It was wrongly submitted due to clerical error, and then "downgraded" with no explanation (a material injustice), only to be "upgraded" to a lesser award than he was initially meant to receive with his peers.  Believes that the awards are also materially different, and how can someone review this case history and find "no material error?" |

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

Docket No: 6782-17
             8417-09

|  |  |
|---|---|
|  | ➢ It ignores or fails to address the material errors mad in prior reviews based on a complete lack of understanding. |
|  | ➢ It was not correctly reviewed, nor has it ever been correctly reviewed with the correct information. |
|  | ➢ His actions predated the 7 August 1942 changes to the Navy Cross Award. His recommendation was dated 19 Jul 1942. His award must be considered in light of the appropriate award prior to the change. |
|  | ➢ Attachments: Comparison of Japanese Submarine, Actions for Aleutian Island Campaign Jun 10-20, 1942, IJN Submarine 1-9 Tabular Record of Movement, Wikipedia Japanese submarine I-9, Chapter III Submarine Operations in the North Pacific Area, |

**SUMMARY OF CASE / AUTHORITIES:**
*(I.e. Disciplinary History (w/total days of Unauthorized Absence (if applicable), Prior/Post Military Service, Age, Education Completed, Scores, Combat History, Applicable Regulations/Statutes, NDRB review and determination)*

**ADVISORY OPINION (AO):** Yes (attached)

**AO PROVIDED TO MBR:** Yes  **REBUTTAL RECD:** Yes  **CONGRESSIONAL INTEREST:** N/A

| Board Members: | Ms. Henkel * | Mr. Bible | Ms. McIlwain |
|---|---|---|---|
| **23 Jul 2018** |  |  |  |
| **Board Vote** | Initials | Initials | Initials |
| **Grant Full** |  |  |  |
| **Grant Partial** |  |  |  |
| **Deny** | *SPB* | *(signature)* | *CM* |
| **Comments** |  |  |  |

Examiner Initials (Case Prep/Board):  **SJN**



**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
701 S. COURTHOUSE ROAD, SUITE 1001
ARLINGTON, VA 22204-2490

SJN
Docket No: 6782-17/
8417-09

OCT 1 1 2018

MR ROBERT W BERGSTROM
C/O RYAN SWEET ESQ
LAW FIRM OF RYAN SWEET PLLC
PO BOX 4784
SPANAWAY WA 98387

Dear Mr. Bergstrom:

This is in reference to your reconsideration request of Docket No. 8417-09. You previously petitioned the Board for Correction of Naval Records (BCNR) and were advised in our letter of 17 June 2010, that your application had been denied. Your case was reconsidered in accordance with the BCNR procedures, which conform to *Lipsman v. Secretary of the Army*, 335 F.Supp.2d 48 (D.D.C. 2004). After careful and conscientious consideration of the entire record, the Board found the evidence submitted was insufficient to establish the existence of probable material error or injustice. Consequently, your reconsideration request has been denied.

Because your application was submitted with new evidence not previously considered, the BCNR found it in the interest of justice to review your application. Your current request has been carefully examined by a three-member panel of the BCNR, sitting in executive session on 23 July 2018. The names and votes of the members of the panel will be furnished upon request. Documentary material considered by the Board consisted of your application and all material submitted in support of your application. In addition, the Board considered the advisory opinion (AO) furnished by the Navy Board of Decorations and Medals (NDBDM) dated 2 February 2018, which was previously provided to you and is enclosed. Additionally, the Board considered your rebuttal statement dated 1 March 2018, and attachments.

You presented as new evidence your attorney's cover letter dated 10 May 2017, and supporting documentation. In your rebuttal, you presented additional supporting documentation from your attorney. After careful and conscientious consideration of the entire record, the Board determined that the documentation that you provided, even though not previously considered by the Board, was insufficient to establish the existence of probable material error or injustice.

The Board carefully weighed all potentially mitigating factors, such as the DNBDM AO, your response to the AO, and desire to have your father's Distinguished Flying Cross (DFC) upgraded to the Navy Cross. However, the Board concurred with the AO statement that your case has

CAR000034

Docket No:  6782-17/
8417-09

been reviewed several times, and it was decided at the highest levels of the Department of the Navy, that the DFC was the appropriate recognition.

It is regretted that the circumstances of your reconsideration petition are such that favorable action cannot be taken again.  You are entitled to have the Board reconsider its decision upon the submission of new and material evidence.  New evidence is evidence not previously considered by the Board.  In the absence of sufficient new and material evidence for reconsideration, the decision of the Board is final, and your only recourse would be to seek relief, at no cost to the Board, from a court of appropriate jurisdiction.

It is important to keep in mind that a presumption of regularity attaches to all official records. Consequently, when applying for a correction of an official naval record, the burden is on the applicant to demonstrate the existence of probable material error or injustice.

Sincerely,

ELIZABETH A. HILL
Executive Director

CAR000035

# APPLICATION FOR CORRECTION OF MILITARY RECORD UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552
*(Please read instructions on reverse side BEFORE completing this application.)*

OMB No. 0704-0003
OMB approval expires
Jun 30, 2009

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services Directorate, Information Management Division, 1155 Defense Pentagon, Washington, DC 20301-1155 (0704-0003). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

PRIVACY ACT STATEM

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

ROUT

DISCI
inform

Social
indivic

**Bergstrom, Edward W.**

*08417 – 09*

## 1. APPLICANT DATA *(The person whose record you are requesting to be corrected.)*

| a. BRANCH OF SERVICE *(X one)* | ARMY | X | NAVY | | AIR FORCE | | MARINE CORPS | COAST GUARD |
|---|---|---|---|---|---|---|---|---|

| b. NAME *(Print - Last, First, Middle Initial)* | c. PRESENT OR LAST PAY GRADE | d. SERVICE NUMBER *(If applicable)* | e. SSN |
|---|---|---|---|
| Bergstrom, Edward W. | Captain | 81765 1310 | |

| 2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES *(Active Duty, Reserve, National Guard, Retired, Discharged, Deceased)* | 3. TYPE OF DISCHARGE *(If by court-martial, state the type of court.)* | 4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY *(YYYYMMDD)* |
|---|---|---|
| Deceased | Honorable | 19650701 |

## 5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED: *(Entry required)*

Retroactive awarding of the Navy Cross decoration per commanding officer Patrol Wing FOUR recommendation letter P15 Serial 0266 dated July 19, 1942.

## 6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS: *(Entry required)*

Recommendation letter P15 Serial 0266 dated July 19, 1942 was not submitted to the awards branch due to a Wing secretary submission error. Submission was done to awards branch in 2003 for award but was denied in error due to incomplete review. Subsequent appeals were denied. No response was given to questions as why award was not made when all other pilots whose recommendation letters were submitted to awards branch in 1942 were awarded the Navy Cross for the same exact bombing missions and actions.

## 7. ORGANIZATION AND APPROXIMATE DATE *(YYYYMMDD)* AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED *(Entry required)*    USN Pacific Fleet, Patrol Wing FOUR, VP-42, July 19, 1942

## 8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE

| a. DATE OF DISCOVERY *(YYYYMMDD)* | b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION. |
|---|---|
| 20010101 | 10 U.S.C. Section 1130.  Also Wing secretary did not submit award recommendation letter to awards branch July 1942 in error. |

## 9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS: *(If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)*

Navy Cross recommendation letter P15 Serial 0266 dated July 19, 1942, Fitness report dated 11/20/1942, Navy Cross recommendation letter appeal submission letter and packet submitted to awards branch dated February 1, 2003, all subsequent appeal letters to the award branch and responses. Secretary of the Navy responses to congressional and Senator inquiries. DD-214 and 215.

| 10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. *(At no expense to the Government) (X one)* | YES. THE BOARD WILL DETERMINE IF WARRANTED. | X | NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE. |
|---|---|---|---|

| 11.a. COUNSEL *(If any)* NAME *(Last, First, Middle Initial)* and ADDRESS *(Include ZIP Code)* | b. TELEPHONE *(Include Area Code)* 360- |
|---|---|
| none | c. E-MAIL ADDRESS @comcast.net |
| | d. FAX NUMBER *(Include Area Code)* none |

## 12. APPLICANT MUST SIGN IN ITEM 15 BELOW. If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name *(print)* and relationship by marking one box below.

| SPOUSE | WIDOW | WIDOWER | X | NEXT OF KIN | LEGAL REPRESENTATIVE | OTHER *(Specify)* |
|---|---|---|---|---|---|---|

| 13.a. COMPLETE CURRENT ADDRESS *(Include ZIP Code)* OF APPLICANT OR PERSON IN ITEM 12 ABOVE *(Forward notification of all changes of address.)* | b. TELEPHONE *(Include Area Code)* 360- |
|---|---|
| Robert W. Bergstrom | c. E-MAIL ADDRESS @comcast.net |
| Vancouver, WA 98685 | d. FAX NUMBER *(Include Area Code)* none |

| 14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM. *(U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)* | CASE NUMBER *(Do not write in this space.)* |
|---|---|

| 15. SIGNATURE *(Applicant must sign here.)* | 16. DATE SIGNED *(YYYYMMDD)* 2009/08/03 | AUG 1 0 2009 |
|---|---|---|

**DD FORM 149, SEP 2007**          PREVIOUS EDITION IS OBSOLETE.          Adobe Designer 7.0

Attached are the submissions and responses to my Navy Cross recommendation letter appeal requests. It also includes the congressional submissions and replies. All of the replies I have received do not give the rational as to why the Navy Cross was not awarded when it should have been in 1942. They do not answer any of the questions I have posed to the awards branch since 2003. The fact remains that because the wrong award recommendation letter was sent in by the wing secretary it has biased all reviews that have occurred since then. My father preformed all of the same actions as those pilots whose Navy Cross recommendation letters were submitted correctly in 1942 and were awarded this decoration. Because of the administrative award confusion at that time so early in the war and the transfer of my father and his commanding officer shortly after the Aleutian Island campaign ended this error was not discovered or corrected. This erroneous submission of the wrong recommendation letter and the unjust review by the awards branch need to be corrected. Captain Edward W. Bergstrom is worthy of the Navy Cross decoration just like all the other pilots who risked their lives flying the slow and obsolete PBY flying boats in the snow and fog to bomb Kiska Harbor in June 1942.

The attached letter I submitted to the Secretary of Defense and the White House on May 31st, 2006 clearly describes the incorrect way the Secretary of the Navy Awards branch reviewed this request. It lists out all of the critical points and facts that show that my father is eligible for and deserves this award. Please correct this error and award him his rightful decoration.

Thank you,

Robert W. Bergstrom
August 3rd, 2009

Board for Corrections of Naval Records                    October 11, 2009
2 Navy Annex
Washington, DC   20370-5100

Dear Sir;

This letter is an addendum to the original submission I sent to you on August 1st 2009.  I would
like this letter to be added to the documents I have already sent you concerning the awarding of
the Navy Cross to my father, Captain Edward W. Bergstrom – service number 81765 1310
(decreased).

All Patrol Plane Commanders (PPC's) who were awarded the Navy Cross for bombing Kiska
Harbor during the Aleutian Island's campaign did not have the submission error that my father
had.  Records indicate that a total of at least five Navy Cross decorations were awarded to PPC's
during this campaign (June 10 to June 20, 1942).  Three were awarded to VP-43 (Davis,
Sorenson, and Jones -CO).  Two Navy Cross's were awarded to VP-41 (Theis and
Engelbretson).  There may have been more but these are the only one's that the awards branch
sent me citations for.  I am not aware of any other VP-43 and VP-41 PPC's who bombed Kiska
Harbor under the clouds during this time except for Jacobson.  *All PPC's who were
recommended for the Navy Cross by the wing commander and had no submission error by the
wing secretary were awarded this decoration.*

No Navy Cross awards were made to VP-42 personnel that participated in the bombing of Kiska
Harbor.  There were two awarded for other actions during this campaign (Campbell and Perkin's
- XO).  Only two VP-42 pilots actually bombed kiska Harbor at low level under the clouds (Lt.
Bergstrom and Nuss).  Only PPC Lt. Bergstrom bombed the harbor twice in a 24 hour period.
As far as I can determine Lt. Bergstrom was the only PPC from VP-42 recommended for the
Navy Cross by his wing commander for the bombing of Kiska Harbor.  VP-42 lost at least half
of the squadron during this time due to enemy action and the severe weather conditions.

Comparison of the actual citations for the Navy Cross and Lt. Bergstrom's DFC show close
similarities.  All of the Navy Cross citations show embellishment of the awardees actions as
compared to Lt. Bergstrom's DFC citation.  The citations written are almost the same for both
DFC and NX.  In fact the wording for the Air medal, DFC and the NX are all almost exactly the
same.  Since Lt. Bergstrom's NX recommendation letter was never reviewed by the awards
branch like all the other NX letters no embellishment was added to amplify his actions.  His
citation was not changed to show the actions which were above and beyond those of the DFC
citations.

All PPC's who were recommended for the NX flew under the clouds in Kiska Harbor and were
subject to intense ship and land based anti aircraft fire.  Those who just did the timed bombing
runs above the clouds were not subjected to this and were only awarded the DFC.  Only those
who did bomb below the clouds and were subjected to the enemy anti aircraft defenses were
awarded the Navy Cross.  All of the citations for the Air medal and DFC indicated that Kiska
Harbor was bombed under the clouds and give the impression that many more PPC's
accomplished this.  Only a select few actually "dive bombed" Kiska harbor under the clouds and
my father was one of them.

Only VP-41 and VP-42 PPC's flew the strenuous search missions for two weeks prior to the bombing of Kiska Harbor (starting the end of May). VP-43 did not participate in these search missions since they did not arrive in the Aleutians until the 10th of June. This meant that VP-41 and VP-42 PPC's and crews were already working at the limits of their physical endurance when they were ordered to bomb Kiska harbor.

In addition to performing the same actions described in the NX citations my father had to fight off attacking enemy floatplane fighters in order to bomb Kiska harbor (as noted in the USS Gillis radio log and newspaper article). He and his crew were at the limits of their physical endurance after the almost continuous two week search missions prior to bombing Kiska harbor. This was not the case for those PPC's from VP-43. According to the VP-42 war diary his two bombing missions to Kiska harbor were done with no break at all. The USS Gillis radio log also show him bombing Kiska harbor at the same time as PCP Theis and Englebretson in VP-41 (who were awarded the NX).

The law (PL 253) that authorizes the Navy Cross during this time states that it can be awarded for "extraordinary heroism or distinguished service in the line of his profession" This law was changed on August 7, 1942 to only "extraordinary heroism" (PL 702). Since my father's NX recommendation letter was not seen or reviewed by the awards branch the wording "extraordinary heroism" was left out of the DFC citation on purpose. He meets both criteria that are called out in the NX law. Extraordinary heroism for the two bombing attacks on Kiska Harbor under the clouds and distinguished service for the almost constant aerial search two weeks prior to the bombing attacks while at the limits of his physical endurance. He had to fly in extremely dangerous weather for all of these missions (snow, freezing rain, fog and "instrument only" flight conditions).

There was a great injustice done to my father when the wing secretary did not submit his Navy Cross recommendation letter to the awards branch in 1942. Because of this error he was not awarded the Navy Cross like all the other PPC's whose recommendation letters were submitted correctly. This error was not found until I discovered it in 2001. After the war, the ADM Horne review board did look at this recommendation letter because it was in his personnel file and not in the awards branch. They did not do a thorough review but only looked at the letter as presented to them. No input was sought or received from the wing commander or commanding officer for this review. Because Barbara Wilson told the review panel in 2003 that his actions mirrored closely those done for the DFC, they did not award him the NX (as reviewed by the Horne board in 1946). This was also a great injustice because she misrepresented the facts in the matter. Please correct this injustice and award the Navy Cross to Lt. Bergstrom as it should have been in 1942.

Sincerely,

Robert W. Bergstrom

Vancouver, WA 98685
1-360-▓▓▓▓

DRS
8417-09

Board for Corrections of Naval Records                    October 25, 2009
2 Navy Annex
Washington, DC   20370-5100

Dear Sir;

This letter is the second addendum to the original submission I sent you on August 11[th t] 2009
and contains new information.  I would like this letter to be added to the documents I have
already sent you concerning the awarding of the Navy Cross to my father, Captain Edward W.
Bergstrom – service number 81765 1310 (decreased).

The Horne Board sent out an ALNAV communication on January 15, 1946 to all Navy
commanders with its desire to review all rejected valor decorations issued in WW II "to ensure
equitableness of awards"  and to "to assure, in so far as practicable, that no oversights, injustices,
or omissions remain" (attachment 1).   My father's Navy Cross recommendation letter was
reviewed by a board but there is no entry of them reviewing this specific case in the Horne
Boards meeting notes.   The review letter only states that they "recommend that no change be
made to the award previously made" (attachment 2).   All the Horne Board meeting notes show
definite decisions to award a medal or not to.  The Horne Board never say's in its meeting notes
it" recommends" an award but makes a firm decision.  By using the word "recommend" instead
of awarding or not awarding the Navy Cross to my father it means no through review was done
of my father Navy Cross recommendation letter.  Because my father's recommending officer
was not notified or submitted supporting documentation to the Horne Board no award was made
of the Navy Cross. A complete and thorough review has never been done for my father's Navy  ✓
Cross recommendation letter as directed in the Horne Board communication.

The Horne board also determined that if other personnel were awarded a valor decoration for an
action then that same decoration should be awarded to those personnel who did the same exact
action but were not awarded it (attachment 3).  An example of this was when Admiral Horne
reviewed Lieutenant Kennedy's upgrade request from the Navy Cross to the Medal of Honor.
Admiral Horne stated that "if the Board was to award the Medal of Honor for this act it would
have to also award the same medal to other officers of the flight and to the pilot on the
subsequent successful flight".  This is the direct opposite to what I was told by the awards board
(Mr. Priest) in 2004 when he stated that "I must emphasize that award decisions are not made on
a comparative basis, but carefully weighing the merits of each individual case".

My father flew the same exact missions and did the same actions as those PPC's who were
awarded the Navy Cross for the bombing of Kiska Harbor in 1942.  His Navy Cross
recommendation letter was not submitted to the awards branch due to a wing secretary
submission error.  Because of this he was awarded the wrong decoration (DFC) and had a great
injustice done to him.  Those PPC's who flew the same exact mission and who's Navy Cross
recommendation letters were submitted correctly were awarded this decoration.

The above information clearly shows how my father was prevented from being awarded the
Navy Cross by mistakes and incorrect assumptions.  Please correct these injustices and award my
father the Navy Cross decoration as it should have been done in 1942.

OCT 29 2009

Sincerely,

Robert W. Bergstrom
████████████
Vancouver, WA 98685
1-360-████████



**DEPARTMENT OF THE NAVY**
SECRETARY OF THE NAVY COUNCIL OF REVIEW BOARDS
720 KENNON STREET SE STE 309
WASHINGTON NAVY YARD DC 20374-5023

IN REPLY REFER TO
1650
RW/025
22 Feb 2010

From: President, Navy Department Board of Decorations and Medals
To:   Chairman, Board for Correction of Naval Records

Subj: COMMENTS AND RECOMMENDATION IN THE CASE OF THE LATE
      CAPTAIN EDWARD W. BERGSTROM, USN, XXX-XX-2558

Ref:  (a) BCNR ltr 8417-09 of 27 Nov 2009 w/encls
      (b) Navy and Marine Corps Awards Manual

1. This is in response to reference (a), in which you requested comments and recommendation in the case of the late Captain Edward W. Bergstrom. We understand that his son has petitioned BCNR to upgrade Captain Bergstrom's Distinguished Flying Cross to the Navy Cross.

2. After careful review of this case, it is the opinion of the Navy Department Board of Decorations and Medals that no material error or injustice was done in awarding Captain Bergstrom the Distinguished Flying Cross. Therefore, we recommend that no relief be granted.

3. The Secretary of the Navy and the Chief of Naval Operations have previously reviewed this case in depth, and both concluded that no change to the DFC was warranted. While we thoroughly examined the documentation of those earlier reviews, we gave this case a fresh review. None of those involved in our current review had been previously familiar with the case.

4. On 19 July 1942, Captain Bergstrom was recommended for the Navy Cross by the Commander, Patrol Wing Four. On 5 November 1942, Captain Bergstrom was awarded the Air Medal. The CO, Patrol Squadron Forty-Two (VP-42) subsequently requested in an undated letter, that Bergstrom and two other pilots be awarded the Distinguished Flying Cross vice the Air Medal. As a result of that letter, Captain Bergstrom's case was reviewed on 1 April 1943, and the Distinguished Flying Cross was awarded.

5. Following the war, the Secretary of the Navy convened the flag level Board of Review for Decorations and Medals (aka Horne Board) to review all recommendations for personal decorations that had been downgraded, or that had resulted in no award. On 19 December 1946 that board reviewed Captain Bergstrom's initial award recommendation for the Navy Cross submitted on 19 July 1942, and recommended no change to the ultimate award of the Distinguished Flying Cross.

COMMENTS AND RECOMMENDATION IN THE CASE OF THE LATE CAPTAIN
EDWARD W. BERGSTROM, USN, XXX-XX-2558

6.   Commanders at the time were charged by the Secretary of Navy
with determining what level of award, if any, was appropriate to
recognize deserving sailors and officers. It is not the place of
the NDBDM to substitute our judgment for that of the commanders at
that time.  Our standard, per reference (b), is that unless new and
relevant information is presented that was not available to
previous decision makers, the case does not deserve reconsideration
by the Secretary of the Navy.

7.   It is apparent from our review that a fully functioning awards
system was in place in Captain Bergstrom's chain of command.  Some
pilots did receive the Navy Cross, while others received lower
awards.  It is impossible for us to know how those decisions were
made, as the detailed notes of the awards process in those units
could not be located.  In the absence of such records, we must
presume regularity.  We did compare all of the citations of the
awards for the bombing of Kiska Harbor, and noticed one major
difference.  All Navy Cross citations described the effectiveness
of fire, for example: "succeeded in scoring a hit."  We did not
find evidence in the record that Captain Bergstrom ever scored a
hit on the enemy during the Kiska Harbor mission.  While this alone
may or may not explain the differences in the levels of awards
approved, it is a clear difference.

8.   While Mr. Bergstrom's desire that his father receive the Navy
Cross is understandable, it must be said again that the
Distinguished Flying Cross is among our nation's highest awards for
heroism.  Many senior military officers, senior civilian leaders,
and award experts have personally reviewed Captain Bergstrom's
case.  All have concluded that the Distinguished Flying Cross is
the appropriate award and that the evidence does not support
upgrade.

9.   The point of contact at NDBDM is Major Wood, 202-685-1763.

                         Sincerely,

                         J. E. Nierle
                         Colonel, U.S. Marine Corps

2

0043
CAR000043

*rebuttal*

Department of the Navy                                              March 13, 2010
Board for Correction of Naval Records
Attn: James R. Exnicios
2 Navy Annex
Washington, DC 20370-5100

Mr. Exnicios,

I am writing in response to your letter dated 8, March 2010 (CRS, Docket No: 8417-09). Attached to
your letter was a letter from the President, Navy Department Board of Decorations and Medals
(NDBDM). That letter includes their comments and a recommendation in the case of my father's Navy
Cross recommendation letter upgrade request (1650, RW/025, 22 Feb 2010 - advisory opinion). This
reply from NDBDM just repeats the erroneous and false statements that they have communicated to me in
the past. They still do not explain exactly why my father's DFC was not upgraded to the NX when I
requested it in 2001. It does not address or explain why it was rejected when Lt. Edward Bergstrom
performed the same actions as all of the other pilots who were awarded the Navy Cross. A Navy Cross
recommendation letter was written by his wing commander, Cpt. Gehres however, the wing secretary
submitted the wrong award submittal to the awards board. It is very clear that because his Navy Cross
recommendation letter was not submitted to the award board and reviewed at the same time as the other
NX awards were (for the very same actions), he was not awarded the NX as Cpt. Gehres had approved.

In reviewing the NDBDM response letter attached, there is misinformation that has been presented by the
awards board. I have submitted critical evidence showing that there have been errors that have occurred
in the award process that must be rectified. The awards board continues to rely on the erroneous and
biased past reviews to make their recommendation to not upgrade the DFC to the NX.

In the NDBDM letter submitted to you on 22 Feb 2010 (including the advisory opinion), there are several
errors presented as well as new information that has not previously been shared with me. The following
is my response to the awards board's claims in the NDBDM letter:

1.  Paragraph 3 states that the awards board had "thoroughly examined the documentation of the
    earlier reviews, we gave this case a fresh review". A thorough review would have uncovered
    evidence that errors in the award process had occurred in the past and seek to rectify the errors. I
    have provided such evidence however; it has been ignored by the awards board. In the attached
    letter, this fact is not mentioned and therefore could be overlooked by additional reviews.

2.  Paragraph 4 incorrectly links the letter sent to the awards branch in 1943 to upgrade his Air
    Medal to the DFC by the CO of VP-42 to the NX recommendation letter. This letter from the CO
    of VP-42 requesting the upgrade to the DFC *is not* related in any way to the NX recommendation
    letter. The letter from the CO of VP-42 upgrading the Air Medal to the DFC only talks about the
    same flying conditions that the other two pilots endured. No mention is made of either the NX or
    its serial number in it. Nor does it mention the actions that convinced the wing commander to
    recommend the NX for my father. The DFC was awarded based on non Kiska Harbor bombing
    missions, and only for the operations in the extremely dangerous flying conditions that affected

REC'D MAR 2 2 2010

CAR000044

all pilots who flew in the Aleutians Islands campaign. These two other pilots never bombed Kiska Harbor like my father did.  If the awards board had performed a thorough review, these facts would have been uncovered.

3. Paragraph 5 references the ADM Horne letter of 19 December 1946.  This letter was not actually seen by the "Horne Board" but only by a member of that board.  There is no mention of this review in the ADM Horne board meeting minutes.  The ADM Horne letter *only* makes a *recommendation*.  Unlike all other ADM Horne board meetings where firm decisions are made; this official only made a recommendation.  There is no supporting documentation to determine whether an in-depth review had been made by this officer.  The ADM Horne board member was not aware that the NX recommendation letter had never been reviewed at all and incorrectly assumed it had been done, thus biasing his decision.

4. Paragraph 6 states that, "unless new and relevant information is presented that was not available to previous decision makers; the case does not deserve reconsideration."  In May 2004, I provided *new and relevant* information to the NDBDM.   In it, I provided the radio log of the sea plane tender, USS Gillis.  The radio log documents the radio communication of Lt. Bergstrom's two bombing attacks on Kiska Harbor at the same time as the other pilots who were awarded the NX for this action.  It also records his aerial combat to fight off enemy fighter's enroute to Kiska Harbor (the same action as NX awardee Commander Carroll Jones of VP-43).  The NDBDM did not consider it as new or relevant information even though it had not been seen by them before and was the exact type of action experienced by Commander Jones who was awarded the NX.

5. Paragraph 7 states that, "All Navy Cross citations described the effectiveness of fire, for example: ["succeeded in scoring a hit".]  We did not find evidence in the records that Captain Bergstrom ever scored a hit on the enemy during the Kiska Harbor mission."  As mentioned above, the USS Gillis radio log does support the evidence that Lt. Bergstrom did, in fact bomb Kiska Harbor twice within a 24 hour period (as in the war diary of VP-42 and his flight log book).  There is also evidence that other Navy pilots were awarded the NX without "scoring a hit."  In my review of the NX award citation cards sent to me by the awards branch, I have found at least three pilots who did not "score a hit" on any ships at all.  NX awardees Commander Carroll Jones, William Sorenson and Machinist Leland Davis did not "score a hit" on any ships in Kiska Harbor.  My father bombed ships under the fog in Kiska Harbor on two occasions with "results not observed".  He also strafed the enemy at this time (standard practice for attacking aircraft.)  There are many other examples where pilots made no hits at all on enemy ships but were awarded the NX or even the Medal of Honor (in other theaters).  A thorough review of the available documentation by the NDBDM would have uncovered the fact that there were no hits scored on any ships by the pilots who were awarded the NX during this action.  The only hits scored were a few Japanese flying boats damaged.  Most pilots who were awarded the NX did not even see where their bombs landed due to the poor weather conditions at the time.  It is a fact that all pilots who were awarded the NX flew thru and under the fog like my father did and were subject to intense anti aircraft fire.  In addition, (Public Law 253) makes no mention of an award criteria requirement of "scoring a hit" for the NX.  The actual criteria states that it is awarded for "extraordinary heroism or distinguished service in the line of his profession."  This law was changed August 7th, 1942 to

say, "Extraordinary heroism in connection with military operations against the enemy," (Public Law 702). Nothing in this law talks about "scoring a hit." The NDBDM also does not mention that all of the NX citations were embellished to show additional information once it was decided that the NX was going to be awarded. Since my father's NX recommendation letter was never reviewed by an awards board until 2001 there was no reason to embellish his award criteria wording. In fact his Air medal and DFC wording was changed to exclude the wording "extraordinary heroism" as is shown in his NX recommendation letter. If the NX was awarded at that time, this exact wording would have been added to the citation like all the other pilots who were awarded the NX. Based on the information I have provided to the NDBDM, it is very clear that my father did perform both extraordinary heroism and distinguished service in the line of duty at this time; just like all the pilots who were awarded the NX for the same exact actions that he did.

The NDBDM did not do a thorough or factual review of lieutenant Bergstroms' NX recommendation letter upgrade request at all. Had they done a thorough review, the evidence supporting the awarding of the NX to my father would be clear and indisputable. The NDBDM has based their decision on inaccurate and erroneous reviews from the beginning since the very first one was done by an awards board member in 1946 and the awards branch director in 2001. The fact remains that my father performed the same exact bombing missions and actions as all of the pilots who were awarded the NX. The only difference is that his NX recommendation letter was never submitted to the awards branch when it should of have been due to a wing secretary error. This submission error has caused a chain of events that have prevented a fair or factual review since the beginning. All subsequent review boards or officials have not bothered to perform a thorough review; rather they are relying on the continued inaccurate and biased reviews that were done previously. I believe that this is an injustice to my father and continue to seek the NX which not only he is due, but entitled to for his heroic actions. Please correct this injustice by approving the upgrade of his DFC to the Navy Cross and awarding it like it should have been in 1942.

Sincerely,

Robert W. Bergstrom

Vancouver, WA 98685
360-████

CR709
84

Department of the Navy                                            March 27, 2010
Board for Correction of Naval Records
Attn: James R. Exnicios
2 Navy Annex
Washington, DC 20370-5100

Mr. Exnicios,

This letter is to clarify exactly why Captain Edward W. Bergstrom is eligible for the Navy Cross as
recommended by his wing commander in July 1942.  It is also a follow up to the letter I sent you on
March 18th, 2010 which was a response to the comments and recommendation by the Navy department
board of decorations and medals (1650 RW/025 22 Feb 2010).  Captain Bergstrom was recommended for
this decoration by his wing commander because he flew below the fog to bomb Kiska Harbor twice in a
24 hour period and was subject to the intense ship and shore based antiaircraft fire.  He also had to fight
off attacking enemy fighter planes to do this.  ***No other pilots from VP-42 were recommended for the NX
for bombing Kiska Harbor, only my father.***  All pilots who did not bomb below the fog were only
awarded the Distinguished Flying Cross.  Only a select few pilots bombed below the fog of the harbor
and my father was one of them.  The way the DFC award criterion was written appears to show all pilots
bombing below the fog which is incorrect.  They only made timed runs from Kiska volcano above the
clouds to drop their bombs on the harbor.  They were not exposed to antiaircraft fire because they were
above the clouds.  The USS Gillis radio log clearly shows my father making bombing runs on the ships in
Kiska Harbor with other NX awardees.  Because his NX recommendation letter (serial 266) was not
submitted to the awards branch he was not awarded the NX.  Instead he was awarded the Air Medal and
then the DFC in error.  In fact in the letter written by the CO of VP-42 requesting the DFC upgrade does
not even mention the NX or the recommendation letter.  He only mentions the actions related to the DFC.
This awarding of the DFC biased all future award reviews because it gave the impression that a complete
review was done of the NX recommendation letter which was untrue.  This mistake has caused all
subsequent reviews to assume that the DFC was awarded in lieu of the NX when in fact it was not.
Because of this mistake no awards boards have acknowledged that his actions went above and beyond
those of the DFC and are only equaled by all pilots who were awarded the NX.  He flew the same exact
bombing missions and accomplished the same actions as the pilots who were awarded the NX (and who
did not have a wing secretary submission error).  He bombed Kiska Harbor twice in a 24 hour period and
was subject to intense ship and shore bases antiaircraft fire.  He also had to fight his way thru aggressive
enemy fighter plane attacks to bomb the harbor.  Pilots who were awarded the DFC did not experience
these actions at all.  The only pilots who did these same actions were the pilots who were awarded the
NX.

**Past Review Errors**

All reviews have based their findings and decisions on past inaccurate and biased reviews.  They have
also never given a reason why he is not worthy for this decoration when all past awardees were when he
had done the same actions as they had.  There have also been contradictory statements from different
review boards.  One review board says one thing and then another will say the exact opposite.  These
contradictory findings have shown the inaccurate and wrong though process that these reviews have
perpetuated from one review to another.  They are all just repeating and supporting all the wrong

information and decisions that had taken place before. This was clearly shown in the November 17th, 2004 letter from Mr. Priest (NDBDM/1177). In it he says, "I must emphasize that the award decisions are not made on a comparative basis, but by carefully weighing the merits of each case". This is in direct contradiction to what the awards manual he uses states. It states, "the …act must be performed in such a manner as to set the individual apart from his shipmates." The only way to show that an act sets an individual apart from another is to compare their actions. This statement by Mr. Priest was troubling since he is the secretary to the NDBDM and should have had an in depth and expert knowledge of the award criteria. But in the letter dated 07/16/2003 (Ser NDBDM/0502) a Mr. Hansford T. Johnson states that "Captain Bergstrom's DFC was determined to be the appropriate award for his actions when compared to similar actions". These two statements contradict each other and show that a fair review cannot be done by the Secretary of the Navy in this case.

Based on the information above it is very clear that Captain Bergstrom has had a great injustice done to him by the Navy and its poor review process. Many errors and wrong assumptions have been perpetuated by the various review boards and offices since the very beginning. They have chosen to ignore the facts and just believe what had been said before. He was not aware of how badly mishandled the Navy Cross review was done by the awards branch and did not know others who did the same actions as he were awarded the NX. Please correct this injustice and recommend that he be awarded the NX decoration like it should have happened 65 years ago as his wing commander ordered.

Sincerely,

Robert W. Bergstrom

Vancouver, WA 98685
360-



**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
2 NAVY ANNEX
WASHINGTON DC 20370-5100

CRS
Docket No: 8417-09
17 June 2010

MR ROBERT W BERGSTROM

VANCOUVER WA  98685

Dear Mr. Bergstrom:

This is in reference to your application for correction of your
late father's naval record pursuant to the provisions of title 10
of the United States Code, section 1552.

A three-member panel of the Board for Correction of Naval
Records, sitting in executive session, considered your
application on 16 June 2010.  Your allegations of error and
injustice were reviewed in accordance with administrative
regulations and procedures applicable to the proceedings of this
Board.  Documentary material considered by the Board consisted of
your application, together with all material submitted in support
thereof, your father's naval record and applicable statutes,
regulations and policies.  In addition, the Board considered the
advisory opinion furnished by the Navy Board of Decorations and
Medals dated 22 February 2010, a copy of which is attached, and
your rebuttal.

After careful and conscientious consideration of the entire
record, the Board found that the evidence submitted was
insufficient to establish the existence of probable material
error or injustice.  In this connection the Board substantially
concurred with the comments contained in the advisory opinion.
Accordingly, your application has been denied.  The names and
votes of the members of the panel will be furnished upon request.

It is regretted that the circumstances of your case are such that
favorable action cannot be taken.  You are entitled to have the
Board reconsider its decision upon submission of new and material
evidence or other matter not previously considered by the Board.
In this regard, it is important to keep in mind that a
presumption of regularity attaches to all official records.

Consequently, when applying for a correction of an official naval record, the burden is on the applicant to demonstrate the existence of probable material error or injustice.

Sincerely,

W. DEAN PFEIFFER
Executive Director

Enclosure

2

# Navy Cross Recommendation Letter Review Request

February 1, 2003

Chief of Naval Operations
Awards Branch
Barbara Wilson

Dear Barbara,

  I am the son of Captain Edward W. Bergstrom USN, 81765 1310, (deceased). During most of my father's USN career I was very young and unaware of the significance of his wartime actions. He passed away before I could ask him much about his combat experiences. For the past two years I have spent a considerable amount of time researching his background, corresponding with his peers and reviewing his USN records. I am now respectfully requesting the Department of the Navy review his record (along with the information attached) to determine if he is eligible for the Navy Cross due to his actions during the Aleutian Islands campaign of, June 1942. Based on my research I have discovered new and amplifying information that supports this review.

The following is a chronology of Capt. Edward W. Bergstrom's Navy career:

Date of birth – 1/5/16
Education – Graduated from University of Minnesota, BS degree, June 1938
Designated Naval Aviator – 11/20/39
Commissioned – 12/7/39
Chronological USN service:
  7/38-8/38 - Elimination flight training, NAS Minneapolis
  1/39-12/39 - Aviator cadet, NAS Pensacola
  1/40-12/40 - Pilot & Asst. Ops. VP-13 & 26 Ford Island
  12/40-1/42 - Pilot & Asst. Gunnery, VP-102 Philippines (warfare operations)
  1/42-4/42 - Pilot & Asst. Gunnery, VP-102 Dutch East Indies (warfare operations)
  4/42-11/42 - Pilot & Gunnery officer, VP-42 Aleutians (warfare operations)
  12/42-2/43 - Hedron Patrol Wing Four (warfare operations)
  3/43-8/43 - Ground training officer staff, NAITC Corpus Christi
  9/43-1/44 - Empire Central Flying School-RAF, Hullanington, England
  2/44-6/45 - Asst. Air Officer, Air officer school, CNAB Training
  7/45-9/45 - Asst. Air Officer, USS Yorktown (warfare operations)
  10/45-5/46 - Navigator, U.S.S. Solomons-CUE67-Trng
  6/46-5/47 - Student, General Line School, Newport, RI
  6/47-2/49 - C.O., FASRON 114, Kodiak
  3/49-7/51 - Training & Plans officer, CAN Res Train Staff, Glenview, Ill
  8/51-2/53 - C.O., Utility Squadron One, Barbers Point
  2/53-6/55 - X.O., VR-21, Barbers Point
  7/55-2/58 - X.O., NROTC Unit, Univ. of Utah

CAR000051

3/58-1/59 - X.O., PXO school San Diego & USS Salisbury Sound (AV-13)
2/59-7/62 - Head, Mobilization Plans & Policies Branch, Naval Operations OP 101
7/62-7/65 - C.O., AIRTRANSRON SEVEN VR-7, NAS, Moffett Field, CA
7/65 - Retired

Promotion history:
- ENSIGN 11/20/39
- LTJG 01/15/42
- LT 06/15/42
- LCDR 05/20/44
- CDR 05/28/50
- CAPT 11/01/58


My father was recommended for the Navy Cross by his commanding officer, Captain
Gehres (see attachment  #1; Recommendations for awards to personnel for conduct during the
Aleutian Islands Campaign-Serial 0266, and his fitness report for that time period, June 1st to
June 20th 1942.)  It describes his actions as follows:

"During the Aleutian Islands Campaign, Lieutenant (junior grade) Edward W.
Bergstrom, A-V (N), USNR, as a patrol plane commander, accepted extremely
dangerous weather conditions consisting of high winds, snow, rain, fog and
icing without question.  His assigned tactical missions were eagerly carried out
during enemy air raids of Dutch Harbor and Fort Glenn in the face of enemy
air opposition.  He participated in all-night aerial patrols and bombing missions
on enemy ships in Kiska Harbor against heavy enemy air and anti-aircraft
opposition.  Lieutenant Bergstrom's eagerness to accept enemy opposition
during extremely dangerous weather marks his flights as outstanding and
extraordinary.  He has performed many missions each of which, considered
separately, would be worthy of an award."

Reference in this letter was made to five different commendatory messages, which
supported this award.  Three of these messages can be seen in attachment #2.  Researchers at the
National Archives (NARA) in College Park, MD could not locate the other two.

The following evidence suggests that the awards branch did not review his Navy Cross
recommendation letter when it was submitted on July 19th 1942.  He was awarded an Air Medal
for this time period per CinPac Serial 23.  No mention was made of his Navy Cross
recommendation letter (Serial 0266) in this communication (see attachment #3.)  The executive
officer (XO) of VP-42, LT. Cdr. Perkins became aware of him being awarded this lesser medal
instead of the DFC that most other patrol plane commanders (PPC) were given for this campaign
per Serial 23.  The XO then sent to the awards branch a letter explaining how this happened and
requesting the upgrading of the Air Medal to the DFC (see attachment #4.)  LT. Cdr. Perkins'
letter makes it very clear that the initial awards recommendation list for the squadron had
discrepancies within it due to errors by the wing secretary (in his letter he does not mention that
this award was in any way connected to the Navy Cross recommendation.)  He also says that
"On the initial group of citations prepared," [LT Bergstrom] was "inadvertently omitted from the
recommendations forwarded for this squadron, probably due to the enormous clerical work load

CAR000052

at that time." And that "Subsequent recommendations apparently received different treatment from the Pacific Fleet Board of Awards, which resulted in the embarrassing circumstances." ***Because of this letter, the awards branch awarded the DFC in lieu of the Air Medal that was already awarded per CincPac Serial 23 (see attachment #5.)*** During all of these communications, no mention was ever made of his Navy Cross recommendation letter. All the evidence seems to point to the "mishandling" and non-review of the Navy Cross recommendation letter from the start (or perhaps confusion because of the similarities of the citation wording on both Serial 23 and Serial 0266.)

1. There is no DFC or Air Medal documentation for this time period that specifically references the Navy Cross recommendation letter in it.
2. The Navy Cross recommendation by Serial 0266 was done on July 19th 1942 and the Air Medal recommendation by CincPac Serial 23 was done at an earlier date. Both are for the same actions.
3. It appears that, due to a processing error by the wing secretary while preparing Serial 23, he inadvertently excluded Lt. Edward Bergstrom's Navy Cross recommendation letter from it. Because of this error LT. Bergstrom was awarded the Air Medal initially when he should have received the DFC (no one knew that he was recommended for the Navy Cross so they assumed that this was what he should have received.) The wing secretary was informed of this error and then sent a corrected recommendation to the awards branch, with no action being taken by them. It took a letter from the XO to correct this error and have the DFC awarded in lieu of the previously award Air Medal. Because of the enormous clerical load at the time, his Navy Cross Recommendation Letter Serial 0266 was not sent to be reviewed and subsequently overlooked. It was not included in Serial 23 from the onset as it should have been. The XO does not appear to have known about Serial 0266 (or did and assumed it had been reviewed by the awards branch) and thought that LT. Bergstrom was only eligible for the DFC award.
4. The DFC recommendation Serial 23 was appropriate for all PPC's who took part in the Aleutian Islands campaign's scouting missions and for the attack on Dutch Harbor.
5. Serial 0266 actions exceeded those of Serial 23's DFC criteria and of all other PPC's in VP-42 at his rank and above because he alone bombed Kiska harbor under extremely intense enemy air, land, and ship based anti-aircraft defenses during a mission that was at least twice as long as all others flown during the campaign.
6. The Serial 0266 letter was forwarded to his fitness report and sat there until the ADM. Horne review after the war. The awards branch never reviewed it.
7. The only time the Navy Cross Serial # is mentioned is in the ADM. Horne review letter of December 1946 (see attachment #6.) This letter states that the awarding of the DFC was appropriate and that no change was needed. It did not realize that the DFC was awarded per CincPac Serial 23 and not per Serial 0266 as indicated in the letter.
8. The ADM. Horne letter was not aware that the Navy Cross recommendation letter was never reviewed at all. It <u>assumed</u> that a review had been done, which was incorrect.

LT. Edward Bergstrom displayed extraordinary heroism and courage during the Aleutian Islands campaign, (see attachment #7, Seattle Times, dated Sept. 8th, 1942). The combat flying weather in the Aleutians during this time was the worst in the world. Many planes and crews were lost not only to the enemy but to extremely hazardous weather as well. LT. Edward Bergstrom was the lead pilot that was assigned to fly the only VP-42 PBY bombing mission (June 12th 1942) to Kiska harbor during the "Kiska Blitz", June 11th to June 14th, 1942

CAR000053

(attachment #12.) He was chosen to lead this mission due to his past combat/bombing experience acquired while with Patrol Wing Ten at the start of the war in the Philippines and Dutch East Indies. This was a special bombing mission hastily put together on June 10th. It had a total flight time of 20 hours, which was above and beyond those being flown by all other PBY pilots during this action (see attachment #8 for his log book page.) This mission consisted of three VP-42 PBY's that had survived the past twelve-day enemy scouting missions and the bombing of Dutch Harbor (a total of six PBY's were lost from VP-41 & 42 during this time period and six were unserviceable). All surviving crews were at the limits of their endurance when the bombing mission was flown. LT. Bergstrom and Ensign Nuss were the only VP-42 planes to actually complete their mission and bomb Kiska Harbor. He flew below the fog at an altitude of 2000 to 3000 feet during his bombing run while under heavy anti-aircraft gunfire (see attachment #8 for a map of Kiska harbor done by Ensign Nuss of the enemy ship and antiaircraft locations on that day.) No other plane flew with him over the harbor. The anti-aircraft defenses were extraordinary and devastating (see attachment #9.) There were two cruisers and four destroyers in the harbor with assorted transports and patrol craft, all firing at his plane. He encountered a very heavy concentration of antiaircraft guns on shore and enemy seaplane fighters in the air. He states in a newspaper article that "We saw their shore installations at Kiska," said Bergstrom, "and they don't have much, but they do have seaplane fighters, which helps." He may have also bombed Kiska harbor on another date, but no record could be found. It is amazing that his plane was not shot down during this bombing run. VP-43 lost one whole crew over the harbor on June 14th and earlier two other crewmen were killed and many more wounded. According to the VP-43 war diary they had to scrap at least two PBY's due to battle damage and had "many bullet and shrapnel holes in tail and wings of remaining planes participating" (see attachment #10.) The Japanese defenses were ready since the bombing had started on June 11th with both PBY's and Army Air Force B-24's (one B-24 was shot down on the 11th and two others were severely damaged at the same time.)

According to LT. Edward Bergstrom's logbook, he departed Dutch Harbor on June 12th at 0300 and flew directly to Kiska harbor for the bombing (total distance of around 750 miles.) He then flew to Atka and refueled from the Gillis. From there he flew to Umak and then back to Dutch Harbor. Total flight time was approximately 20 hours for the mission.

During this same time his action in preventing a submarine attack on the U.S.S. US Grant on June 17th, 1942 is also mentioned in VP-42's war diary and the ship's deck log (see attachment #12.) It states, "U.S.S. GRANT sailing from Cold Bay beginning 0405 (plus 10). One plane, Lieutenant (jg) Bergstrom, sighted a periscope off Sanak Island in 54° - 32' N, 162° - 30' W. An immediate attack was made dropping one depth bomb. No damage to the submarine was apparent, but an attack on the GRANT was probably averted." The U.S.S. US Grant was an Army transport that had just off loaded troops and its loss would have reduced combat effectiveness for the whole campaign. This action is not mentioned in any awards recommendation letter or correspondence at all.

He was also able to pass on knowledge that he acquired while in combat against the Japanese in the Philippines and Dutch East Indies to the other PPC's in his squadron. The value of this knowledge was evident in at least one case that prevented the loss of an aircraft from his squadron. LT. Campbell described a mission he was on where he used some of this knowledge; "I was on a scouting mission before the first attack," [Dutch Harbor] he said. "Bergstrom had put me wise to cloud flying-staying on the edges, so that I could pull back into them if attacked. I

CAR000054

contacted a landplane –it wasn't a Zero, but a biplane of an older type-I was able to avoid it alright." (see attachment #7.)

On June 14th an order was given to end the bombing missions when the seaplane tender Gillis at Atka Island ran out of food and bombs and the surviving crews were exhausted. Most of the bombing was done by VP-43, which had arrived from San Diego on June 10th. They had not flown any of the long scouting missions prior to the bombing so were not at the limits of their endurance on June 11th like the surviving VP-41 and VP-42 crews were. Very few of the PPC's that bombed Kiska Harbor had also participated in the scouting missions or the bombing of Dutch Harbor and they were from VP-41.

One of these PPC's was **LT. Bill Thies** and he was awarded the Navy Cross for this action (see attachment #11.) LT. Thies's action was very similar to that of LT. Bergstrom's. They both had flown the long and dangerous patrol missions since May 29th and had been in the bombing of Dutch Harbor. LT. Thies had also bombed Kiska harbor but the bombing mission(s) were not as long as LT. Bergstrom's and he had not located and attacked an enemy submarine during this time (almost all Kiska bombing missions were flown from the tender Gillis at Atka Island, which was around 300 miles from Kiska.) His Navy Cross citation letter states that he had hit a transport during the bomb run. Post war examination of enemy records did not substantiate this claim.

A VP-43 **Naval Aviation Pilot, Leland Davis** also was awarded the Navy Cross for actions during the bombing of Kiska harbor. These actions were very similar to LT. Bergstrom's. Machinist Davis had also attacked an enemy submarine and had bombed Kiska harbor. He had not flown the long patrol missions or was in the bombing of Dutch harbor like LT. Bergstrom. Davis was the PPC who was lost with all hands on June 14th over Kiska harbor.

Other Navy Crosses awarded for the "Kiska Blitz" were to: Ensign James T. Hildebrand of VP-41, CO LT. Cdr Jones, and Ensign Sorenson, both of VP-43.

LT. Bergstrom's actions were unique because he undertook the bombing of Kiska Harbor after he had been on almost continuous long-range patrol missions searching for the enemy in the preceding twelve days. Only one other VP-42 PPC and a few from VP-41 shared this rigorous schedule, and no other PPC from the wing besides Ensign Nuss flew this long of a bombing mission as far as I can tell. The weather conditions during these patrol missions and the attack on Kiska harbor was extremely hazardous due to the low fog and freezing levels. He also experienced freezing rain, high winds and snow squalls during these missions. The enemy defenses that he was subjected to during the bombing of Kiska Harbor were extensive and extremely dangerous. Despite these hardships he successfully performed his duty in a heroic and distinguished fashion in the face of overwhelming odds and adversity.

It should also be noted that he arrived in the Aleutians at the end of April 1942 after returning to the United States from Australia a week before. From December 8th 1941 to march 6th 1942 he was a PPC with Patrol Wing Ten (VP-102) in the Philippines and Dutch East Indies. During that time he was with the only Navy aircraft wing that had engaged the Japanese in combat. Ninety eight percent of the wing's PBY's were either shot down or destroyed on the water by enemy attacks. He was one of the few members of Patrol Wing Ten to fight the

5

Japanese and survive. He never had any real time off when he returned to the states and was immediately sent to the Aleutians for combat. No other PPC from Patrol Wing Ten had this done to them. Most were given extended leave before being sent out again. While with Patrol Wing Ten he participated in extensive scouting and combat missions against the Japanese. He was shot down at least once and escaped from enemy aircraft attacks many times. The missions he flew were very long and extremely dangerous with no fighter protection at all. Due to the spread out nature of these missions his CO never knew much of his actions so no awards were given until after the war (two Air Medals for missions flown and a Presidential unit citation.)

In summary, his actions were very similar to those of other PPC's who were awarded the Navy Cross, and in some cases his actions exceeded them. LT. Edward Bergstrom showed extraordinary heroism while accomplishing many difficult and dangerous missions. He bombed Kiska Harbor after being on almost continuous enemy scouting missions in the preceding twelve days, during which half of his squadron's planes were lost to enemy action or the weather. He was at the limits of his endurance when he was ordered to fly a 20-hour plus bombing mission in extremely hazardous weather conditions. When he reached Kiska Harbor he was subjected to sea, land, and air based antiaircraft defenses that were devastating against an aircraft that was never designed to make this type of an attack much less in broad daylight against heavily defended targets. He also prevented an enemy submarine attack against the Army transport USS US Grant and provided valuable PBY combat flying knowledge from his time in Patrol Wing Ten that helped his fellow PPC's survive against the enemy.

Based on the facts presented above, and the fact that his Navy Cross recommendation letter was never reviewed, I am requesting that the Navy review it now. Time does not erase the fact that he flew in extraordinary and dangerous situations during the month of June 1942 and that he deserves to be awarded the Navy Cross as recommended by his commanding officer, Captain Gehres.

Thank you for considering my request and I look forward to your response.


Sincerely,


Robert W. Bergstrom
██████████
Vancouver, WA 98686
Phone # 1-360-█████████
████████@pacifier.com

6

16 April 2003

To:  CDR D.A. LOFTUS
Fr:  Barbara Wilson

Su:  REQUEST FOR REVIEW FOR NAVY CROSS ICO FORMER CAPT
     EDWARD W. BERGSTROM, USN, 81765, 1310 (DECEASED)

Mr. Robert W. Bergstrom, son of Capt Edward W. Bergstrom, has been seeking to have his father's recommendation for the Navy Cross recommended by Commander, Patrol Wing FOUR on 19 July 1942, (Attach 1), reviewed to award his father the Navy Cross, posthumously. The recommendation was for then LTJG Bergstrom's actions during the enemy bombing of Dutch Harbor and Umnak and as a patrol plane commander when he eagerly accepted extremely hazardous scouting missions and participated in all-night aerial patrols and bombing attacks on enemy ships in Kiska Harbor against concentrated air and anti-aircraft opposition.

Robert Bergstrom contends in his request that, though awarded a Distinguished Flying Cross (DFC) from a different recommendation, his father's Navy Cross recommendation was never reviewed and requests the Navy review it now.

His father was recommended for the DFC by CINCPAC, it was original approved by SECNAV 5 Nov 42 as an Air Medal and then later upgraded to the DFC on 25 Mar 43. The Horne Board reviewed this case again in their comprehensive review and determined "No Change" to the DFC. The DFC was for the period 10 to 20 Jun 1942. NDBDM awards card is at Attach 5; citation reads almost identical to the proposed citation for the Navy Cross at Attach 1.

From reading Mr. Bergstrom's request, it wasn't clear whether he was requesting a separate award of the Navy Cross after review of the recommendation "or" because it appears to be for the same action that the DFC was awarded, if he wanted the DFC upgraded. Per my recent telecon with him, he indicated upgrade of the DFC to a NX.

There appears to have been two separate recommendations originated - one for the DFC and one for the NX by two different commands. Though it is not clear by available records what happened to the NX recommendation, it is "very" clear that the actions cited in the NX recommendation mirrored those actions of the DFC. These "specific actions" were reviewed on three different occasions as outlined in

in the NX recommendation mirrored those actions of the DFC. These "specific actions" were reviewed on three different occasions as outlined in para 3 above. Any one of the three reviews could have deemed LTJG Bergstrom's actions to warrant a higher award than the DFC but did not. I have attached copies of the awards card on as many records as I could locate from the list of individuals included in his request to include 3 Navy Crosses (DAVIS, SORENSEN, JONES) and 4 DFC's (BINGHAM, DICKEY (2), JONES) for actions during June 1942 for review and comparison.

v/r, Barbara



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D.C. 20350-2000

IN REPLY REFER TO

Ser 09B13/3U515571
1 May 2003

FIRST ENDORSEMENT on ROBERT W. BERGSTROM ltr of 1 Feb 03

From:   Chief of Naval Operations
To:     Secretary of the Navy (Navy Department Board of Decorations and Medals)

Subj:   REQUEST FOR REVIEW FOR NAVY CROSS ICO FORMER CAPT EDWARD W. BERGSTROM, USN, 81765 (DECEASED)

1.  Forwarded recommending the Distinguished Flying Cross as previously approved vice the Navy Cross as the more appropriate award for Captain Edward W. Bergstrom's actions for the period 10 - 20 June 1942.

B. A. WILSON
By direction
Chief of Naval Operations

CAR000059



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

1650
Ser NDBDM/0502
16 July 2003

From:   Secretary of the Navy
To:     Chief of Naval Operations

Subj:   RECOMMENDATION FOR NAVY CROSS

Encl:   (1) ROBERT W. BERGSTROM ltr of 01 FEB 03 with ends

1.  After carefully considering the request contained in
enclosure (1), no upgrade to the previously approved
Distinguished Flying Cross is approved.

2.  Captain Bergstrom's accomplishments are noted with great
pride.  However, this case has been reviewed on several
occasions.  Besides the original reviews by the chain of command
and this most recent review, subsequent to World War II the
Secretary of the Navy ordered a special board to review awards to
ensure uniformity across theaters.  While some awards were
upgraded based on this extra review, Captain Bergstrom's
Distinguished Flying Cross was determined to be the appropriate
award for his actions when compared with similar actions.

Hansford T. Johnson
Acting

Copy to:
ROBERT W. BERGSTROM

EDWARD W. BERGSTROM - FILE COPY
CAR000060

Barbara Wilson                                              April 15, 2004
Chief of Naval Operations
2000 Navy Pentagon N09B13
Washington DC 20350-2000

Barbara;

      This is in reply to my FOIA request for information that I received from you last week. It was in response to my father's (Capt Edward W. Bergstrom) Navy Cross Recommendation appeal that I had sent you February of 2003. I initiated a FOIA request because I had never heard from either your office or from the Secretary of the Navy as to the final decision. I was very surprised at the information I received on the FOIA from your office. Besides the April 16th 2003 letter in which you determined that there was no reason to upgrade my father's DFC to the Navy Cross (in your opinion); I was shocked to see the letter from the Secretary of the Navy not approving it. In the Secretaries letter it said "copy to Robert Bergstrom." I was never sent a copy of this denial thus I have been waiting almost a year for a reply in vain. Is this truly a denial or was it just not sent to me in error? I am not clear on your reasoning found in the last paragraph justifying the denial. There are several points which I wish to clarify:

**Mirroring of criteria:**
      You state that "it is "very" clear that the actions cited in the NX recommendation mirrored those actions of the DFC." Yes they may sound similar but since the Navy Cross serial 0266 was never reviewed the final citation would have been different than the generic one found in the serial 23 DFC citations. When a Navy Cross recommendation is reviewed, the final citation wording will be different than from the wording first proposed by the field commander because the review process will bring out more detailed words or phrases describing the actions or facts more completely. You also say that these "specific actions" were reviewed on three different occasions which is only true for the serial 23 DFC criteria and not for serial 0266.

**ADM. Horne review**:
      You state that the Horne board did a "comprehensive review" of serial 0266 which is incorrect. The ADM. Horne board did not review his NX recommendation serial 0266 correctly. They say that they determined that no upgrade was approved based on the "services set forth in the basic correspondence." This means that they assumed that the citation wording was the final NX wording after serial 0266 had been reviewed by an awards board in 1942. No awards board ever reviewed the serial 0266 NX recommendation letter. The wording found in serial 0266 is similar to serial 23 because of the confusion of two separate awards letters being sent at the same time to the awards branch in error. A complete review of serial 0266 would have clearly shown how his actions went well above and beyond those of his peers and met the Navy Cross criteria. If they had done a comprehensive review they would have discovered why the wing commander recommended him for the NX and no other PPC at his rank from his squadron for actions during the Aleutian Island Campaign.

**Serial 23 was a generic statement**:
      The serial 23 DFC criteria was a generic statement that was broad based and not specific to one PPC. Its statement "bombing attacks against ships in Kiska Harbor" is found on each serial 23 DFC

CAR000061

criteria but in fact only a few PPC's actually bombed the harbor during the Aleutian Island Campaign. Of those that did, most bombed thru the cloud cover on a timed run from Kiska volcano or while flying thru the clouds and fog well above the antiaircraft defenses. As I described in the Navy Cross Recommendation appeal letter, he flew the long and extraordinarily dangerous reconnaissance patrols looking for the Japanese carrier/invasion force for two weeks before being ordered by the wing commander to bomb Kiska Harbor. No other PPC's at his rank from his squadron flew the long patrol missions and bombed Kiska Harbor and only a few from VP-41 did (William Theis.) In fact the only PPC's to actually bomb Kiska Harbor during the Aleutian Islands campaign were for the most part those from VP-43, Ensign Nuss and LTJG Bergstrom from VP-42 and a few from VP-41 (William Theis.)

**Photographic evidence of the attack**:
        The attached captured Japanese photo shows quite clearly his bomb run and how close he was to the target (exactly the same as William Theis and many of the VP-43 PPC's who were awarded the Navy Cross.) This photo was captured on Guam after the war and shows the heavy antiaircraft bursts around his plane. It was taken at 9:10am on June 12th 1942. There are also captured Japanese newsreel films of the same attack. This eyewitness film justifies his worthiness of being awarded the Navy Cross. This is his plane because of the time and date the photo was taken. Per his log book (and war diary) he left Dutch Harbor around 0300 June 12th and flew directly to Kiska Harbor arriving at 0900+10 (9:10am) (see attached flight time calculations based on feedback from veteran PBY pilots who flew this exact route in the Aleutians during World War Two.) After bombing the harbor he flew to the USS Gillis for refueling.

**Awards cards**:
        You also attached copies of awards cards from other PPC's who were awarded the NX. All of these PPC's were from VP-43 and did not have to fly the long and dangerous patrol missions for two weeks prior to the bombing of Kiska Harbor. LTJG Bergstrom flew these patrols and bombed Kiska Harbor with no real break while at the utmost limits of his physical endurance. The only PPC who was awarded the NX that did fly the long patrol missions and bombed Kiska Harbor like LTJG Bergstrom was LT William Thies of VP-41. He is the one you should have compared him to and not the VP-43 PPC's. LTJG Bergstrom's actions went above and beyond those of the VP-43 PPC's because they did not fly the long patrols and then bomb Kiska Harbor with no break like he did. The awards cards that showed the DFC criteria for comparison were for PPC's (Bingham and Dickey) who were never recommended for the Navy Cross.

**Three separate recommendations caused confusion:**
        Due to the fact that there were three separate recommendations submitted to the awards branch for the same actions at different times, errors were made. The wing secretary initially inadvertently omitted LTJG Bergstrom's DFC recommendation forwarded by the squadron to the awards branch in error due to the enormous workload at the time (he was awarded the Air Medal anyway.) The wing secretary was informed of this on July 4th, 1942. A corrected DFC recommendation was then sent to the awards branch and received different treatment so that it was not reviewed at all (there was confusion because they had received the Air Medal recommendation first and a similar worded NX recommendation on July 19th, 1942.) The letter from the CO which recommended the Air Medal upgrade to the DFC for my father and other PPC's clearly states this. Also at this time the Battle of Midway awards were being processed by the awards branch so they were overwhelmed and could not

CAR000062

spend the time sorting out why they had received three decoration requests for the same actions and time period. He was recommended for the Navy Cross (serial 0266) by his wing commander and the recommendation was never reviewed properly because of this confusion. He was the only PPC to be recommended for the NX for actions during the Aleutian Islands Campaign (June 1st to June 15th, 1942) in his squadron at his rank and below. It was referenced by the Horne review but they only looked at the "basic Communication" which did not indicate why his actions were any different than the other PPC's in his squadron. A complete review of what he actually did shows that he performed well above and beyond the level of all other PPC's at his rank. Those PCP's in VP-41 who "mirrored" his exact actions were awarded the Navy Cross (William Thies for one) for the Aleutian Islands Campaign (there was no submission errors or confusion with their NX recommendations.)

**Public law change:**
      You should also be aware of the Public Law that covers his NX recommendation (attached.) It is Public Law 253 and not Public Law 702 that is in use now. PL 253 was amended on August 7th 1942. His actions took place in June of 1942 so are covered by PL 253. The change is significant because it removed the "or distinguished service" reference. His actions were for both distinguished service and extraordinary heroism. Distinguished service is displayed by his extraordinarily dangerous patrol missions which were flown almost continuously for two weeks prior to his bombing of Kiska Harbor and "as officer in charge of two difficult advanced base units of the squadron" during that same time period. Extraordinary heroism is shown by both the long and dangerous patrol missions and for the actual attack on Kiska Harbor thru intense ship, aircraft and land based antiaircraft fire of which very few PPC's from VP-41 or VP-42 did (Ensign Nuss.)

The aircraft that he and all of the other PPC's who bombed Kiska Harbor flew was the PBY flying boat. This aircraft was never designed to be used the way it was during the "Kiska Blitz." It was designed to attack lightly defended submarines and patrol craft, not heavily defended land and sea targets. It was slow, not very maneuverable and carried a small bomb load. The only reason it was used to bomb Kiska Harbor is because that was all that was within reach of the enemy at the time. All the aircraft carriers were at the battle of Midway. This bombing with PBY aircraft was a desperate measure dictated by the circumstances.

Please review your initial conclusions found in the April 16th 2003 letter in light of the above rebuttal. Again, I am asking that his serial 0266 Navy Cross Recommendation Letter be reviewed fully by the awards board. LTJG Bergstrom is worthy of being awarded the Navy Cross just like the other PPC's (William Theis) who flew the long and dangerous patrol missions and bombed Kiska Harbor thru intense antiaircraft fire were.

Thank you,


Robert W. Bergstrom
████████████
Vancouver, WA 98686
1-360-██████
████████@pacifier.com

CAR000063

Barbara Wilson                                          May 21, 2004
Chief of Naval Operations
2000 Navy Pentagon N09B13
Washington DC 20350-2000

Barbara;

      This is an addendum to the April 15th, 2004 FOIA rebuttal letter I just sent you.  Since then I received a document from the National Archives (NARA) that expands on, and supports the awarding of the Navy Cross to my father, Capt. Edward W. Bergstrom.  This document is the radio log for June, 1942 from the USS Gillis.  The USS Gillis was the seaplane tender that was at Atka Island which serviced and bombed up the PBY's participating in the "Kiska Blitz", June 11th to the 14th 1942.  What is remarkable about this document is that it records the actions that he did on June 11th and 12th, 1942.  His radio call sign was "22V3."  Per the attached "Operation Plan No. 1-42" it directs Patrol Squadron FORTY-TWO to use call signs "Thirteen VICTOR" to "Twenty four VICTOR."  Per the VP-42 war diary only three planes were ordered to bomb Kiska from the squadron.  LT Campbell did not bomb Kiska per the appendix.  Ensign Nuss did bomb Kiska Harbor per the radio log of the Gillis and the war diary appendix.  The only VP-42 plane to also bomb Kiska was my father's plane (call sign 22V3.)  The radio log also shows his plane making another bombing run on Kiska June 11th.  The first time he bombed was on June 11th at around 7 PM.  He flew with two other VP-41 PBY's (3V3 and 7V3.)  They bombed ships in the harbor with a direct hit on a transport.  He then flew to Dutch Harbor per orders.  From there he flew back to Kiska.  At 10 AM on June 12th he engaged in combat with an enemy cruiser plane which was driven off.  At 11 AM he made a bombing run on Kiska Harbor, results not observed.  He mentions this bombing run and combat with the cruiser plane in the Los Angeles Times newspaper article that was sent with the original Navy Cross Recommendation letter appeal.  The time of this attack is around two hours after the time on the captured Japanese bombing photo.  The time difference is probably explained by the time the translator used - Tokyo time (?)  The times used on the Gillis radio log are in ZULU time (GMT -10.)  This document clearly shows his actions and why he is worthy of being awarded the Navy Cross.  He and Ensign Nuss were the only pilots from VP-42 to bomb Kiska Harbor during the "Kiska Blitz."  **He bombed the harbor twice in one 16 hour period.**  He flew under intense enemy seaplane attack and sea and land based anti aircraft fire each time.  These attacks were carried out while he was at the utmost limits of his physical endurance.  No other PPC from VP-42 did this many bombing missions against Kiska Harbor.  Will you please reconsider your initial recommendation that no upgrade to his DFC was warranted.  These attached documents clearly describe his actions and shown that he is worthy of the Navy Cross.

Thank you,


Robert W. Bergstrom
█████████
Vancouver, WA 98686
1-360-█████
████████@pacifier.com

1

CAR000064

Grace Cole, CIV SECNAV ADMIN CACB                                    May 21st 2004
Department of the Navy
Office of the Secretary
1000 Navy Pentagon
Washington, D.C.  20350-1000

Grace,

      Attached is a document that was sent to me by the National Archives that provides additional documentation supporting my father, Capt. Edward W. Bergstrom's worthiness of having his DFC upgraded to the Navy Cross decoration. Attached is also a copy of a letter that I sent to the director of the awards branch-CNO, Barbara Wilson. It is a follow up addendum to the letter that I sent her on April 15th 2004 concerning her decision to not recommend his DFC being upgraded to the Navy Cross. The document is the radio log from the USS Gillis for the month of June 1942.

      The USS Gillis was the seaplane tender that serviced the PBY's who bombed the Japanese forces during the "Kiska Blitz." This radio log documents Ensigns Edward Bergstrom's actions that caused the Wing Commander of Patrol Wing Four to recommend him for the Navy Cross (Serial 0266.) It indicates that he bombed Kiska Harbor twice in a 16 hour period. These actions were under intense enemy seaplane attack and sea and land based anti aircraft fire. He was also operating at the utmost limits of his physical endurance during the bombings. He was the only PPC from his squadron (VP-42) to bomb Kiska Harbor twice during the Kiska Blitz. No other PPC did this. The first time he bombed was on June 11th at around 7 PM. He flew with two other VP-41 PBY's (3V3 and 7V3.) They bombed ships in the harbor with a direct hit on a transport. He then flew to Dutch Harbor per orders. From there he flew back to Kiska. At 10 AM on June 12th he engaged in combat with an enemy cruiser plane which was driven off. At 11 AM he made a solo bombing run on Kiska Harbor, results not observed. He mentions this bombing run and combat with the cruiser plane in the Los Angeles Times newspaper article that was sent with the original Navy Cross Recommendation letter appeal. The time of this attack is around two hours after the time on the captured Japanese bombing photo. The time difference is probably explained by the time the translator used - Tokyo time (?) The times used on the Gillis radio log are in ZULU time (GMT -10.) This document clearly shows his actions and why he is worthy of being awarded the Navy Cross. His actions went above and beyond those of his squadron and were equal to, or exceeded those of other PPC's who were awarded the Navy Cross for this action. I would appreciate the Secretary of the Navy reviewing this new information and upgrade my father's DFC to the Navy Cross.

                 Sincerely,


                 Robert W. Bergstrom
                 █████████████

                 Vancouver, WA 98686
                 360-█████████
                 ████████@pacifier.com I



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

1650
Ser NDBDM/0914
21 September 2004

Mr. Robert W. Bergstrom

Vancouver, Washington 98686

Dear Mr. Bergstrom:

    This is in response to your letter of April 20, 2004, to the
Secretary of the Navy regarding the upgrade of your father's
Distinguished Flying Cross to a Navy Cross, as well as your
letters of May 21, 2004, to Ms. Grace Cole and Ms. Barbara Wilson.
The additional information you submitted has been thoroughly
reviewed, as well as the records from your previous submissions.

    Your desire to ensure your father is appropriately recognized
for his exemplary performance in World War II is certainly
understandable, and I hope to alleviate your concern that his
original Navy Cross recommendation has not been adequately
reviewed.  At this point, three separate boards have reviewed the
original Navy Cross letter:  the Admiral Horne Board in 1946, and
in 2003 both the Chief of Naval Operations (CNO) Awards Board and
the Secretary of the Navy's Awards Board, which is the Navy
Department Board of Decorations and Medals (NDBDM).

    Although you are concerned that your father's Navy Cross
recommendation was not adequately reviewed by the Admiral Horne
board since it had not been reviewed at the Navy Department level
prior to that time, I would like to reassure you that this was
exactly the type of case the board was commissioned to find.  As
you well know, in his 19 December 1946 letter, the Senior Member
of the board references the original Navy Cross letter.  This
provides clear evidence that the board did, in fact, review the
original Navy Cross recommendation.  As you have pointed out,
neither the Air Medal letter nor the subsequent request for an
upgrade to the Distinguished Flying Cross (DFC) refer to the
original Navy Cross recommendation.  Therefore, the only way this
specific letter could have been referenced by the Admiral Horne
board would be by virtue of the fact that it had been presented to
the board for review as part of your father's file, making it
clear that its contents were taken into consideration by this
board.  As a further point of interest, the 19 December 1946
letter does not reference either the Air Medal or DFC letters, so
there would not have been any confusion between them and the Navy
Cross letter.

P 9687978 920705 95

As you are aware, in 2003 both the CNO Awards Board and the NDBDM also reviewed your father's case.  What you may not be aware of, however, is that they were presented your February 1, 2003, package in its entirety, in which, of course, you included your father's original Navy Cross recommendation letter.  Your dedication in researching military records is admirable, and you have provided extensive amplifying details regarding the bombing of Kiska Harbor and the period leading up to that attack.  Due in part to your research, these boards did not have any questions regarding the facts of these events.  Furthermore, I would like to reassure you that both of these boards make decisions by carefully weighing the merits of each individual case, vice "rubber-stamping" any other opinion or decision.

Concerning Ms. Wilson's memo of 16 April 2003, while it would have been available to the boards during their reviews, its purpose was to describe the situation, including the administrative history of your father's award.  The memo does not actually make any recommendation regarding a decision nor did it carry a vote, and all of the detailed information you provided was also presented to the boards.

Regarding the Public Law change you note, please be assured the wording change was not a factor in the boards' reviews.  Lastly, please accept my apologies for the administrative oversight in not immediately forwarding you a copy of the Acting Secretary of the Navy's letter of 16 July 2003.

Although regrettably it is not the response you desire, the decision remains to uphold the Distinguished Flying Cross as the appropriate award for your father.  His exemplary performance under arduous conditions is held in high respect.  Please accept our grateful appreciation for all of your father's dedicated service to the Navy and our Nation.

Sincerely,

L. S. PRIEST
Secretary, Board of
Decorations and Medals
By direction

Department of the Navy
Office of the Secretary
Attn: Gordon England
1000 Navy Pentagon
Washington, DC 20350-1000

September 30th 2004

Dear Mr. England,

This letter is in reply to your letter of September 21st 2004 (Ser NDBDM/0914) in which you explain why your agency is again denying my fathers Navy Cross recommendation appeal letter award upgrade.  I appreciate the fact that you responded to my recent letter about the initial July 16th 2003 denial letter and of Barbara Wilson's comments therein.  However, I feel your response is unclear as to just what kind of review you've conducted with the critical pieces of evidence I've provided in my initial Navy Cross recommendation letter and, what the review board's justification of denial are.  I would like detailed explanations and justifications as to what criteria was used, and the reasons why these pieces were not considered as critical to the nomination of Captain Edward Bergstrom for the Navy Cross.  Specifically, I would like you address these particular facts:

**Admiral Horne review-**

In your letter you state that "...the <u>only</u> way this specific letter [serial 0266] could have been referenced by the Admiral Horne board would be by virtue of the fact that it had been presented to the board for review as part of your father's file, making it clear that its contents were taken into consideration by this board..."  As it clearly states in the Admiral Horne denial letter, they based their review on "the basic correspondence" of the Navy Cross recommendation letter.  This means that they did not do a thorough review of his actions because *they did not have all the facts* (this review was done four years after the fact.)  This board did not go beyond the basic correspondence to see additional heroic actions made by my father, they only reviewed what was on the Navy Cross Recommendation Letter which was very similar to the generic DFC Recommendation Letter.  The Navy Cross Recommendation letter did not amplify his actions as to why they were any different than those who received the DFC.  To the best of my knowledge the review board did not do further research or contact his Commanding Office to find out why only he was recommended for the Navy Cross and <u>no other PPC from his squadron</u>.  Were these facts considered in your evaluation?  Was further research done based on my correspondence to confirm my findings?  If these actions still do not warrant awarding of the Navy Cross why not?  What criteria is used to determine if his actions meet the criteria?

**LT. William Thies Comparison-**

If the board had done a thorough review they would have discovered that his actions were ***exactly the same*** as Lt. William Thies's who was awarded the Navy Cross.  My question to you is, why can Lt. William Thies be awarded the Navy Cross for his actions when they were exactly same as my father's?  The USS Gillis radio log clearly shows that my father and Lt. William Thies bombed Kiska Harbor together at the same time on June 11th.  I had the

CAR000068

opportunity to talk to Mr. Thies and I asked him why he was awarded the Navy Cross and not my father. He said he was not sure why and that my father was worthy of the award just like he was (in fact he never could figure out why he got the award and that hardly anyone else who did the same exact actions did.) Please explain why both recent board reviews ignored this fact. The Horne board would have determined this if they had done an in-depth review of his actions and that they mirrored LT. Thies's exactly. Were these facts considered in your evaluation? Was further research done to determine why Lt. William Thies was awarded the Navy Cross for the same actions as my father, yet my father was not awarded the Navy Cross? If these actions still do not warrant awarding of the Navy Cross why not? What criteria is used to determine if his actions meet the criteria?

**Comparison to his Peers-**

Finally, the other major fact that I take issue with is that my father's actions were clearly ***"above and beyond"*** those of all his peers in VP-42 as he was the only PPC at his rank (and above) to bomb Kiska Harbor and yet he was only awarded the DFC just like the other PPC's in his squadron. In fact he bombed Kiska Harbor twice in a 16 hour period. These actions were exceptional. His actions warrant a much higher award than the DFC. *This was why his Commanding Officer recommended only him for the Navy Cross and not any of his fellow PPC's in VP-42.* If these actions still do not warrant awarding of the Navy Cross why not? What criteria is used to determine if his actions meet the criteria?

It is apparent that many "errors" occurred during his Navy Cross recommendation letter review process. From the beginning it has been impossible for him to get a fair hearing and evaluation of his heroic actions. Again, I am asking you to do a thorough and complete review of ALL the documentation and not just focus on the past (improperly performed) reviews. Captain Edward Bergstrom's actions completely justify him being awarded the Navy Cross just as his Wing Commander recommended and as Lt. William Thies was. I look forward to your reply.

Sincerely,

Robert W. Bergstrom
█████████████
Vancouver, WA 98686
360█████████





**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

1650
Ser NDBDM/1177
17 November 2004

Mr. Robert W. Bergstrom

Vancouver, Washington 98686

Dear Mr. Bergstrom:

This is in response to your letter of September 30, 2004, to the Secretary of the Navy regarding the decision to uphold the Distinguished Flying Cross as the appropriate award for your father. I am responding for the Secretary. I hope the following information will clarify the processes used by Navy awards boards.

Navy awards boards at all levels are chartered to review an award recommendation package *as it is presented to them*, making it incumbent upon those submitting award recommendations to ensure all relevant information is provided. If the board has questions or desires further information, the originator of the award is contacted. Therefore, regarding the Admiral Horne Board review of your father's Navy Cross recommendation, you are correct in that they would only have looked at the original Navy Cross letter. That is the board process – to review the recommendation as it is submitted to them.

Regarding the 2003 Chief of Naval Operations (CNO) Awards Board and the Navy Department Board of Decorations and Medals (NDBDM) review of your father's case, the same review process was applied: these boards reviewed the package that was presented to them, in this instance, your February 1, 2003, submission. As stated in our previous correspondence to you, your research of military records is excellent, so these boards did not have any additional questions regarding the facts of the bombing of Kiska Harbor or the events leading up to it and, therefore, no further research was done because your findings were not in question.

The copy of the USS GILLIS radio log you submitted in May 2004 was thoroughly reviewed and the determination made that its addition to your father's case did not warrant a further NDBDM review. The standard for reconsideration of a case by the board is "new and relevant material evidence that was not available at the time the original recommendation was considered." While the USS GILLIS radio log provided additional details regarding the situation, it did not alter the basic facts and, therefore, was not considered "new."

Regarding your comments concerning comparisons of your father's actions to others, I must emphasize that award decisions are not made on a comparative basis, but rather by carefully weighing the merits of each individual case.

I regret we are unable to comply with your request to provide "detailed explanations and justifications" regarding board decisions. No verbatim audio or written records are kept of board discussions. Furthermore, to ensure the continued integrity of the deliberative process, such details are not releasable. In fact, board members may not discuss their deliberations outside of board meetings.

In summary, it is not the case that errors were made during the review of your father's Navy Cross recommendation. The correct process has been applied to each and every review of your father's case. In fact, his award recommendation has been reviewed more times and received far more consideration than is afforded to most award submissions.

I hope the above information has helped clarify the procedures used by Navy awards boards. Please allow me to again express the Navy's lasting gratitude for your father's dedicated service.

Sincerely,

L. S. PRIEST
Secretary, Board of
Decorations and Medals
By direction

Department of Defense                                              May 31st, 2006
Secretary of Defense Donald Rumsfeld
Pentagon, Washington, DC 20301-1900

Mr. Rumsfeld,

I am writing this letter to report how the Secretary of the Navy incorrectly reviewed a medal upgrade that I requested for my father, Captain Edward W. Bergstrom (deceased). I am specifically requesting that the Department of Defense conduct a complete and proper review of the Navy Cross recommendation review request letter that I submitted to the Secretary of the Navy in 2003 and why the Navy did not follow its own awards manual criteria in the review it did do.

The Secretary of the Navy's decision to not upgrade my father's Distinguished Flying Cross (DFC) to the Navy Cross (NX) decoration was greatly influenced on the conclusion and recommendation by the Chief of Naval Operations Awards Branch Director Barbara Wilson in 2003. She concluded that no upgrade was warranted due to the fact it had been "reviewed on three different occasions" by an awards board during and just after World War II. In her research she "assumed" that the first DFC review conducted covered the actions that generated the Navy Cross recommendation by Wing Commander, Leslie Gehres. This was not true. The initial award request (Serial 23) was sent in error to the awards branch by the Wing secretary and was for the DFC, not the Navy Cross. **The Navy Cross recommendation letter (Serial 0266) was never sent to the awards branch for review.** The Wing secretary mistakenly included Lt. Edward W. Bergstrom as being recommended for the DFC (Serial 23) when he should have been recommended for the Navy Cross under Serial 0266 only. This Serial 23 submission was not related to the Navy Cross recommendation letter, but covered the same actions. The Wing secretary should have only submitted the Navy Cross recommendation and not the DFC request at all. Since the awards review board was initially only dealing with a lesser medal than the NX, they did not do the in-depth review that would have been required for this higher decoration. They did not know that his actions went above and beyond those of all plane commanders who were awarded the DFC and only equaled by those pilots who were awarded the NX.

Barbara Wilson goes on to say that "it is very clear that the actions cited in the NX recommendation mirrored those actions of the DFC." The Air Medal, DFC, and NX award verbiage was the same as written by the Wing Commander on all the PPC's medal recommendation requests for this campaign (see attached LT. Thies NX and LT. Bergstrom's award letters). When the ADM. Horn board reviewed the NX recommendation letter after the war they only used the wording on the NX recommendation letter in its review (in fact they say "for services set forth in the basic correspondence"). This wording was the same as the DFC wording. The ADM. Horn board was not aware that the DFC awarded was based on the review of Serial 23 and not that of Serial 0266. This documentation did not amplify or explain why he was worthy of the NX decoration. The board did not have any input from or contact with the recommending officer to support the award. They also did not take the time to research the real facts in the case and just moved onto the next review in line with the thousands of others to do. This review did not take the time to find out why he was the only one

CAR000072

from his squadron to be recommended for the NX for his actions. The board was unaware of the Wing secretaries' error of submitting the DFC request instead of the Navy Cross request. They did not realize that the DFC request should never have been submitted and that the NX recommendation letter had never been reviewed or seen by an awards board before their review in 1946.

Lt. Edward Bergstrom was not informed of the initial submission mistake until six months later when his commanding officer was made aware of the Wing secretary error. Because of this, his commanding officer (Cdr. Perkins) wrote a letter to the awards board explaining why he was worthy of the DFC instead of the Air Medal. This letter resulted in the Air Medal being upgraded to the DFC. The letter sent to the awards branch did not reference the Navy Cross recommendation letter and does not mention the actions that made him worthy to be recommended for it. It only references the DFC actions found in Serial 23 and points out that he had met the criteria, along with two other PPC's (who were not recommended for the NX) in the Wing who were also affected by the Wing secretary's error. Cdr. Perkins was not the CO of VP-42 when the original Navy Cross recommendation letter was written. He was not aware of the non submission of the Navy Cross letter to the awards branch.

The reason that the Navy Cross Recommendation letter was not reviewed until after the war is because it was never submitted to the awards branch at all. It is clear however, that due to a submission error by the Wing secretary only a DFC request was received and reviewed by the awards branch (Serial 23) in July 1942. The Navy Cross Recommendation letter was never sent to the awards branch, so it was not reviewed or even acknowledged as being received. The only reason the ADM. Horne review board saw the NX recommendation letter (Serial 0266) after the war was that a copy had been put in Lt. Edward Bergstrom's personnel file by the Wing Secretary in June 1942 (the copy of the Navy Cross recommendation letter that they used by the ADM. Horne board was marked "Fitness Report"). **There was never a copy of this recommendation placed in the CNO awards file of Lt. Edward Bergstrom because Serial 0266 was never received or reviewed by them.** They only received the DFC (Serial 23) award request, and this is the only copy found in his file, even to this day.

Here is the sequence of events that prove Capt. Edward W. Bergstrom is worthy of the NX award. Attached is the radio log for June, 1942 from the USS Gillis. The USS Gillis was the seaplane tender that was at Atka Island which serviced and bombed up the PBY's participating in the "Kiska Blitz", June 11th to the 14th 1942. What is remarkable about this document is that it records the actions of Capt. Edward Bergstrom on June 11th and 12th, 1942. His radio call sign was "22V3." Per the attached "Operation Plan No. 1-42" it directs Patrol Squadron FORTY-TWO to use call signs "Thirteen VICTOR" to "Twenty four VICTOR." Per the VP-42 war diary only three planes were ordered to bomb Kiska from the squadron. Lt. Campbell did not bomb Kiska per the appendix. Ensign Nuss did bomb Kiska Harbor per the radio log of the Gillis and the war diary appendix. The only VP-42 plane to also bomb Kiska was my father's plane (call sign 22V3.) The radio log also shows his plane making another bombing run on Kiska on June 11th. The first time he bombed was on June 11th at around 7 pm. He flew with two other VP-41 PBY's (3V3 and 7V3.) He and VP-43's LT. Thies bombed ships in the harbor with a direct hit on a transport (no transport was hit per a later Navy review). He then flew to Dutch Harbor per orders. From there he flew back to Kiska to bomb the ships in the

harbor again. At 10 am on June 12th, he engaged in combat with enemy cruiser planes which were driven off. At around 11 am, he made a bombing run on Kiska Harbor, results not observed. He mentions this bombing run and combat with the cruiser plane (s) in the Los Angeles Times newspaper article that was sent with the original Navy Cross Recommendation letter appeal to Barbara Wilson. This document clearly shows his actions and why he is worthy of being awarded the Navy Cross. He and Ensign Nuss were the only pilots from VP-42 to bomb Kiska Harbor during the "Kiska Blitz." **He was the only VP-42 PPC who bombed Kiska harbor twice in one 16 hour period.** He flew under intense enemy seaplane attack and was subject to intense sea and land based anti aircraft fire each time. These attacks were carried out while he was at the utmost limits of his physical endurance. No other PPC from VP-42 did this many bombing missions against Kiska Harbor.

The fact is **that his actions went above and beyond** most of the other VP-41 and VP-43 patrol plane commanders (PPC's) who were awarded the NX decoration. None of the three PPC's (Lt. Cmdr Jones, Ensign Sorensen, and Machinist Davis) from VP-43 who were awarded the NX flew the round the clock reconnaissance missions for two weeks prior to the Kiska Blitz like my father did. In fact, only two PPC's from VP-41 who were awarded the NX did fly these missions (Lt. Theis and Ensign Hildebrand, Jr.). My father had to fight off enemy seaplane fighter attacks to bomb Kiska harbor. Few of the other PPC's had to do this per the record. He also bombed the heavily defended harbor twice in a 16 hour period while at the limits of his physical endurance after the almost constant two week reconnaissance missions.

The Navy states that they do not compare the actions of one PPC to another when determing if a NX is awarded. In the November 17th, 2004 letter Mr. Priest, Secretary of the Board of Decorations and Medals by Direction in the Secretary of the Navy's office states, "I must emphasize that award decisions are not made on a comparative basis, but by carefully weighing the merits of each individual case". Yet, this is in direct contradiction to what the awards manual that they use says (SECNAVINST 1650.1F). **It states in the last paragraph that "the act…must be performed in such a manner as to set the individual apart from his shipmates."** The only way to determine if an act would set him apart from his fellow PPC's can only be done by direct comparison to another PPC's actions. The fact remains that my father's actions were at the very least equal to all the other PPC's who were awarded the NX and in most cases went above and beyond them. A direct comparison of Lt. Theis and Ensign Hildebrandt's actions to those of my father shows that he flew identical missions and faced identical enemy defenses as they did. His extraordinary heroism and actions sets him apart from all the other PPC's who were awarded the DFC (none of whom bombed Kiska Harbor) and are only equaled by Navy Cross winners LT. Theis and Ensign Hildebrant of VP-42.

The Navy will not respond to my request for information or documentation as to why he is not worthy of this award. In fact, their response has been that they do not record the awards board discussions and rationale as to how/why an award is approved/disapproved. They have done an extremely poor job of reviewing this award in a fair and equitable way to say the least. I find it incredulous that an agency of this size and stature is not required to defend or document its processes for conclusions, and is not accountable for its actions or mistakes. By not having to document or account for this decision the Navy will never be accountable to the officers or sailors who fought for this country, or to the citizens of the United States.

CAR000074

Because of these errors in the Navy Cross review process by the CNO and the Secretary of the Navy, a just and proper review was not done. I am requesting that the Department of Defense convene a new review board that will evaluate all of my father's actions in a fair and complete way as per the awards manual direction.

This Navy Cross recommendation review request is 65 years after the fact. It is quite apparent that all parties involved in the review of this request are not intimately familiar with the situation at the time. They cannot and will not give a reason why they will not upgrade his DFC to the NX. What they do say in explaining why no upgrade is warranted is contradictory, evasive, and indefensible. It is time that the Navy is held accountable for this review and upgrade his DFC to the NX that he deserves and is most worthy of.

Thank you,

Robert W. Bergstrom

Vancouver, WA 98685
@comcast.net

Robert W. Bergstrom

Vancouver, WA 98686
360-

July 5, 2003

Senator Patty Murray
173 Russell Senate Office Building
Washington, D.C. 20510

Honorable Senator Murray;

 I am writing to ask for your help in awarding Capt Edward W. Bergstrom (my father, now deceased) the Navy Cross for his extraordinary actions during World War Two.  I contacted your office last year and was told to get back to you if the Navy Awards Branch rejected my award request.  I contacted the Navy Awards Branch at the Pentagon on 06/16/03 and was told that the Admiral reviewing his case was recommending that it *not be awarded*.  The next step in the process is for the Secretary of the Navy to review the documentation and make a final decision.  I would like you to intercede on my behalf with the Secretary of the Navy to have this decoration awarded.

 I submitted the Navy Cross recommendation letter review request with documentation last January to the Navy Awards Branch.  It was reviewed on May 18th 2003 by an awards board.  I contacted the awards branch and was put in touch with a Cdr. Brian Fletcher who told me it was sent to the Secretary of the Navy and to call back in two weeks to find out the decision.  After a month had passed, I talked to the Awards Branch Director, Barbara Wilson.  After some changes in personnel, she sent me to Betty Barnes, a clerk in her office who was able to look up the status of my father's review.  Betty told me that it was not sent to the Secretary of the Navy and that the Admiral reviewing it was recommending that the Distinguished Flying Cross not be upgraded to the Navy Cross.  She also said that the Admiral was taking the "highly unusual step" of having the Awards Branch write a letter to accompany his recommendation to the Secretary of the Navy explaing why it should *not be awarded*.  The writing of a letter justifying his decision indicates that the Admiral has a reason to doubt it's validity and that it is not a simple yes or no decision.  Unfortunately, I am not privy to this letter or information.

 It should also be noted that law (Public Law 253), approving the awarding of the Navy Cross was changed on August 7th, 1942 by (Public Law 702.)  My father's action was in June 1942.  I am not sure if the Awards Branch or the Secretary of the Navy are aware of this change. The law that applies to my father states that the Navy Cross can be awarded for "extraordinary heroism or distinguished service in the line of his profession."  The change on August 7th, 1942 changed this to just read, "extraordinary heroism."  His actions were both for extraordinary heroism and distinguished service.

 My father was recommended for the Navy Cross by his commanding officer for actions during June 1942, but due to an "administrative foul-up" it was never reviewed.  I have attached copies of the documentation I submitted for review to the Awards Branch.  It explains the justification for the awarding of the Navy Cross.  Based on the information in the justification, I feel there is ample evidence supporting the upgrading of his Distinguished Flying Cross to the

Navy Cross.  I would like you to review this documentation and contact the Secretary of the Navy to ensure that it is awarded.  He is worthy of this award just like the other five Patrol Plane Commanders in his wing who were awarded the Navy Cross for the same actions of June 1942.

Sincerely,

Robert W. Bergstrom

Senator Patty Murray                                            March 29, 2004
C/o Colleen Catching
The Marshall House
1323 Officer's Row
Vancouver, WA 98661-3856

Dear Colleen:

  This is a follow-up to the Sept 29, 2003 letter that your office sent me in response to my request for assistance in awarding the Navy Cross (NX) to my father, Capt. Edward W. Bergstrom (deceased.) As you know he was recommended for the Navy Cross by his wing commanding officer for actions in the Aleutians June 10 to 20 1942. I requested thru a FOIA request all documentation that was sent by the Navy awards branch at the Pentagon to the Secretary of the Navy for final review and determination. I just received it and have enclosed copies for your review. Not much seems to have been written by the actual awards board as to why they are not recommending the upgrade of his Distinguished Flying Cross (DFC) to the Navy Cross. It appears that they are going with the awards branch directors' review that this has been reviewed three times before and that since they never determined his actions to be worthy of this award that the current board should not either. She and the awards board seem to have ignored what the real facts are and just rubber stamped a rejection and sent it on to the Secretary of the Navy for final denial. The awards board seems to have not really read my appeal letter at all. If you read my appeal letter it is very clear that the Navy Cross recommendation letter was **never reviewed by the Navy at all.** He had the original DFC recommendation letter downgraded to an Air Medal. This was then upgraded when his commanding officer requested it. These were not connected to the serial 0266 at all. The ADM Horne review after the war did not upgrade the DFC to the Navy Cross. It references serial 0266 not knowing that it was never reviewed at all. This same mistake is being continued by the present awards board once again. The ADM Horne review of 1946 (four years after the fact) based all of its information on the original DFC award letter. Any Patrol Plane Commander who flew in the Aleutians Island Campaign was awarded the DFC for just flying. The review of this lesser medal was not as in-depth as the Navy Cross recommendation so no real close scrutiny was done on them. My father was the **only PPC** at his rank and above from his squadron (VP-42) to fly the extremely dangerous patrol missions searching for the Japanese fleet **and to then bomb Kiska Harbor.** No other PPC from his squadron at his rank or above did this and very few from VP-41 did (William Thies.) I expect the Secretary of the Navy to actually review his actions and make the correct decision and award him the Navy Cross. Also the director of the awards branch, Barbara Wilson does a great disservice by stating that "it is "very" clear that the actions cited in the NX recommendation mirrored those actions of the DFC." She implies that the DFC actions were the same as the Navy Cross actions and that there is no real difference. If she or the Awards Board read my appeal they would have realized that there is a great difference between the two recommendation letters. She also attaches award cards of other PPC's (but not all) who were awarded the Navy Cross for some of the same actions that he did. These PPC's were in VP-43 and **did not** fly the extremely dangerous patrol missions on an almost daily basis for the two weeks prior to the bombing of Kiska Harbor like my father did. He flew these patrols (and survived unlike half of his squadron) and then bombed Kiska Harbor while at the utmost limits of his physical ability to fly a plane. The only other PPC who was awarded the Navy Cross that

really "mirrored" my father's actions was William Thies (award citation was attached to the appeal request.)

Since I last talked to you I have discovered an actual photo taken by the Japanese of my dad's plane bombing Kiska Harbor on June 12th, 1942 at 9:10 AM.  It can only be his plane since he left Dutch Harbor at around 3:00 AM and the math calculates out to exactly this time that he would have arrived over Kiska Harbor (flying in a straight line like he did based on his log book.)  I am in the process now of getting copies of this photo.  Also I do not think that the awards branch is aware of the Public Law change that modified the award criteria a few months after my father's actions.  It makes a difference since "distinguished service" was removed on the latter change.

I hope that the Secretary of the Navy will make the effort to review his actions based on the facts presented and not "rubber stamp" the denial like Barbara Wilson and the awards board did.  He deserves that much to say the least.

Sincerely,

Robert W. Bergstrom

Vancouver WA 98686
360-
@pacifier.com

Senator Patty Murray                                                  March 30, 2004
C/o Colleen Catching
The Marshall House
1323 Officer's Row
Vancouver, WA 98661-3856

Dear Colleen:

This is a follow-up to the letter I sent you yesterday, March 29, 2004 that responded to the FOIA request I received from the Navy awards branch in reference to my fathers Navy Cross recommendation letter appeal. I just wanted to explain how LTJG Edward Bergstrom's original DFC award criterion is similar to the Navy Cross award criteria. As I mentioned in the last letter Barbara Wilson said that they "mirrored" each other in reference to the actions. She say's that "these specific actions "were reviewed three times. First of all the Navy Cross recommendation letter serial 0266 was never reviewed. The only review done by any board was on the DFC criteria from serial 23 which was a broad generic statement used for all PPC's who took part in the Aleutian Island Campaign, May 29 to June 20th 1942. In fact the upgrade of LTJG Bergstrom's Air Medal to the DFC was really based on a letter from the commanding officer of VP-42 telling the awards board that since all other PPC's in the squadron were awarded the DFC he should also. No real review was done on his specific Navy Cross actions. When the ADM Horne board reviewed the DFC award they reference his Navy Cross recommendation letter serial 0266 (since it was in his personnel record now four years after the fact) not realizing that it was never reviewed at all. They just looked at what the criteria said and if it warranted the up grade (this is what I guess happened since no documentation was done by them as to why it was not worthy of being upgraded by them.) So no one really looked at his actions to see if in fact he was worthy of the Navy Cross. Barbara Wilson attached award cards that compared LTJG Bergstrom's actions to those of the VP-43 PPC's. These PPC's did not fly the long patrol missions for two weeks before the Kiska Blitz so they should not be used to compare his actions to. LT William Theis of VP-41 who did fly these long patrol missions should be the one she compares him to and she did not for some reason. The DFC award cards match LTJG Bergstrom's actions because his criterion was the same DFC criteria as found in serial 23. None of the PPC's from VP-41 and VP-42 who were awarded the DFC bombed Kiska Harbor like he did so this criteria does not apply to his actions (the generic award criteria says they all attacked ships in Kiska Harbor which was untrue, none of the PPC's other than LTJG Bergstrom, Ensign Nuss of VP-42 and a few others from VP-41 did this during the Aleutian Island Campaign.) She also states that these award cards should be used for "review and comparison" to LTJG Bergstrom's award criteria which is a confusing statement since VP-43 did not fly the long patrol missions like VP-41 and VP-42 did (like comparing apples and oranges.) The only real comparison between VP-43 PPC's who were awarded the Navy Cross and LTJG Bergstrom's is the actual bombing of Kiska Harbor. That is the only actions that VP-43 shared with him.

I am also confused with the letter from the Secretary of the Navy that was part of the FOIA material that I received from the awards branch. It is written by a Hansford T. Johnson (acting) and is dated 16 July 2003. It appears to be the official denial from the Secretary of the Navy to me. In fact it say's at the bottom "copy to: Robert W. Bergstrom." I never received this

CAR000080

letter at all.  Why was it not sent to me last July?  Will your office have this review request reopened by the Secretary of the Navy for me and have it correctly reviewed?  I appreciate your help in this matter and look forward to your reply.


Sincerely,


Robert W. Bergstrom
Vancouver WA 98686
360-
@pacifier.com

Senator Patty Murray                                                    September, 30th 2004
C/O Colleen Catching
1323 Officer's Row
Vancouver, WA 98661-3856

Dear Colleen,

     I am writing this letter to you in reply to the Secretary of the Navy's letter (Ser NDBDM/0914) that upholds the denial of my fathers medal upgrade to the Navy Cross. I have attached my reply to the Secretary of the Navy for your information.

     First, I wish to say that I am very disappointed in the letter I received from the Secretary of the Navy. The most disappointing aspect of the reply is what they left out. By reading the letter it appears to have be written in haste, due to what I suspect was your inquiry from two weeks ago. The letter does not give any detailed answers as to why they actually denied the upgrade. It just say's that it was reviewed three times and that no upgrade is warranted. I expected a more detailed reply explaining exactly what process was used to review the recommendation and what criteria he did not meet that would warrant not upgrading to the Navy Cross. As you can see in my reply letter I have asked for the criteria used and, detailed answers as to why specific significant facts and information were not addressed in their denial letter. As a U.S. citizen and the son of a distinguished Navy Captain, I am very disappointed in the conduct of the office of the Secretary of the Navy. It is apparent that my request is not of great importance or high priority to them. I find it appalling that an Agency such as this can spend tax payer money and not serve the public to high standards. I don't feel the Secretary of the Navy adequately reviewed my father's records, nor do I feel they did an adequate job in explaining why it was denied. Needless to say, I am not satisfied with their decision and fully expect them to reply to my questions.

     By not responding to specific critical facts and information, they absolve themselves from being held accountable for the decisions hence, they are not in the position of defending there conclusions. In talking with your aide Colleen, she said that they were not able to reply to specific questions and that they do not even take notes during review board meetings. Again, they cannot be held accountable to hearsay. Therefore, I have also submitted a FOIA request asking for all material from the Secretary of the Navy that relates to this denial.

     When a proper review of the documentation I have submitted takes place, it will be quite clear that my father is worthy of the Navy Cross decoration. His actions were exemplary and exactly the same as LT William Thies's. If LT. Thies was awarded the Navy Cross for the same exact actions as my father then I can see no reason why he should not be awarded the Navy Cross as well. My father's actions also went "above and beyond the call of duty" and above those of his peers in VP-42. He deserves the recognition of a higher award than the DFC awarded. *This was why his Commanding Officer recommended only him for the Navy Cross and not any of his fellow PPC's in his*

CAR000082

*squadron.*

Please help me get a fair and proper review of my father's actions of June 1942 that responds to the critical facts presented by me in his Navy Cross recommendation appeal letter. I will not let this issue end until he is awarded the Navy Cross as per his Commanding Officer's recommendation.

Sincerely,

Robert W. Bergstrom

Vancouver, WA 98686
360-



**DEPARTMENT OF THE NAVY**
OFFICE OF THE SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

1650
Ser NDBDM/1208
08 December 2004

The Honorable Patty Murray
United States Senator
The Marshall House
1323 Officer's Row
Vancouver, Washington 98661
Attention:  Colleen Catching

Dear Senator Murray:

     This is in response to your inquiry of November 17, 2004, regarding Mr. Robert W. Bergstrom's continued desire to have his father's Distinguished Flying Cross upgraded to a Navy Cross.  I am responding for the Secretary.

     Mr. Bergstrom's letter of September 30, 2004, to the Secretary of the Navy, which you enclosed with your correspondence, was answered directly to Mr. Bergstrom on November 17, 2004.  A copy of this letter is enclosed for your review.  The Freedom of Information Act request he mentions has also been answered separately.

     Mr. Bergstrom emphasizes in his letter to you that his father was the only one his Commanding Officer (CO) submitted for a Navy Cross following the Kiska action.  While the recommendation of a CO is certainly the first step in the award process, simply being recommended does not justify an award.  If that were the case, there would be no need for awards boards at any level.  The Navy, like all military organizations, has a chain of command, and it is the responsibility of those in the chain when considering an award recommendation to ensure fair and thorough review.  As the recommendation moves up the chain, more senior officers with the benefit of greater experience and a wider perspective review the submission, and the recommended award is often changed, as was the case with Mr. Bergstrom's father.

     Mr. Bergstrom's letter to you also mentions his father's actions in comparison to those of Lieutenant William Thies. However, award decisions are not made on a comparative basis; each case is reviewed and decided on its own merits.  For example, it is quite common for individual members of an aircrew or platoon to receive different awards for the same action.

     Although the results of our reviews are not what Mr. Bergstrom had hoped for, as stated in our correspondence directly

CAR000084

to him, the documentation he submitted regarding his father's actions has been subjected to exceptionally extensive review.  In fact, considering only the 2003 Chief of Naval Operations and Navy Department Board of Decorations and Medals board reviews, thirteen senior officers have personally reviewed his father's case.

I hope this information will assist you in clarifying the Navy's award review process to Mr. Bergstrom.  While this case is considered closed, our respect and admiration for his father's outstanding service are undiminished.  If I may be of any further assistance, please let me know.

Sincerely,

L. S. PRIEST
Secretary, Board of
Decorations and Medals
By direction

Enclosure



RECEIVED DEC 0 7 2015

**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000



1650
Ser DNS-35/15U104016
November 30, 2015

RECEIVED
DEC 1 5 2015

The Honorable Patty Murray
United States Senator
Attn: Alyson Teeter-Baker
2988 Jackson Federal Building, 915 Second Ave.
Seattle, WA 98174

Dear Senator Murray:

This is in response to your letter of August 6, 2015 on behalf of your constituent, Mr. Robert Bergstrom, concerning his late father, Mr. Edward Bergstrom, and his request to upgrade the previously approved Distinguished Flying Cross to the Navy Cross.

It has consistently been the Navy's policy to support the decisions of our delegated awarding authorities. Once an award recommendation has been reviewed and an award issued by a competent awarding authority, it can only be reconsidered upon submission of new, relevant material or evidence that an injustice occurred in the decision process.

Mr. Bergstrom's request has been reviewed by both the Chief of Naval Operations and the Secretary of the Navy on several occasions and after a thorough review of this case to include the paragraphs specified in your letter, it has been determined that the documentation submitted does not substantiate that an error or injustice occurred when the Distinguished Flying Cross was approved.

Mr. Bergstrom's desire to ensure his father is appropriately recognized for his performance in World War II is understandable; however, the decision remains to uphold the Distinguished Flying Cross as the appropriate award.

Point of contact for this matter is Mr. Patrick Marquez, Deputy, Chief of Naval Operations Awards at (202) 685-1770.

0086
CAR000086

Sincerely,

T. L. Biddiex
By direction

0087
CAR000087

**BRIAN BAIRD**
THIRD DISTRICT, WASHINGTON

COMMITTEE ON THE BUDGET

COMMITTEE ON SCIENCE

COMMITTEE ON TRANSPORTATION
AND INFRASTRUCTURE

http://www.house.gov/baird



**Congress of the United States**
**House of Representatives**
**Washington, DC 20515**

DISTRICT OFFICES:

GENERAL O.O. HOWARD HOUSE
750 ANDERSON STREET, SUITE B
VANCOUVER, WA 98661
(360) 695-6292

120 UNION AVENUE SE, SUITE 105
OLYMPIA, WA 98501
(360) 352-9768

WASHINGTON, DC OFFICE:
1421 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3536

August 10, 2005

Robert W. Bergstrom

Vancouver, WA 98685

Dear Mr. Bergstrom:

I am writing to update you on the most recent information that I have received from the Secretary of the Navy (Secretary).

According to the Secretary, your request for an upgrade of your father's Distinguished Flying Cross (DFC) to the Navy Cross has been denied. I have gone to great efforts to work with the Secretary's office to review your request, and the information you have provided to support it. Your statement that officers received the Navy Cross for the bombing of Kiska Harbor is correct. However, the research done by the Navy shows that other officers received the DFC, as your father did.

In response to your request for written justification for the denial of your request, the Navy has provided my office with the following statement. "In order to maintain the integrity of the board process, no verbatim audio of written records are kept of board discussions, and board members may not discuss their deliberations outside of board meetings." I regret that there are no means to accommodate your request.

I have asked that each review of this case be reexamined to determine whether or not they were done appropriately. This award has been reviewed an extraordinary three times. This is to your credit, as the amount of research and energy you have put into this task have led to a real scrutiny of the facts in evidence. I can find no information that indicates a review board did not do their duty, or accept evidence that was submitted to them.

I regret that I was unable to obtain the results you were seeking. However, I cannot alter the Department of the Navy's decision so long as it is consistent with federal law. I want to emphasize that my staff and myself have worked hard to ensure that your Father receive the respect he earned. This decision by the Navy does nothing to diminish the respect and admiration that any of us feel for his exceptional service to this country. Please contact me again in the future if there is another matter that I can assist you with.

**BRIAN BAIRD**
THIRD DISTRICT, WASHINGTON

COMMITTEE ON THE BUDGET

COMMITTEE ON SCIENCE

COMMITTEE ON TRANSPORTATION
AND INFRASTRUCTURE

http://www.house.gov/baird



## Congress of the United States
## House of Representatives
### Washington, DC 20515

DISTRICT OFFICES:

GENERAL O.O. HOWARD HOUSE
750 ANDERSON STREET, SUITE B
VANCOUVER, WA 98661
(360) 695-6292

120 UNION AVENUE SE, SUITE 105
OLYMPIA, WA 98501
(360) 352-9768

WASHINGTON, DC OFFICE:
1421 LONGWORTH HOUSE OFFICE BUILDING
WASHINGTON, DC 20515
(202) 225-3536

Sincerely,

Brian Baird
Member of Congress

BB: mm

0089
CAR000089

Congressman Brian Baird                                                March 6th, 2006
120 Union Avenue SE, Suite 105
Olympia, WA 98501

Honorable Congressman Baird;

      I am replying to the letter you sent me dated August 10th, 2005 in which you provided me an update regarding the Secretary of the Navy's justification for not upgrading my fathers Distinguished Flying Cross (DFC) to the Navy Cross (NX) decoration.

      From the start, the Navy's handling of the review process and how it made its decision is badly flawed to say the least. All of the replies I have received from the Navy in response to my critical observations of how my fathers Navy Cross recommendation review request was mishandled by them have boiled down to these four errors;

1. All reviews done (even including the most recent 2003 CNO review), were based on the original submission error by the Wing secretary in June 1942. The Navy Cross (NX) recommendation letter-P15 Serial 0266 was never submitted to the CNO awards branch, ever. The only request submitted to the awards branch in 1942, was for the Distinguished Flying Cross (DFC). This submission was done in error and never should have happened. By erroneously submitting this request (Serial 23) to the awards branch instead of the NX request, it has, up to this day, caused each board to believe that the NX actions were properly reviewed. The ADMR Horne board of 1946 also "assumed" that the NX request had been reviewed by an earlier board. The ADMR Horne board was only aware of the NX recommendation letter (Serial 0266) because they obtained it from my fathers personnel file and not from his CNO awards file. However, Serial 0266 *is not* in his CNO awards file because they *never reviewed it* at all. Because of this the 2003 review board was also under the impression that the NX criteria had been reviewed correctly (Barbara Wilson told them that it had been reviewed three times before). Barbara Wilson told the awards board that a thorough NX review had been done in the past; thereby biasing the award board's decision and all subsequent reviews.

2. Because Serial 0266 was not reviewed at the beginning; all the subsequent reviews erroneously assumed it had been reviewed. All these reviews were based on the lesser DFC criteria and not that of the NX. By only looking at my father's actions and how they compare to other PPC's who were awarded the NX can a true review be done. Only he and three other PPC's from VP-42 and VP-43 flew the strenuous reconnaissance missions for two weeks *before* making two extremely dangerous bombing attacks on enemy ships in Kiska Harbor. VP-43 PPC's did not make these reconnaissance flights at all. All the other PPC's who were awarded the DFC in the VP-42 and VP-41 did not make bombing attacks against Kiska Harbor (except by Ensign Nuss once). My father also had to fight his way thru enemy seaplane fighter attacks while attacking Kiska Harbor. This was not the case with most other PPC's who were awarded the DFC or NX. Because my father's actions were above and beyond those of his peers who were awarded the DFC, he was the *only* PPC from his squadron to be recommended for the NX by his Wing commander. All awards boards have made their decision based on incomplete and faulty data since the very beginning.

3. Discrepancies in how the board reviewed this case are evident. In the 11/17/2004 letter (Ser NDBDM/1177) from the Secretary of the Navy, Mr. Priest states "I must emphasize that award decisions are not made on a comparative basis, but carefully weighing the merits of each individual case." But in a letter dated 07/16/2003 (Ser NDBDM/0502) a Mr. Hansford T. Johnson states that "Captain Bergstrom's DFC was determined to be the appropriate award for his actions when compared with similar actions". These two statements contradict each other and do not give the sense that a fair review has been done at all. The Secretary of the Navy does not even follow its own

regulations when reviewing this award request. In the awards manual that they use (SECNAVINST 1650.1F, Navy Cross) that specifically states, "The act…must be performed in such a manner as to set the individual apart from his shipmates…" The only way to determine if an act sets him apart from a peer (PPC), one has to compare the actions of others. This was not the case in this review at all. When a careful review of my father's actions is done it will become very clear that he went above and beyond the actions of the PPC's who were awarded the DFC and at the very least equal to those of the PPC's who were awarded the NX.

4. The Navy only supplies past NX award cards from PPC's who were not in VP-41 and VP-42 and who did not fly the two week reconnaissance missions prior to the Kiska Harbor bombing missions. Only those award cards of PPC's who were awarded the DFC from his squadron are used by the Navy to show that others received this award for similar actions as my fathers. The Navy does not realize that my father's actions went above and beyond those of his peers and that only he was recommended for the NX in his squadron. The Navy also does not recognize that the wording used in the awards submission requests is **exactly** the same for all awards submitted (Air Medal, DFC. NX) for VP-41 and VP-42. They *assumed* that the PPC's who were awarded the DFC in my fathers squadron did, in fact bomb Kiska Harbor which is untrue. Because a blanket award citation verbiage was used in the decorations request for the both squadrons, it gives the impression that others who were awarded the DFC bombed Kiska Harbor which is *incorrect*.

Because of these errors in the Navy Cross review process by the CNO and the Secretary of the Navy, a fair review was not done and still has not been done. I am requesting that the Secretary of the Navy convene a new review board that will evaluate all the actions in a fair and in-depth way. I also request that a complete accounting of how the board accomplished it review process be made available to me.

The Navy Cross recommendation review request is 64 years after the fact. It is quite apparent that all parties involved in the review of this request have no idea of the true actions that my father did to be recommended for this award. The Secretary of the Navy cannot and will not provide any documentation or justification of why they will not upgrade his DFC to the NX. What they do say in explaining why no upgrade is warranted is contradictory, evasive, or indefensible. How can an agency of this size and stature lack responsibility and accountability for its decision or actions to the citizens of the United States?

Thank you,


Robert W. Bergstrom

Vancouver, WA 98685
360-████
████ @comcast.net



**DEPARTMENT OF THE NAVY**
NAVY PERSONNEL COMMAND
5720 INTEGRITY DRIVE
MILLINGTON TN 38055-0000

5730
Ser 00LL
09U001723C
April 23, 2009

The Honorable John McCain
United States Senator
Attn: Alexis Lane
5353 N. 16th Street, Suite 105
Phoenix, AZ 85016

Dear Senator McCain:

Thank you for your letter of February 11, 2009, on behalf of Mr. Robert Bergstrom, son of Captain Edward W. Bergstrom, United States Navy, Retired, Deceased, concerning his father's medals, specifically the Navy Cross.

Your continued desire to assist Mr. Bergstrom is appreciated. Captain Bergstrom's service personnel record was reviewed and substantiated that he was recommended for the Navy Cross on July 19, 1942. However, the Chief of Naval Operations Awards Board held on December 19, 1946, failed to authorize the awarding of the Navy Cross to Captain Bergstrom. It should be noted that during the review process an award can be approved, approved at a lower award, or disapproved. Contact with the aforementioned Awards Board indicates that Captain Bergstrom was awarded the Distinguished Flying Cross instead. In 2003 a request was made for reconsideration of the Navy Cross, but was denied.

Time limits associated with the Navy Cross are three years for submission and five years for awarding. However, even though the normal time limits have long passed, in accordance with 10 U.S.C. Section 1130, it may be possible to request reconsideration for this award for Captain Bergstrom if it is requested and forwarded through your office and specifically contains new and relevant material evidence which has never been considered. The complete requirements for submitting an award recommendation are contained in the recently updated Navy and Marine Corps Awards Manual, available online at http://doni.daps.dla.mil/default.aspx by pointing to Instructions and clicking on New Instructions, and then on 1650.1H. In addition, I have enclosed some general information regarding Section 1130 submission procedures that provides a summary of the requirements. This information is appropriate for forwarding to Mr. Bergstrom or any individuals assisting in preparing the award recommendation package. Once the package is completed, it should be submitted to:

>Chief of Naval Operations
>DNS 35
>2000 Navy Pentagon
>Washington, DC 20350-2000

Our records denote that on November 5, 2008, Mr. Bergstrom received a set of his father's medals. As replacement medals can only be issued on a one-time basis, additional medals can not be provided. To be of assistance, the following is a list of Navy awards that Captain Bergstrom was entitled to:

>Distinguished Flying Cross
>Bronze Star Medal
>Air Medal (w/2 gold stars)
>World War II Victory Medal
>American Defense Service Medal (w/Fleet Clasp)

American Campaign Medal
Asiatic Pacific Campaign Medal (w/1 bronze star)
European-African-Middle Eastern Campaign
Navy Occupation Service Medal (w/Asia Clasp)
Korean Service Medal (w/2 bronze stars)
United Nations Service Medal
Presidential Unit Citation Ribbon
Navy Unit Commendation Ribbon
Republic of Korea War Service Medal
Discharge Button
Honorable Service Lapel Pin (Ruptured Duck)
Naval Aviator Insignia

Additionally, Captain Bergstrom was not entitled to the Vietnam Service Medal as he was not assigned to VR7 during the period the unit was awarded the Vietnam Service Medal.

Captain Bergstrom was also entitled to the United States Coast Guard Meritorious Unit Commendation Ribbon, Air Force Commendation Medal, Army Distinguished Unit Badge with Oak Leaf Cluster, which are not stocked and issued by the U.S. Navy. Captain Bergstrom was entitled to the Republic of Korea Presidential Unit Citation, which is a foreign award and is not stocked by the Navy. All these awards may be obtained from civilian dealers of military supplies.

The Philippine Defense Ribbon with one bronze star and Philippine Presidential Unit Citation Badge which Captain Bergstrom earned are foreign awards and not stocked by the Navy. The Defense and Armed Forces Affairs Office (DAFAO) of the Philippine Embassy in Washington, DC is the point of contact to obtain these awards. The Philippine Liberation Medal will be issued free to veterans; however, $7.00 will be charged for each of the other medals to defray administrative and shipping costs. A copy of the discharge document or other discharge records detailing service in the Philippines should be included with the request and mailed to:

Defense and Armed Forces Affairs Office
Embassy of the Philippines
(Veterans Affairs Section)
1600 Massachusetts Avenue, North West
Washington, DC 20036
(202) 467-9427

Enclosed is a Correction to NAVPERS 553, Certificate of Release or Discharge from Active Duty, DD Form 215, which has been issued to reflect all of Captain Bergstrom's awards. This form should be attached to his original discharge document.

Thank you for your interest in this matter. As always, please do not hesitate to contact my office if I can be of further assistance in this or any other matter.

Sincerely

E. A. Wright

E. A. WRIGHT
Congressional Affairs
By direction of the Commander

Encl:
(1) Section 1130 recommendation
(2) DD Form 215 (2)

CAR000093

JOHN McCAIN
ARIZONA

COMMITTEE ON ARMED SERVICES
COMMITTEE ON
ENERGY AND NATURAL RESOURCES
COMMITTEE ON HEALTH,
EDUCATION, LABOR, AND PENSIONS
COMMITTEE ON HOMELAND SECURITY
AND GOVERNMENTAL AFFAIRS
COMMITTEE ON INDIAN AFFAIRS

# United States Senate

241 RUSSELL SENATE OFFICE BUILDING
WASHINGTON, DC 20510–0303
(202) 224–2235

5353 NORTH 16TH STREET
SUITE 105
PHOENIX, AZ 85016
(602) 952–2410

4703 SOUTH LAKESHORE DRIVE
SUITE 1
TEMPE, AZ 85282
(480) 897–6289

407 WEST CONGRESS STREET
SUITE 103
TUCSON, AZ 85701
(520) 670–6334

TELEPHONE FOR HEARING IMPAIRED
(602) 952–0170

May 4, 2009

Mr. Robert Bergstrom
███████████
Vancouver, WA 98685

Dear Mr. Bergstrom:

In response to my latest inquiry on your behalf, enclosed you will find the letter that I have received from the Department of the Navy.

After reading the letter over, I think that you will find it to be self-explanatory. Should you have any further questions regarding this situation, please do not hesitate to contact my office.

Thank you for giving me the opportunity to be of assistance to you.

Sincerely,

John McCain
United States Senator

JM/xae

CAR000094

# Comparison of Japanese Submarine

| Wednesday, June 10, 1942 | Thursday, June 11, 1942 | Friday, June 12, 1942 |
| --- | --- | --- |
| | Japanese submarine I-17, heading towards Unimak Island on the surface, is spotted by a PBY-5 "Catalina" from VP-43, piloted by Pilot Machinist Leland L. Davis. Davis commences a bombing run just when the submarine is diving and drops two depth charges immediately ahead of the wake left by I-17. He observes a large oil slick spreading from each side of the submarine's hull and claims it as sunk. (51-00N, 177-10W). In reality, I-17 is buffeted by explosions, but the damage is minor. The oil leak is repaired by the following morning. http://www.combinedfleet.com/I-17.htm | |

CAR000095

# Actions for Aleutian Island Campaign June 10 - June 20, 1942

| Saturday, June 13, 1942 | Sunday, June 14, 1942 | Monday, June 15, 1942 | Tuesday, June 16, 1942 |
|---|---|---|---|
| | | Japanese submarine I-9's floatplane reconnoiters Kodiak Naval Air Station. On that same day, I-9 attacks two merchants in the same area, but misses both times. | |

http://www.combinedfleet.com/I-9.htm

| Wednesday, June 17, 1942 | Thursday, June 18, 1942 | Friday, June 19, 1942 |
| --- | --- | --- |
| VP-42 -LT Edward Bergstrom depth bombed submarine which was hunting troopship USS US Grant (about 10 miles from ship at 54-32N, 162-30W).  Prevented attack on this troopship.* | | Japanese submarine I-9 shells and damages the 4,636-ton American troop transport GENERAL W. C. GORGAS (former Hamburg-America Lines PRINZ SIGISMUND) at 56-17N, 146-46W. |

USS US Grant Deck Log

VP-42 War Diary June 17, 1942
http://www.combinedfleet.com/I-9.htm
*May have been I-9, I-17 or I-19. These three were active in this area.

http://www.combined fleet.com/I-9.htm

# SENSUIKAN!



(Type A1 Submarine)

# IJN Submarine I-9:
# Tabular Record of Movement

© 2001-2016 Bob Hackett & Sander Kingsepp
Revision 5

---

**25 January 1938:**
Laid down at Kure Navy Yard.

**20 May 1939:**
Launched.

**26 July 1940:**
Cdr (later Captain) Nanri Katsuji (49)(former CO of I-59) is appointed Chief Equipping Officer (CEO).

**25 November 1940:**
Cdr (Rear Admiral, posthumously) Kato Ryonosuke (48) (former CO of I-1) is appointed Chief Equipping Officer of I-9 "on paper".

**20 December 1940:**
Cdr (later Captain) Oyama Toyojiro (49)(former CO of I-15) is appointed Chief Equipping Officer.

**13 February 1941:**
Completed and attached to Yokosuka Naval District. Cdr Oyama Toyojiro is the CO.

**28 February-3 March 1941:**
In Cdr Oyama's absence, LtCdr (Cdr, posthumously) Ueno Toshitake (56)(current torpedo officer of I-9) is appointed the CO of I-9 "on paper".

**31 July 1941:**
Cdr (promoted Captain 1 May 1943; Rear Admiral, posthumously) Fujii Akiyoshi (49)(former CO of I-2) is appointed CO.

**November 1941:**
I-9 is assigned to Vice Admiral Shimizu Mitsumi's Advance Expeditionary Force (Sixth Fleet) as flagship of Rear Admiral Sato Tsutomu's SubRon 1's I-15 through I-26.

Case 2:21-cv-00055-MJP   Document 39-1   Filed 01/18/22   Page 99 of 128

**21 November 1941:**
Departs Yokosuka with ComSubRon 1 RAdm Sato Tsutomu aboard in company of I-15, I-17 and I-25, carrying a Watanabe E9W1 "Slim" floatplane.

**2 December 1941:**
The coded signal "Niitakayama nobore (Climb Mt. Niitaka) 1208" is received from the Combined Fleet. It signifies that hostilities will commence on 8 December (Japan time). Mt. Niitaka, located in Formosa (now Taiwan), is then the highest point in the Japanese Empire.

**7 December 1941: Operation "Z" - The Attack on Pearl Harbor:**
Off Hawaii. I-9, with Rear Admiral Sato embarked, patrols north of Oahu during the attack on Pearl Harbor. Its mission is to reconnoiter and attack any ships that try to sortie from Pearl Harbor.

**9 December 1941:**
I-6 reports sighting a LEXINGTON-class aircraft carrier and two cruisers off Oahu heading ENE. Vice Admiral Shimizu in KATORI at Kwajalein orders all of SubRon 1's boats, except the Special Attack Force, to pursue and sink the carrier. I-9 surfaces and sets off at flank speed after the carrier.

**11 December 1941:**
700 miles NE of Oahu. At 1340, I-9 battle-surfaces on the unarmed Matson Lines' steamer LAHAINA (ex-WEST CARMONA, ex-GOLDEN STATE) returning to Hawaii after the outbreak of war with 745 tons of molasses and 300 tons of scrap iron. After surfacing off LAHAINA's starboard quarter, the submarine first fires a warning shot. The crew abandons ship after transmitting an S.O.S. signal. Cdr Fujii fires no less than 25 shells for 12 hits (8 starboard, 4 port), setting the superstructure afire.

**12 December 1941:**
In the following morning, the crew attempts to reboard the ship, but the fires and flooding are out of control. LAHAINA explodes, capsizes to port and sinks around 1230 at 27-42N, 147-38W. Two LAHAINA sailors die of exposure, two commit suicide. Thirty survivors reach Kahului, Maui, on 21 December. [1]

**13 December 1941:**
The Imperial General Headquarters orders the IJN submarines to shell the US West Coast. VAdm Shimizu issues a detailed order on the targets. I-15, I-9, I-10, I-17, I-19, I-21, I-23, I-25 and I-26 are each to fire 30 shells on the night of 25 December. Rear Admiral Sato, aboard I-9, is charged to execute the order.

**19 December 1941:**
Arrives off Cape Blanco, Oregon.

**22 December 1941:**
Departs her patrol sector for Guadalupe Island area.

**27 December 1941:**
Most of the I-boats off the coast have depleted their fuel reserves. Vice Admiral Shimizu cancels the shelling.

**1 January 1942:**
Arrives at Kwajalein.

**January 1942: Operation "K-1" - Flying Boat Attack on Pearl Harbor:**
The Naval General Staff develops a plan to raid Pearl Harbor using two large Type 2 four-engined Kawanishi H8K1 _Emily_ flying boat bombers. The objective of the attack is to disrupt ship repair activities. The plan calls for the planes to depart Wotje in the Marshalls and fly to French Frigate Shoals in the Hawaiian Islands (500 miles WNW of Pearl Harbor) where they are to be refueled by I-class submarines.

**1 February 1942:**
Kwajalein is attacked by planes from USS ENTERPRISE (CV-6). Two hours later, Headquarters Sixth Fleet orders I-9 and the other boats of SubRon 1 to put to sea and intercept the enemy carriers. After their return, I-9 departs that same day, carrying a E9W1 floatplane on her second war patrol.

**5 February 1942:**
At Kwajalein. Five submarines are selected to participate in Operation K-1. I-9 is assigned to take up station midway between Wotje and the Shoals and act as a radio beacon for the two H8K1 Emily flying boats. I-19, I-15 and I-26 are to refuel the flying boats at the Shoals. I-23 is to standby south of Hawaii, provide weather reports and act in an air-sea rescue capacity. The submarines depart for their stations.

**7 February 1942:**
Arrives to the area 200 miles S of Hawaii.

**23 February 1942:**
The E9W1 floatplane from I-9 conducts a nightly recce flight over Pearl Harbor. Due to limited visibility the pilot and observer cannot identify any ships in the harbor. During recovery after return, both wings of the plane are damaged.

**28 February 1942:**
Departs her patrol sector to participate in Operation K-1.

CAR000099

**1 March 1942: The Second Air Attack on Pearl Harbor:**
I-9 is on station and participates in Operation K-1.

**4 March 1942:**
After dark, the Emilys arrive at French Frigate Shoals, refuel and take off again for Pearl Harbor.

**5 March 1942:**
Seven hours after departing French Frigate Shoals, the flying boats drop eight 550-lb. bombs on Honolulu through an overcast. They achieve no significant results and return to the Marshall Islands.

**13 March 1942:**
I-9 acts as radio-beacon-cum-communications relay platform at Point M (19-00N, 174-20W).

**16 March 1942:**
Vice Admiral, the Marquis, Komatsu Teruhisa (former CO of CA NACHI) assumes command of the Sixth Fleet (Submarines).

**21 March 1942:**
Returns to Yokosuka.

**15 May 1942:**
Departs Yokosuka for Aleutians on her third war patrol, carrying an E14Y1 Type 0 Glen floatplane.

**17 May 1942:**
Arrrives at Ominato.

**19 May 1942:**
Departs Ominato to support the invasion of the Western Aleutians.

**20 May 1942:**
Reassigned to Northern District Force.

**21 May 1942:**
Rear Admiral (later Vice Admiral) Yamazaki Shigeaki's (former CO of old CA YAKUMO) SubRon 1's I-19, I-9, I-15, I-17, I-25 and I-26 is tasked to carry out preliminary invasion reconnaissance of the Aleutian Islands. I-9 departs Yokosuka for Kiska.

**24 May 1942:**
At dawn, I-9's E14Y1 floatplane reconnoiters Kiska and Amchitka, Aleutians. The pilot reports that Reynard Cove on Kiska is best suited for a future landing. No troops or barracks are sighted ashore. He also reports that contrary to the earlier reports there is no airfield on Amchitka.

**26 May 1942:**
Around 0500 (local), I-9's floatplane reconnoiters Adak and Kanaga. The pilot counts eight bivouacs and other similar buildings on Adak.

**29 May 1942:**
Provides distant cover for Rear Admiral Kakuta Kakuji's CarDiv 4.

**5 June 1942: Operation "AL"- The Invasion of the Western Aleutians:**
Twenty ships of the Vice Admiral Hosogaya Boshiro's (former CO of MUTSU) Fifth Fleet, including light cruisers KISO and TAMA, three destroyers, three corvettes, three minesweepers and four transports land Rear Admiral (later Vice Admiral) Omori Sentaro's (former CO of ISE) Occupation Force on Attu, Aleutians without opposition.

**6 June 1942:**
Joins a patrol line off Aleutians.

**7 June 1942:**
Captain (later Rear Admiral) Ono Takeji's Occupation Force occupies Kiska, also without opposition.

**8 June 1942:**
The patrol line is shifted to Kodiak area.

**15 June 1942:**
I-9's floatplane reconnoiters Kodiak Naval Air Station. On that same day, I-9 attacks two merchants in the same area, but misses both times.

**19 June 1942:**
I-9 shells and damages the 4,636-ton American troop transport GENERAL W. C. GORGAS (former Hamburg-America Lines PRINZ SIGISMUND) at 56-17N, 146-46W.

**30 June 1942:**
Reassigned to Advance Force. Departs her patrol sector for Yokosuka.

CAR000100

Imperial Submarines

**7 July 1942:**
I-9 arrives at Yokosuka.

**7 August 1942: American Operation "Watchtower" - The Invasion of Guadalcanal, British Solomon Islands:**
Rear Admiral (later Admiral) Richmond K. Turner's Amphibious Task Force 62, covered by Vice Admiral (later Admiral) Frank J. Fletcher's Task Force 61 and Rear Admiral (later Admiral) John S. McCain's Task Force 63's land-based aircraft, lands Maj Gen (later Gen/Commandant) Alexander A. Vandegrift's 1st Marine Division on Guadalcanal, opening a seven-month campaign to take the island.

**15 August 1942:**
Departs Yokosuka in company of I-15, I-17, I-19 and I-26 with ComSubRon 1 Rear Admiral Yamazaki Shigeaki aboard on her fourth war patrol.

**23 August 1942:**
I-9 joins the patrol line A off San Cristobal..

**24 August 1942: The Battle of the Eastern Solomons:**
Vice Admiral (later Admiral) Frank J. Fletcher's Task Force 61's USS SARATOGA (CV-3) and ENTERPRISE (CV-6) launches aircraft that find and sink the light carrier RYUJO. In turn, CarDiv 1's SHOKAKU and ZUIKAKU launch aircraft that find and damage ENTERPRISE. That evening, aircraft from SARATOGA damage seaplane carrier CHITOSE.

**25 August 1942:**
At 1143, LtCdr Frederick Bell's USS GRAYSON (DD-435), temporarily screening Fletcher's TF 11, spots a "carrier's superstructure" 12 miles WSW. The destroyer is detached to investigate the contact, two minutes later identified as a diving submarine.

At 1223, GRAYSON commences a depth-charge attack, but I-9 foils her approach, turning inside the destroyer's turning circle. After the contact is reestablished, GRAYSON makes another attack, but again I-9 escapes with a hard turn at full speed at the depth of 200 feet.

LtCdr Bell, joined by a Douglas SBD "Dauntless" dive-bomber from USS WASP, conducts a dummy attack to wear the submarine down. After 1329, GRAYSON drops the third pattern of depth charges. I-9 heads due west at 4 knots and the contact is lost until 1347. Meanwhile PATTERSON (DD-392) joins the hunt.

At 1351, GRAYSON commences the fourth attack, but I-9 turns to WSW, making 7 knots. With the fifth attack the destroyer expends her entire supply of depth charges, slowing the submarine down to 4 knots. Buffeted by close explosions, I-9 drops to 440 feet; all lights go out and a small leak appears in one of the forward fuel tanks. Aft bilge pump is disabled.

At 1418, PATTERSON commences her first run, but fails to detect the target in the turbulence created by GRAYSON's depth charges. 1438, USS MONSSEN (DD-436) joins the hunt.

At 1440, PATTERSON establishes sonar contact with the submarine; a few minutes later her lookouts report the submarine is surfacing. The "Dauntless" marks its location with a smoke float. PATTERSON and MONSSEN make one attack each. After a huge air bubble and oil slick appear, the destroyers depart the area, claiming their target as sunk.

I-9 surfaces two hours after the last attack. An inspection reveals some additional damage: two periscopes are rendered inoperable and one radio transmitter temporarily knocked out. Rear Admiral Yamazaki reports the damage to Truk and is ordered to return to base.

**30 August 1942:**
Arrives at Truk. Undergoes repairs by URAKAMI MARU.

**8 September 1942:**
Departs Truk for an area SE of Guadalcanal on her fifth war patrol with ComSubRon 1 embarked.

**15 September 1942:**
Cdr Fujii sights several transports. On that same day, I-9 is reassigned to 2nd Patrol Unit.

**23 September 1942:**
200 miles SE of Guadalcanal. I-9 briefly chases a transport escorted by one destroyer.

**1 October 1942:**
Departs her patrol sector for Truk.

**6 October 1942:**
Arrives at Truk.

**13 October 1942:**
The staff of ComSubRon 1 is transferred ashore.

**16 October 1942:**
Departs Truk on her sixth war patrol SE of the Solomons, carrying an E14Y1 floatplane. Reassigned to the "B" Patrol Unit.

**31 October 1942:**
Reassigned to B Patrol Unit. Ordered to reconnoiter Nouméa, New Caledonia.

CAR000101

**4 November 1942:**
I-9's floatplane reconnoiters Nouméa airfield and harbor, sighting one aircraft carrier, three cruisers and several smaller vessels.

**7 November 1942:**
I-9 is detached from B Patrol Unit to conduct aerial reconnaissance of Espiritu Santo instead of I-7.

**11 November 1942:**
I-9 is ordered to proceed to Shortland.

**12 November 1942:**
I-9's floatplane reconnoiters Espiritu Santo, but as a result of dense cloud cover no ships can be observed.

**16 November 1942:**
Truk. Vice Admiral Komatsu convenes a meeting of his submarine captains. He announces that the Sixth Fleet has been ordered by Admiral Yamamoto, CINC, Combined Fleet to organize a supply system for the IJA's 17th Army garrison on Guadalcanal.

**19 November 1942:**
Arrives at Shortland, embarks cargo.

**24 November 1942:**
Departs Shortland on her first supply run to Kamimbo Bay, NW Guadalcanal, carrying 32 tons of food and ammunition.

**26 November 1942:**
Arrives at Kamimbo, unloads her cargo, then departs for Truk.

**1 December 1942:**
Arrives at Truk.

**Late December 1942:**
Departs Truk for Shortland.

**2 January 1943:**
Arrives at Shortland.

**4 January 1943:**
Departs Shortland on her second supply run to Guadalcanal, carrying 21 tons of food in rubber containers.

**6 January 1943:**
Arrives at Kamimbo, unloads her cargo, then departs for Shortland.

**8 January 1943:**
Returns to Shortland.

**10 January 1943:**
Departs Shortland on her third supply run to Guadalcanal.

**12 January 1943:**
Arrives off Kamimbo, but fails to deliver her cargo, since the anchorage is patrolled by torpedo boats.

**14 January 1943:**
Returns to Shortland.

**16 January 1943:**
Departs Shortland on her fourth supply run to Guadalcanal.

**18 January 1943:**
Arrives off Kamimbo, but cannot release her supply drums underwater.

**20 January 1943:**
Returns to Shortland.

**22 January 1943:**
Departs Shortland on her fifth supply run to Guadalcanal, carrying 18 tons of cargo in 120 supply drums.

**25 January 1943:**
Arrives off Kamimbo, releases 80 supply drums with 12 tons of cargo, but is then driven away by torpedo boats.

**27 January 1943:**
Returns to Shortland.

**28 January 1943:**
Departs Shortland on her sixth supply run to Guadalcanal.

CAR000102

**30 January 1943:**
Arrives off Kamimbo, releases all supply drums, but all are detected and destroyed by arriving torpedo boats.

**31 January 1943: Operation "KE" - The Evacuation of Guadalcanal:**
A task force of units of the Second and Third Fleets from Truk including carriers ZUIKAKU, ZUIHO and JUNYO, Bat Div 3's KONGO and HARUNA, CruDiv 4's ATAGO and TAKAO, CruDiv 5's HAGURO and MYOKO, DesRon 4's light cruiser NAGARA, DesRon 10's light cruiser AGANO and destroyers, steams north of the Solomons as a feint to cover Rear Admiral (later Vice Admiral) Hashimoto Shintaro's (former CO of HYUGA) destroyer force from Rabaul.

**1 February 1943:**
Returns to Shortland, departs for Truk on that same day.

**4 February 1943:**
Arrives at Truk.

**5 February 1943:**
Departs Truk for Yokosuka.

**9 February 1943:**
The Japanese successfully complete the evacuation of 11,700 troops from Guadalcanal.

**12 February 1943:**
Arrives at Yokosuka.

**20 February 1943:**
Transferred from Yokosuka to Kawasaki's Kobe Yard for repairs. [2]

**1 May 1943:**
Cdr Fujii is promoted Captain.

**11 May 1943: American Operation "Landcrab"- The Invasion of Attu, Aleutians:**
Rear Admiral (later Admiral) Thomas C. Kinkaid's Task Force 16, covered by Rear Admiral Francis W. Rockwell's Task Force 51, lands the Army's 7 th Division that captures Attu.

**12 May 1943:**
Reassigned to Northern District Force.

**13 May 1943:**
Returns to Kure.

**14 May 1943:**
Departs Kure for Yokosuka, arriving on 16th.

**21 May 1943: Operation "KE-Go" - The Evacuation of Kiska:**
The Imperial General Headquarters decides to evacuate the garrison at Kiska Island, Aleutians.

**23 May 1943:**
Departs Yokosuka for Paramushiro Island in the Kuriles.

**27 May 1943:**
Arrives at Paramushiro.

**29 May 1943:**
Departs Paramushiro on her first supply run to Kiska, carrying 17 tons of ammunition and 2 tons of food.

**1 June 1943:**
Bering Sea, off Agattu. I-9 is chased by an unidentified destroyer for three hours.

**2 June 1943:**
Arrives at Kiska, unloads her cargo and departs on that same day, carrying 79 passengers (55 sailors, 10 soldiers and 10 gunzoku construction workers).

**8 June 1943:**
Returns to Paramushiro.

**10 June 1943:**
Departs Paramushiro for Kiska on her second supply run to that location to evacuate the personnel of the local midget base. No messages are received from I-9 thereafter.

**13 June 1943:**
Kiska, 15 miles E of Sirius Point. At 1758 LtCdr (later RAdm) Elliot M. Brown's USS FRAZIER (DD-607) detects a target with her radar

6,900 yards away. FRAZIER closes the range in dense fog at 20 knots and soon establishes sonar contact with a submarine. At 2009 a lookout sights two periscopes at 100 yds.

FRAZIER opens fire on the submarine, scoring a hit on one periscope. The destroyer attacks I-9 with depth charges. Air bubbles, oil and debris rise to the surface, but FRAZIER makes two more attacks to ensure that the submarine is sunk. I-9 is lost with all hands at 52-08N, 177-38E. [3]

**15 June 1943:**
Presumed lost lost with all 101 hands off Kiska.

**1 August 1943:**
Removed from the Navy List.

---

**Authors' Note:**
[1] One source claims that on 9 December LAHAINA had been detected by a floatplane, probably an E14Y1 Type 0 launched from I-9. This is incorrect: no aircraft were launched from submarines on that day, nor were any E14Y1s embarked by that time.

[2] On 11 April 1943, USS TUNNY (SS-282) attacked a Japanese submarine it identified as I-9 off Truk. Since I-9 was nowhere near Truk at that time, this could only have been a mistake. In all likelihood, TUNNY 's adversary was I-16.

[3] USS FRAZIER's victim was first identified as I-31 in Morison's "History of United States Naval Operations in World War II," but this is incorrect: I-31 had already been lost a month before off Attu.

Thanks go to Dr. Higuchi Tatsuhiro of Japan.

– Bob Hackett & Sander Kingsepp

**Back to Submarine Page**

WIKIPEDIA

# Japanese submarine *I-9*

The **Japanese submarine *I-9*** was a Type A1 submarine built for the Imperial Japanese Navy (IJN) during the 1930s.

## Contents

Design and description
Construction and career
Notes
References

## Design and description

The submarines of the A1 type were versions of the preceding J3 class with superior range, improved aircraft installation, and were fitted as squadron flagships.[1] They displaced 2,966 tonnes (2,919 long tons) surfaced and 4,195 tonnes (4,129 long tons) submerged. The submarines were 113.7 meters (373 ft 0 in) long, had a beam of 9.5 meters (31 ft 2 in) and a draft of 5.3 meters (17 ft 5 in). They had a diving depth of 100 meters (330 ft).[1]

For surface running, the boats were powered by two 6,200-brake-horsepower (4,623 kW) diesel engines, each driving one propeller shaft. When submerged each propeller was driven by a 1,200-horsepower (895 kW) electric motor. They could reach 19 knots (35 km/h; 22 mph) on the surface[2] and 8.25 knots (15.28 km/h; 9.49 mph) underwater. On the surface, the A1s had a range of 16,000 nautical miles (30,000 km; 18,000 mi) at 16 knots (30 km/h; 18 mph); submerged, they had a range of 90 nmi (170 km; 100 mi) at 3 knots (5.6 km/h; 3.5 mph).[3]

The boats were armed with four internal bow 53.3 cm (21.0 in) torpedo tubes and carried a total of 18 torpedoes. They were also armed with a single 140 mm (5.5 in)/40 deck gun and two twin 25 mm (1 in) Type 96 anti-aircraft guns.[3]

Unlike the J3 class, the aircraft hangar is integrated into the conning tower and faces forward; the positions of the deck gun and the catapult were exchanged so the aircraft can use the forward motion of the ship to supplement the speed imparted by the catapult.[3]

## Construction and career

| History | |
|---|---|
| **Empire of Japan** | |
| Name: | *I-9* |
| Builder: | Kure Naval Arsenal |
| Laid down: | 25 January 1938 |
| Launched: | 20 May 1939 |
| Commissioned: | 13 February 1941 |
| Struck: | 1 August 1943 |
| Fate: | Sunk, 13 June 1943 |

| General characteristics | |
|---|---|
| Class and type: | Type A1 submarine |
| Displacement: | 2,966 tonnes (2,919 long tons) surfaced<br>4,195 tonnes (4,129 long tons) submerged |
| Length: | 113.7 m (373 ft 0 in) overall |
| Beam: | 9.5 m (31 ft 2 in) |
| Draft: | 5.3 m (17 ft 5 in) |
| Installed power: | 12,400 bhp (9,200 kW) (diesel)<br>2,400 hp (1,800 kW) (electric motor) |
| Propulsion: | Diesel-electric<br>1 × diesel engine<br>1 × electric motor |
| Speed: | 23.5 knots |

CAR000105

On 11 December 1941, *I-9* sank SS *Lahaina* 700 miles northeast of Oahu. On 19 June 1942, the boat damaged US Army Transport *General W. C. Gorgas* with gunfire. On 25 August, she was depth charged and damaged by the destroyers USS *Grayson* (DD-435), USS *Monssen* (DD-436), and USS *Patterson* (DD-392). She made supply runs to Guadalcanal from November 1942 to January, 1943. She was sunk off Kiska(58°08′N 177°38′E) on 13 June 1943 by the destroyer USS *Frazier* (DD-607).[4][5][6]

## Notes

1. Bagnasco, p. 188
2. Chesneau, p. 200
3. Carpenter & Dorr, p. 101
4. Boyd & Yoshida, p. 211
5. Stille, p. 19. There is some confusion over the date, however; *DANFS* lists it only a possible, and on 11 June. Japanese records were so chaotic, JANAC could not be certain.
6. Hackett & Kingsepp

## References

- Bagnasco, Erminio (1977). *Submarines of World War Two*. Annapolis, Maryland: Naval Institute Press. ISBN 0-87021-962-6.
- Boyd, Carl & Yoshida, Akikiko (2002). *The Japanese Submarine Force and World War II*. Annapolis, Maryland: Naval Institute Press. ISBN 1-55750-015-0.
- Carpenter, Dorr B. & Polmar, Norman (1986). *Submarines of the Imperial Japanese Navy 1904–1945*. London: Conway Maritime Press. ISBN 0-85177-396-6.
- Chesneau, Roger, ed. (1980). *Conway's All the World's Fighting Ships 1922–1946*. Greenwich, UK: Conway Maritime Press. ISBN 0-85177-146-7.
- Hackett, Bob; Kingsepp, Sander (2012). "IJN Submarine I-9: Tabular Record of Movement" (http://www.combinedfleet.com/I-9.htm). *SENSUIKAN! Stories and Battle Histories of the IJN's Submarines*. Combinedfleet.com. Retrieved 18 August 2015.
- Hashimoto, Mochitsura (1954). *Sunk: The Story of the Japanese Submarine Fleet 1942 – 1945*. Colegrave, E.H.M. (translator). London: Cassell and Company. ASIN B000QSM3L0.
- Stille, Mark (2007). *Imperial Japanese Navy Submarines 1941-45*. New Vanguard. **135**. Botley, Oxford, UK: Osprey Publishing. ISBN 978-1-84603-090-1.

| | |
|---|---|
| | (43.5 km/h; 27.0 mph) surfaced |
| | 8 knots (15 km/h; 9.2 mph) submerged |
| Range: | 16,000 nmi (30,000 km; 18,000 mi) at 16 knots (30 km/h; 18 mph) surfaced |
| | 60 nmi (110 km; 69 mi) at 3 knots (5.6 km/h; 3.5 mph) submerged |
| Test depth: | 100 m (330 ft) |
| Crew: | 100 |
| Armament: | 6 × bow 533 mm (21 in) torpedo tubes |
| | 1 × 14 cm (5.5 in) deck gun |
| | 2 × twin 25 mm (1 in) Type 96 anti-aircraft guns |
| Aircraft carried: | 1 × Yokosuka E14Y seaplane |
| Aviation facilities: | 1 × catapult |

Retrieved from "https://en.wikipedia.org/w/index.php?title=Japanese_submarine_I-9&oldid=786521508"

This page was last edited on 20 June 2017, at 00:15.

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

## CHAPTER III

## Submarine Operations in the North Pacific Area
### (April – August 1942)

The objective of the Aleutian Operations was the invasion of
Attu and Kiska Islands and the destruction of military facilities
on Adak Island.  The Northern Force, under the commander of the
5th Fleet, was assigned to carry out the mission.  Because the
Aleutian Operations were closely connected with the Midway Opera-
tions, the Commander in Chief of the Combined Fleet was to exer-
cise overall command of both operations.

The plan for the Aleutian Operations as outlined by the Com-
mander in Chief of the Combined Fleet was as follows:

"Destroy the military strength stationed on the islands as
well as the defense facilities.  Dutch Harbor is to be attacked
by the Carrier Force prior to the landing of the Invasion Force
on Kiska Island.  Also prior to the invasion, the enemy on Kiska
and Adak will be destroyed from the air.

"The Invasion Force will invade Kiska Island simultaneously
with the assault on Adak Island by a small element of the Invasion
Force to prevent the enemy from using the military facilities
there.  The landing force for Adak will then invade Attu Island.
In the event of counterattacks by powerful enemy forces, they will
be destroyed by the Carrier Task Force, the Submarine Group and
other supporting units."

29

The attack on Dutch Harbor by the Carrier Task Force was to be launched on 4 June and the landing on Kiska Island was scheduled for 7 June.

The Northern Force was divided into the Main Force, the 2d Carrier Task Force, the Attu and Kiska Invasion Forces and the Submarine Group. On 10 May, the 1st Submarine Squadron (I-9, I-15, I-17, I-19, I-25, I-26 and Heian Maru) was placed under the command of the 5th Fleet and designated the Submarine Group of the Northern Force.

The mission of the Submarine Group in the Aleutian Operation, as outlined in the General Order of the Combined Fleet, was generally as follows:

a. Prior to the end of May the Submarine Force was to conduct reconnaissance of strategic areas in the Aleutians, while elements of the Group were to guard the entrance to the port of Seattle during the period of the invasion.

b. After performing the reconnaissance, the majority of the Group was to protect the advance of the Carrier Force and support the attack on Dutch Harbor.

c. In the event the Combined Fleet wages a decisive battle in the Midway area, the Groups shall return to the immediate control of the 6th Fleet.

d. The operational boundary between the submarines participating in the Aleutian Operations and the submarines participating in the Midway Operations was set as $40^\circ$ N.

30

0108
CAR000108

## Submarine Operations in the Aleutians

As soon as the 1st Submarine Squadron became a part of the Northern Force on 10 May 1942, the commander of the 1st Submarine Squadron ordered the I-25 and I-26 to advance immediately to the eastern part of the Aleutian Islands and scout the area around Kodiak Island. The two submarines sailed directly to the eastern part of the Aleutians and carried out reconnaissance over Chirikof, Sitkinak and Kodiak Islands.

Around the end of May, they left the Kodiak area and patrolled the waters off the coast of Seattle. During this period the plane from the I-25 spotted a cruiser and two destroyers in the vicinity of Kodiak. While moving from Kodiak to Seattle, the I-26 spotted two vessels which looked like large cruisers.

Meanwhile, the remainder of the submarines of the 1st Submarine Squadron left Japan around the middle of May; the I-19 for Dutch Harbor; the I-15 for Adak Island; the I-17 for Attu Island; and the I-9 for Kiska Island. After completing reconnaissance of these areas, the I-15, I-17 and I-9 cruised east along the southern side of the archipelago from a point about 300 nautical miles south of Kiska, and by 4 June, reached a point about 200 nautical miles south of Dutch Harbor. The I-19 took up a position south of Unimac Pass near Dutch Harbor. During the cruise, no enemy vessels were sighted in the area of Kiska, Attu or Adak, however, a few patrol ships were found moored in the Dutch Harbor area. Based on this

31

information, the commander of the Northern Force, at the start of the invasion operations, estimated the enemy surface strength in the Aleutian Area to be a small force including one or two cruisers.

The first air raid on Dutch Harbor was carried out by the 2d Carrier Task Force at 2400 hours on 3 June, and the second attack was carried out from 0800 to 1200 on 5th June. The invasion Force for Kiska Island succeeded in landing on the island at 2130 on 7 June. The Invasion Force for Attu was ordered to abandon its plan to first land on Adak and was instructed to land on Attu directly. At 0010 hours on the 8th of June the landing was effected.

Meanwhile, the 1st Submarine Squadron (less the I-25 and I-26) started on a sweep west from a point about 200 nautical miles south of Dutch Harbor. The I-15 and I-19 passed through Amukta Pass and moved down the northern side of the archipelago to a point north of Adak. The I-9 and I-17 swept south of the archipelago to the waters south of Adak. Although all of these submarines were prepared to engage enemy fleet units, none were sighted.

On the 10th of June 1942, the 2d Submarine Squadron was assigned to the Northern Force by order of the Combined Fleet, therefore, the Force commander ordered the 1st Submarine Squadron to patrol the eastern Aleutians while the 2d Submarine Squadron, upon arrival, would patrol the western Aleutians. Upon receipt of these orders the I-15, I-17, I-19 and the I-9 returned east to patrol the areas in the vicinity of Unmak Island, Unalaska Island, Akutan Island and Kodiak Island. The submarines reached their respective areas around

32

the middle of the month and patrolled their areas until the end of the month. The I-25 and I-26 had continued their patrol off the coast of Seattle, and around the end of June they were ordered to shift their patrol to the area south of Unimac Pass. On 8 June, the I-25 and I-26 sank a supply ship and during their patrol from 10 June, they sank one more cargo vessel and shelled the radio compass station at Estevan Point on Vancouver Island and Astoria Airfield.

## Operations of the 2d Submarine Squadron

After completing its operations in the Indian Ocean, the 2d Submarine Squadron (I-1, I-2, I-3, I-4, I-5, I-6, I-7) had returned to its home base and did not take part in operations from May to the early part of June 1942. On the 10th of June, the 2d Submarine Squadron was assigned to the Northern Force and ordered to proceed to the Aleutian waters. Upon receipt of these orders, the flagship of the squadron, the I-7, accompanied by the I-1, I-2, I-3 and I-4 left the Homeland for duty in the Aleutians. These submarines arrived in the area south of Adak around 20 June and from then until the early part of July patrolled the waters between Adak and Amchitka although it was difficult to perform a satisfactory patrol due to the fog and bad weather. The remainder of the squadron, the I-5 and I-6, which had been left in the Homeland to complete repairs, were to proceed to the Aleutians upon completion of repairs and the submarine tender Santos Maru was ordered to stand by at its base in

33

0111
CAR000111

the Homeland.

In late June, Imperial General Headquarters revised its original plan and decided to hold the bases in the Aleutians at least through the winter. The fortifications for the defense of Kiska was to be strengthened and the Northern Force was to defend the area against enemy counter invasion. The 1st Submarine Squadron, however, had reached the limit of its operations; therefore, the squadron was ordered to return to the Homeland for repairs and was subsequently to join the Submarine Force of the Combined Fleet. With the return of the 1st Submarine Squadron to Japan around the end June, the 2d Submarine Squadron was the only submarine force remaining under the command of the Northern Force, therefore, its area of operations was extended to include the entire Aleutian waters. The I-7, I-1, I-2 and I-3 were to patrol the waters south of Unimac Pass to cut off the route between Dutch Harbor and Seattle. The I-4 and I-5 was to patrol and reconnoiter Dutch Harbor from a position north of Unimac Pass, while the I-6 was to remain in the area south of Kiska in defense of the island. The submarines proceeded to their respective patrol areas and in the middle of July, the I-7 sank an enemy transport in the waters southwest of Unimac Pass.

On 20 July, the 2d Submarine Squadron less the I-6 was ordered to return to Japan by early August for transfer to the Submarine Force of the Combined Fleet. The I-6 was ordered to remain in the Aleutian area as the base submarine of the Northern Force for patrol

34

0112
CAR000112

of the waters around Kiska Island.  In the latter part of July,
one of our flying boats stationed on Kiska discovered the presence
of a flying boat tender in Nasan Bay (Atka Island).  The I-6 immedi-
ately proceeded to Nasan Bay but upon arrival there found no trace
of the tender, therefore it returned to Kiska.  In mid-August, the
I-6 was ordered to rejoin its squadron and returned to Japan in the
latter part of the month.

### Organization of the Northern Force Base Submarine Group

On 14 July 1942, the reorganization of the fleet was carried
out and, as a result, the 26th Submarine Division (RO-61, RO-62,
RO-65, RO-67) and the 33d Submarine Division (RO-63, RO-64, RO-68),
which had been operating in the South Seas area as a part of the
7th Submarine Squadron, were released from the 7th Submarine
Squadron and assigned to the 5th Fleet as an attached submarine
group.  With the 26th and 33d Submarine Divisions being placed
under his command on 14 July, the Commander in Chief of the 5th
Fleet placed the submarine divisions under the command of the
Kiska Defense Unit commander.  They were called the Base Submarine
Group and primarily engaged in the defense of Kiska.  The 26th and
33d Submarine Divisions were to operate in Aleutian waters using
Kiska as a base, and, with the exception of the RO-65 and RO-67
which had not completed repairs, the two divisions left Japan in
the latter part of July and arrived in Kiska in early August.

35

****** FOR OFFICIAL USE ONLY – PRIVACY ACT PROTECTED ******

MEMORANDUM TO FILE

Docket No. 08417-09

*08417-09*
*08417-09*

Examiner: CRS   Branch/Status 1 –USN

Subj: Ex-CAPT   Bergstrom, Edward W., █████████

Personal appearance requested: NO          Reconsideration:

Action Requested:   50

In addition to Petitioner's application (DD-149) with any attachments and any related correspondence, the Board considered the following records:

- ☒ Enlisted/Officer Service Record
- ☒ Examiner's Case Summary
- ☐ NDRB File                    ☐ Record of Court-Martial
- ☐ Medical Record               ☐ VA Records     ☐ PEB Record
- ☐ Advisory Opinion
- ☐ Other: _____

Messrs. __Lippolis, Greear, Bowen_____

Ms._____        EXECUTIVE SESSION

voted on __16 June 10__ to:              ☐ Grant relief

                                         ☐ Partial relief

☐ Grant personal appearance              ☒ Deny

☐ Minority Vote: Mr/Ms_____    voted To _____

Comments:_____

_____

_____

☐ That Petitioner's naval record be corrected to show that on 1965/07/01 /or_____,

Petitioner was issued a honorable/general discharge by reason of misconduct/or _____,
vice the discharge actually issued on that date.

BERGSTROM, E. W. CAPT USN
(Last)    (First)    (MI)    (Rate/Rank)    (Service)    (SSN/SerNr)

Address: Robert W. Bergstrom (sm)

████████████████████    (ent)

Vancouver, WA 98685

HON                                    1 Jul 65
Discharge Received    Reason    Index Code    Authority    Date

Injustice Alleged:    Requests Navy Cross


| | | |
|---|---|---|
| Deceased | ✔ Yes ___ No | |
| Reconsideration | ___ Yes ___ No | |
| Counsel | ___ Yes ✔ No | |
| Personal Appearance Requested | ___ Yes ✔ No | |
| FBI Report | ___ Yes ✔ No | |
| U/A | ___ Yes ✔ No | |
| Requested Restoration | ___ Yes ✔ No | |
| Probation Violated | ___ Yes ✔ No | |
| Psy Eval | ___ Yes ✔ No | |
| Combat Service | ✔ Yes ___ No | |
| NDRB Review | ___ Yes ✔ No | |
| Character/Docs Submitted | ✔ Yes ___ No | |
| Advisory Opinion | ✔ Yes ___ No | deny |
| Family/Hardship | ___ Yes ✔ No | |
| Alcohol/Drugs | ___ Yes ✔ No | |
| Homosexual | ___ Yes ✔ No | |
| Prior Active Duty | ___ Yes ✔ No | |

DOB _____ Age at Enl _____ Date of Enl Com 12 Jul 39   Date of Dis 1 Jul 65

Education _____ Conduct Mark _____ OTA/Prof Marks _____

Bergstrom

| Date | Type Action | Description/charges | Comments/sentence |
|------|-------------|---------------------|-------------------|
| 27 Jul 38 | | Entered AD Designated Naval Aviator | |
| 12 Jul 39 | | Commissioned | |
| 19 Jul 42 | | Recommended for the NX | |
| 5 Nov 42 | | Awarded the AM | |
| 1 Apr 43 | | AM upgraded to the DFC | |
| 19 Dec 46 | | Horne Board reviewed downgraded awards and recommended no change to the DFC | |
| 1 Jul 65 | | Retired from AD grade of Captain | Completed 26 yrs, 11 mos & 4 days AD |
| 1 Feb 03 | | Son submits request to Awards Br to upgrade the DFC to NX. This request was denied. | |
| 22 Feb 10 | | Awards Branch advisory Opinion, para 3, indicates that they gave this case a fresh review | |

Note:

1. Appears that applicant does not realize Awards Branch gave the case a fresh review based on this application to the BCNR.

## THE SECRETARY OF THE NAVY

### WASHINGTON

The President of the United States takes pleasure in presenting the DISTINGUISHED FLYING CROSS to

### LIEUTENANT EDWARD W. BERGSTROM
### UNITED STATES NAVAL RESERVE

for service as set forth in the following

CITATION:

"For heroism and extraordinary achievement while participating in aerial flight as Patrol Plane Commander during the Aleutian Islands Campaign against enemy Japanese forces from June 10 to 20, 1942. In spite of high winds, snow, rain, and fog, Lieutenant Bergstrom took part in extremely hazardous scouting missions during the enemy bombing of Dutch Harbor and Umnak and, in the face of determined Japanese air assaults and anti-aircraft fire, he participated in all-night aerial patrols and bombing attacks on enemy ships in Kiska Harbor. His expert airmanship, cool courage, and outstanding devotion to duty were in keeping with the highest traditions of the United States Naval Service."

For the President,

*Frank Knox*

Secretary of the Navy.

In the name of the President of the United States,
the Commander in Chief, United States Pacific Fleet,
takes pleasure in presenting the AIR MEDAL to

LIEUTENANT (JG) EDWARD W. BERGSTROM, U.S. NAVAL RESERVE

for service as set forth in the following

CITATION:

"For extraordinary heroism while partici-
pating in aerial flight in combat with the
enemy in the line of his profession as a
Patrol Plane Commander during the Aleutian
Islands Campaign from June 10 to June 20,
1942. He accepted extremely hazardous
scouting missions during the enemy bombing
of Dutch Harbor and Umnak and participated
in all-night aerial patrols and bombing
attacks on enemy ships in Kiska Harbor
against concentrated air and anti-aircraft
opposition. These flights were made in
spite of high winds, snow, rain, fog, and
icing and are considered outstanding, and
extraordinary. His courage and devotion to
duty are in keeping with the highest trad-
itions of the naval service".

Finished Discipline File
Fitness Reports Jacket

                                    C. W. NIMITZ,
                                    Admiral, U.S. Navy.

Temporary Citation.

Decorations-Medals - Noted

### THE SECRETARY OF THE NAVY.
#### WASHINGTON.

The President of the United States takes pleasure in presenting the NAVY CROSS to

#### LIEUTENANT WILLIAM N. THIES
#### UNITED STATES NAVAL RESERVE

for service as set forth in the following

CITATION:

"For extraordinary heroism and distinguished service as a pilot in action with enemy Japanese forces during the Aleutian Islands Campaign, June 1 to 16, 1942. Despite the hazards of severe weather conditions, Lieutenant Thies constantly sought out and engaged the enemy, inspiring other members of his squadron to supreme efforts by his example of zealous aggressiveness. Boldly defying continuous and heavy anti-aircraft fire, he participated in all-night aerial patrols and bombing attacks on enemy Japanese ships in Kiska Harbor and succeeded in scoring a hit on an enemy transport. His fine spirit of determination in accomplishing difficult and dangerous missions and his outstanding devotion to duty were in keeping with the highest traditions of the United States Naval Service."

For the President,

*Frank Knox*

Secretary of the Navy.

/www.geocities.com/CapeCanaveral/Runway/9601/usnavypby2.html

6/23/01

CAR000119

**CONFIDENTIAL**

FILE

UNITED STATES PACIFIC FLEET
**AIRCRAFT SCOUTING FORCE**
PATROL WING FOUR

**19 JUL 1942**

P15
Serial    (0266)

From:      Commander Patrol Wing FOUR.
To  :      President, Board of Awards, Pacific Fleet.
           (1) Commander Task Force EIGHT.
           (2) Commander-in-Chief, United States Pacific
               Fleet.

Subject:   Recommendations for awards to personnel for
           conduct during the Aleutian Islands Campaign.

Unclassified
*W.C. Evans*
W. A. Evans
Captain, Navy

1.        During the Aleutian Islands Campaign, Lieutenant
(junior grade) Edward W. Bergstrom, A-V(N), USNR, as a patrol
plane commander, accepted extremely dangerous weather condi-
tions consisting of high winds, snow, rain, fog and icing,
without question.  His assigned tactical missions were eagerly
carried out during enemy air raids of Dutch Harbor and Fort
Glenn in the face of enemy air opposition.  He participated in
all-night aerial patrols and bombing missions on enemy ships in
Kiska Harbor against heavy enemy air and anti-aircraft opposi-
tion.  Lieutenant Bergstrom's eagerness to accept enemy opposi-
tion during extremely dangerous weather marks his flights as
outstanding and extraordinary.  He has performed many missions
each of which, considered separately, would be worthy of an
award.  Reference is made to the following commendatory mes-
sages:  Commander-in-Chief, United States Navy despatch 081245;
Commander-in-Chief, United States Pacific Fleet despatch
072145; Commander-in-Chief, United States Pacific Fleet despatch
132105; Commander North Pacific Force, United States Pacific
Fleet despatch 051559; and Commanding General, Alaska Defense
Command despatch 110145, all of June, 1942.

2.        As a result of the above actions, it is recom-
mended that a ~~Navy Cross~~ be awarded to Lieutenant Edward W.
Bergstrom, A-V(N), USNR, Patrol Wing FOUR, with the follow-
ing,

CITATION

*awarded OFFICER ?*

For extraordinary heroism and distinguished con-
duct in the line of his profession and in the
face of the enemy.  During the enemy bombing of
Dutch Harbor and Umnak and thereafter Lieutenant
Bergstrom, as a patrol plane commander, eagerly
accepted extremely hazardous scouting missions
and participated in all-night aerial patrols and
bombing attacks on enemy ships in Kiska Harbor
against concentrated air and anti-aircraft oppo-
sition.

**FITNESS**

**REPORTS**

*L. E. Gehres*
L. E. GEHRES

0120
**CAR000120**

**Time line of processing of the Air medal award request, DFC upgrade, and the Navy Cross Recommendation letter;**

July 1942    Initial award request for the Aleutian Island campaign sent to the Chief of Naval Operations awards branch by Patrol Wing FOUR. Wing secretary inadvertently includes Lt Edward Bergstrom as being recommended for the DFC when he should have only been recommended for the NX under Serial 0266 instead.

Pacific Fleet, Board of Awards Serial 23 (sent July, 1942), Secnav dispatch 261616 of November, 1942.

July 1942    Recommendation letter to President, Board of Awards, Pacific Fleet P15 Serial 0266, dated 7/19/1942 for the Navy Cross for actions during the Aleutian Island campaign. No action taken and no record of it being seen or reviewed by the awards board. Since it was never submitted to the awards branch there is no copy of it in Lt. Edward Bergstrom's file with them.

Nov 1942    Fitness Report (performance review) for Lt Edward W. Bergstrom dated 11/20/1942 references letter P15 Serial 0266 dated 07/19/192 to President, Board of Awards, Pacific Fleet for the Navy Cross. Signed by VP-42 CO Cdr. Russell. Does not reference or mention Serial 23 award request for the DFC.

Dec 1942    Award list letter forwarded to Commander Fleet Aircraft Wing Four. Confirms award of Air Medal to Lt. Edward W. Bergstrom based on Serial 23 award request and does not reference Serial 0266.

Pacific Fleet, Board of Awards Serial 03647, dated December 13th, 1942

Jan 1943    Letter written by VP-42 CO Perkins explaining how the Wing secretary inadvertently omitted from Serial 23 that Lt. Edward W. Bergstrom was to be awarded the DFC. It was omitted due to the "enormous clerical work load at the time". This letter does not mention the Navy Cross recommendation letter Serial 0266 or its actions.

DFC upgrade letter sent to Commander Fleet Air Wing Four (January 1943?).

Mar 1943    Awards board reviewed letter from Cdr. Perkins and corrects the Wing secretaries' mistake of Serial 23 (June, 1942).

Air Medal upgraded to DFC per awards board meeting March 25th, 1943.

Dec 1946    First time Navy Cross recommendation letter P15 Serial 0266 dated July 19th, 1942 is ever reviewed or mentioned by a review board. Board determines that no upgrade to the DFC award previously made is warranted. Only reviewed what was "set forth in the basic correspondence" (only Serial 0266 one page letter

reviewed).  No one is contacted or interviewed in its review.  The board does not know that the DFC was awarded per Serial 23 and not Serial 0266.  Assumes that Serial 0266 was reviewed in the past which is untrue.  Navy Cross recommendation letter was never submitted to the CNO awards branch.  They only see Serial 0266 because a copy was in Lt. Edward Bergstrom's personnel folder.

Adm. Horne review letter Serial 3737 dated December 19th, 1946.

Jan 2003        Barbara Wilson incorrectly assumes that the Navy Cross recommendation letter Serial 0266 was reviewed correctly by the ADM Horne board in 1946 and recommends to the review board that no action be taken to upgrade the DFC to the Navy Cross.  Awards board does not approve Navy Cross upgrade.

Barbara Wilson, Director awards branch, Chief of Naval Operations reviews appeal letter sent to her February 1st, 2003.  Secretary of the Navy fails to inform me of their decision.  I waited a year until I found out their decision not to upgrade DFC to the NX,

**CONFIDENTIAL**

FILE

**UNITED STATES PACIFIC FLEET**
**AIRCRAFT SCOUTING FORCE**
**PATROL WING FOUR**

**19 JUL 1942**

P15
Serial   0266

From:                  Commander Patrol Wing FOUR.
To :                   President, Board of Awards, Pacific Fleet.
Unclassified           (1) Commander Task Force EIGHT.
*W. A. Evans*          (2) Commander-in-Chief, United States Pacific
*Captain, Navy*            Fleet.

Subject:               Recommendations for awards to personnel for
                       conduct during the Aleutian Islands Campaign.

1.          During the Aleutian Islands Campaign, Lieutenant
(junior grade) Edward W. Bergstrom, A-V(N), USNR, as a patrol
plane commander, accepted extremely dangerous weather condi-
tions consisting of high winds, snow, rain, fog and icing,
without question.  His assigned tactical missions were eagerly
carried out during enemy air raids of Dutch Harbor and Fort
Glenn in the face of enemy air opposition.  He participated in
all-night aerial patrols and bombing missions on enemy ships in
Kiska Harbor against heavy enemy air and anti-aircraft opposi-
tion.  Lieutenant Bergstrom's eagerness to accept enemy opposi-
tion during extremely dangerous weather marks his flights as
outstanding and extraordinary.  He has performed many missions
each of which, considered separately, would be worthy of an
award.  Reference is made to the following commendatory mes-
sages:  Commander-in-Chief, United States Navy despatch 081245;
Commander-in-Chief, United States Pacific Fleet despatch
072145; Commander-in-Chief, United States Pacific Fleet despatch
132105; Commander North Pacific Force, United States Pacific
Fleet despatch 051559; and Commanding General, Alaska Defense
Command despatch 110145, all of June, 1942.

2.          As a result of the above actions, it is recom-
mended that a ~~Navy~~ Cross be awarded to Lieutenant Edward W.
Bergstrom, A-V(N), USNR, Patrol Wing FOUR, with the follow-
ing,

CITATION

                       For extraordinary heroism and distinguished con-
                       duct in the line of his profession and in the
                       face of the enemy.  During the enemy bombing of
                       Dutch Harbor and Umnak and thereafter Lieutenant
                       Bergstrom, as a patrol plane commander, eagerly
                       accepted extremely hazardous scouting missions
                       and participated in all-night aerial patrols and
                       bombing attacks on enemy ships in Kiska Harbor
                       against concentrated air and anti-aircraft oppo-
                       sition.

L. E. GEHRES

**FITNESS**
**REPORTS**

CLASSIFIED     U. S. NAVAL COMMUNICATION SERVICE
COMMANDER-IN-CHIEF
U. S. PACIFIC FLEET                    INCOMING

SECRET                      132105                    PRIORITY

YOUR 122347

REF - UTMOST SECRET

DATE  15 JULY 42  CRYPTO-GROUP  182 8  CBO  L          SERIAL NO.

| ORIGINATOR | ACTION | | INFORMATION |
| KAMAKHA | CINCPAC | | |

132105

| 10 | UofS | ACS | F&O | OPERATIONS | PI Di | WAR PLANS | YOG | | FRO | FTO | FRO | ACO | FMO | Mod | Gun | Avia | Aero | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | | | | |

Chronological



**CLASSIFIED**

U. S. NAVAL COMMUNICATION SERVICE
COMMANDER-IN-CHIEF
U. S. PACIFIC FLEET

**INCOMING**

CONFIDENTIAL               Ø81245                    PRIORITY

COMINCH MOST FULLY AND HEARTILY CONCURS IN CINCPAC Ø72145

XX CARRY ON AND HOLD ON AND WE WILL CASH IN ON THE SPLENDID

WORK YOUR GALLANT FORCES HAVE DONE IN THE FACE OF THE ENEMY

DESPITE THE HELLISH WEATHER

REF: THE BATTLE OF MIDWAY HAS NOT LESSENED MY CLOSE FOLLOW-
ING OF YOUR SPLENDID EFFORTS X YOUR TIRELESS PERSISTENCE
YOUR COURAGE AND THE BULLDOG GRIP YOU HAVE KEPT ON THE
ENEMY IN SNOW RAIN AND FOG HAVE AROUSED MY ADMIRATION X

DATE   8 JUNE '42   CRYPTO-GROUP  133C     CBO   REH

| ORIGINATOR | ACTION | | | INFORMATION | |
|---|---|---|---|---|---|
| COMINCH | COMALSEC | CTF 8 | CPW 4 | CINCPAC | COMNORSEAFRON |
| Ø81245 | | | | | |

| 06 Adm | CofS 01 | ACS 02 | FSec 05 | OPERATIONS | Fil/La | WAR PLANS | FCO 79 | FRO 74 | FIO 75 | FRO 87 | ACO 80 | FMO 56 | Med 76 | Gun 90 | Avia 91 | Aero 96 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| X | X | | | X | | X | | | | | | | X | | | | | | |

Subject File

CAR000125

CLASSIFIED

NAVAL COMMUNICATION SER...
COMMANDER-IN-CHIEF
U.S. PACIFIC FLEET

INCOMING

SECRET                                    072145                            -OP-  -OP-

RESULTS SEARCH LAST NIGHT COVERED SECTORS 4 5 AND 6 TO 300 MILES
USING 2 PLANES DEPARTING OUTER LIMITS APPROXIMATELY 1400 OCT X
S V24 MADE RADAR CONTACT WITH PLANE LAT 54-55 LONG 171-40 AT 0710

GOT RANGE CLOSED FROM 15 TO 6 MILES TOOK AVOIDING ACTION AND LOST
NO SURFACE DAMAGE PICKED UP X 4 V3 ATTACKED BY PLANE LAT 54-03 LONG
169-15 AT 072130 OCT X SIGHTED PLANE VISUALLY FOR SOME PERIOD X

1 SURFACE CONTACT DELIVERED ... SUB X REPORTS CONFUSED BY
INTERFERENCE AND SUSPECTED ... BUT SINCE COMPLETELY VERIFIED X
SUSPECTING COMPROMISE OF CODE PLANE USED DECEPTIVE MESSAGE INDICAT-

ING HE WAS SEARCHING SECTOR 11 UNAUTHENTICATED X CONSIDER THESE CON-
TACTS CONFIRM PREVIOUS INFORMATION FROM CAMPBELL AND ARE VERY SIG-
NIFICANT X AVOIDING ACTION BY TURNING APPARENTLY EFFECTIVE

DATE   7 JUNE 42          CRYPTO-C...

ORIGINATOR
DUTCH HBR ALASKA
(2ERD)

072145

ACTION
COM FLIGHT 1
COM FLIGHT 1

INFORMATION

| ComS | ACS | FSec | OPERATIONS | 20 Lt | WAR PLANS | FCO | FRO | ITO | PRO | ACO | FMO | Mat | Gun | Avia | Aero |
|------|-----|------|------------|-------|-----------|-----|-----|-----|-----|-----|-----|-----|-----|------|------|
|      | 02  |      | X          |       |           |     |     |     |     |     |     |     |     | ∧    |      |

CAR000126

9-07-gca
5(2)

UNITED STATES PACIFIC FLEET
Flagship of the Commander in Chief

Serial 03647

CONFIDENTIAL

CONFIDENTIAL

December 13, 1942.

| | |
|---|---|
| From: | Commander in Chief, U. S. Pacific Fleet. |
| To: | Commander Fleet Aircraft Wing FOUR. |
| Subject: | Awards - forwarding of. |
| References: | (a) Pacific Fleet, Board of Awards Serial 23. |
| | (b) Secnav dispatch 261616 of November, 1942. |
| Enclosures: | (A) Navy Crosses and Temporary Citations for - |

(A) Navy Crosses and Temporary Citations for -
Lieutenant Commander Carroll B. Jones,
U. S. Navy.
Ensign William T. Sorenson, U. S. Naval
Reserve.

(B) Distinguished Flying Crosses and Temporary
Citations for -
Lieutenant Commander Herman L. Ray, U. S. Navy.
Lieutenant Arthur L. Jacobson, U. S. Naval
Reserve.
Lieutenant James A. Masterson, U. S. Navy.
Lieutenant (jg) Carl F. Baggee, U. S. Naval
Reserve.
Lieutenant (jg) Russell C. Gish, U. S. Naval
Reserve.
Lieutenant (jg) Rolf Hagen, U. S. Naval Reserve.
Lieutenant (jg) Richard G. Johnston, U. S.
Naval Reserve.
Lieutenant (jg) Milton R. Dahl, U. S. Naval
Reserve.
Ensign Herbert W. George, U. S. Naval Reserve.
Ensign William T. Decker, U. S. Naval Reserve.
Ensign James C. Clark, U. S. Naval Reserve.

(C) Gold Star and Temporary Citation for -
Lieutenant (jg) Jack F. Litsey, U. S. Naval
Reserve.

(D) Temporary Citation of Air Medal for -
Lieutenant Commander Douglas L. Day, Jr.,
U. S. Navy.
Lieutenant Gordon K. Ebbe, U. S. Naval Reserve.

Classification cancelled
or changed to
UNCLASSIFIED
by authority of Chief of
Naval Personnel on

7-20-54
(Date)

(Signature)    (Rank)

- 1 -

-07-gca
5(2)

UNITED STATES PACIFIC FLEET
Flagship of the Commander in Chief

rial 03647



Subject: Awards - forwarding of.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Lieutenant Willie M. Dickey, U. S. Navy.
Lieutenant Arthur L. Jacobson, U. S. Naval Reserve.
Lieutenant Carl H. Amme, U. S. Navy.
Lieutenant William R. Stevens, U. S. Navy.
Lieutenant (jg) Edward W. Bergstrom, U. S. Naval Reserve.
Lieutenant (jg) Richard G. Johnston, U. S. Naval Reserve.
Lieutenant (jg) James H. Davies, U. S. Navy.
Ensign Benjamin L. Bingham, U. S. Naval Reserve.
Ensign Herbert W. George, U. S. Naval Reserve.
Ensign Donald D. Duffy, U. S. Naval Reserve.
Ensign Jack Arnold, U. S. Naval Reserve.
Ensign Harold E. Belew, U. S. Naval Reserve.
Ensign Leonard A. Dobler, U. S. Naval Reserve.
Ensign Arne W. Havu, U. S. Naval Reserve.
Ensign Harold K. Mantius, U. S. Naval Reserve.
Ensign Sherwood L. Nelson, U. S. Naval Reserve.
Ensign Hobart H. Throckmorton, U. S. Naval Reserve.
Ensign Joseph P. Weibler, U. S. Naval Reserve.
Ensign John L. Sampson, U. S. Naval Reserve.
Ensign Andy Glosecki, U. S. Naval Reserve.
Ensign Orville A. Withee, U. S. Naval Reserve.
Ensign Stanley C. Eland, U. S. Naval Reserve.
Ensign Donald R. Coe, U. S. Naval Reserve.
Ensign Doberstein, U. S. Naval Reserve.
Ensign Samuel C. Peterson, U. S. Naval Reserve.
Ensign Cleon S. Stitzel, U. S. Naval Reserve.
Ensign Thomas R. Wheaton, U. S. Naval Reserve.
Machinist Earnest W. Williams, U. S. Navy.
DUNN, W. L., AP1c, U. S. Navy.
KASPERSON, E. H., CAP, U. S. Navy.
BOLMAN, D.R., AP1c, U. S. Navy.
BUCKLEW, O. T., AP1c, U. S. Navy.
BUERGEY, H. P., AP1c, U. S. Navy.

Classification cancelled or changed to UNCLASSIFIED by authority of Chief of Naval Operations on
7-20-54
(Date)
CB Cooper Sk
(Signature) (Rank)